Jeffrey S. Rugg, Esq., Bar No. 10978  
jrugg@bhfs.com  
BROWNSTEIN HYATT FARBER SCHRECK, LLP  
100 N. City Parkway, Suite 1600  
Las Vegas, Nevada 89106  
Telephone: (702) 382-2101  
Facsimile: (702) 382-8135  

Date Filed: May 23, 2011

Attorneys for WELLS FARGO BANK, N.A.

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In Re: | CASE NO. BK-11-17208-BAM |
|---|---|
| **DESERT OASIS APARTMENTS, LLC,** | Chapter 11 |
| Debtor. | **OPPOSITION TO EMERGENCY MOTION FOR AN ORDER AUTHORIZING THE USE OF CASH COLLATERAL ON AN INTERIM BASIS** |

CT Investment Management Co., LLC ("Special Servicer") in its capacity as Special Servicer to Wells Fargo Bank, N.A. ("Lender") submits this Opposition to Emergency Motion Authorizing the Use of Cash Collateral on an Interim Basis (the "Motion") and states as follows:

**INTRODUCTION**

Contrary to the Debtor's implied argument in the Motion, this case is not about a typical fully-leased apartment building with stable long-term tenants and a substantially oversecured creditor. The Debtor's position is significantly more tenuous and indicative of an inability to refinance and to reorganize the Debtor's estate. After years of demonstrating no ability to refinance or pay off a loan that matured in 2006, and after Lender agreed to extend or forbear many times with significant modifications to the loan and its repayment, the Debtor filed this case one day before a foreclosure sale. The Debtor owes almost $3,100,000 and now seeks the use of Lender's cash collateral for a property of indeterminate value that generates income that can fluctuate greatly based on the lease of units to short-term tenants in a battered real estate market. Moreover, the

Debtor has given no indication of its plan or any ability to successfully reorganize. Pre-petition, the Debtor was unable to refinance its debt, and there is no indication it will be able to confirm a plan within a reasonable time.[1] Accordingly, Lender does not consent to the use of its cash collateral as requested by the Debtor.

After Lender's secured loan to the Debtor matured in 2006, the parties agreed to a series of short term extension agreements, which in mid 2009 culminated in the Debtor agreeing to a sweep of all of its excess cash (after payment of taxes and expenses associated with the property) from a lockbox to pay outstanding interest and principal. This amount fluctuated due to the uncertain nature of the Debtor's cash flow, and the Debtor unilaterally ceased these payments in early 2011.

Lender will only be adequately protected if, in addition to the interest payments and replacement liens proposed by the Debtor, Lender receives the benefit of its pre-petition bargain, in particular payment of excess cash to Lender after payment of the Debtor's expenses. The Debtor's proposed segregation of these funds, which it will clearly seek to use at a later date against Lender, is insufficient as adequate protection given the Debtor's recent refusal and inability to pay into the lockbox. Moreover, the Debtor's proposed cash collateral order does not provide Lender with many of the basic protections afforded a secured lender in bankruptcy. The Motion should be denied, or the Court should permit the use of cash collateral only on terms substantially similar to those agreed to pre-petition.

**FACTS**

The Debtors' minimal recitation of the relevant facts sheds light on the fact that its proffer of adequate protection is insufficient.

**Debtor Receives a Secured Loan of $5,200,000**

1.  On July 21, 2003, Original Lender made the Loan to the Debtor in the principal amount of $5,200,000, as evidenced by a note, a properly recorded deed of trust, a properly recorded assignment of leases and rents, properly recorded financing statements, and a guaranty executed by the Debtor's managers, David B. Gaffin and B. Howard Bulloch (collectively, the

---

[1] The Debtor has not filed its schedules of assets and liabilities or its statement of financial affairs, and its list of 10 largest unsecured creditors does not list a claim of more than $7,500. Thus, it is unclear if the Debtor has any significant creditors other than Lender.

1  "Loan Documents"). (Declaration of Thomas Ruffing dated May 23, 2011 (the "Ruffing Decl.")
2  filed contemporaneously herewith, at ¶ 5).

3      2.    The original maturity date for the Loan was August 10, 2006 (the "Original Maturity
4  Date"). The Loan was secured by the apartment complex that is the subject of the Motion (the
5  "Property") and the rents generated by the Property. (*Id*.).

6      3.    In connection with a securitization, the Loan was transferred by Original Lender to
7  Wells Fargo Bank, N.A., a national banking association, as trustee for J.P. Morgan Chase Commercial
8  Mortgage Securities Corp., a Delaware corporation, as lender ("Lender"). (*Id*. at ¶ 6).

9      4.    Midland Loan Services, Inc., a Delaware corporation ("Midland"), is the Loan's
10  servicer. Pursuant to a participation agreement dated as of August 17, 2004, between Original Lender
11  and Capital Trust, Inc. ("Capital Trust"), Lender appointed Special Servicer, which has authority to
12  assert Lender's interests with respect to the Loan. (*Id*. at ¶ 7).

**The Loan Maturity Date Is Extended Multiple Times through 2010**

14      5.    On August 2, 2006, Special Servicer agreed to waive a debt coverage ratio of 2.0 to
15  1 and extend the Original Maturity Date by one year to August 10, 2007, provided that, among
16  other conditions, the Debtor paid certain fees and made a payment of $1,025,000, which funds were
17  to be applied to reduce the then currently outstanding principal amount of the Loan. (*Id*. at ¶ 8).

18      6.    On July 30, 2007, Special Servicer again agreed to waive a debt coverage ratio of
19  2.0 to 1, waive the prohibition of partial payment of the Loan, and to extend the maturity date by an
20  additional year to August 10, 2008, provided that, among other conditions, the Debtor paid certain
21  fees and made a payment of $340,000, which funds were to be applied to reduce the then currently
22  outstanding principal amount of the Loan. (*Id*. at ¶ 9).

23      7.    The Debtor notified Special Servicer of its inability to repay the Loan at its August
24  10, 2008, maturity. Accordingly, on August 11, 2008, Special Servicer agreed to a two-month
25  extension, provided that, among other conditions, the Debtor paid certain fees and made a payment
26  to Midland of $250,000, which funds were to be applied to reduce the then currently outstanding
27  principal amount of the Loan. (*Id*. at ¶ 10).

8. Debtor again notified Special Servicer of its inability to repay the Loan at its December 10, 2008, maturity. On December 4, 2008, Special Servicer agreed to another extension to April 10, 2009, provided that, among other conditions, the Debtor paid certain fees and made a payment of $235,000, which funds were to be applied to reduce the then currently outstanding principal amount of the Loan. (*Id*. at ¶ 11).

### Debtor Defaults in April 2009

9. On April 14, 2009, Special Servicer sent the Debtor a reservation of rights letter notifying the Debtor that a default had occurred because the Debtor had failed to pay the Loan on April 10, 2009, the then existing maturity date. (*Id*. at ¶ 12).

### The Parties Agree to a Forbearance; Debtor begins Paying Excess Cash Flow to Lender

10. On April 17, 2009, Lender, the Debtor, and the two guarantors (B. Howard Bulloch and David Gaffin) entered into a Pre-Negotiation Agreement, wherein the parties agreed on certain terms regarding discussions they were conducting related to the Loan. As a result, the parties agreed to extend the maturity date to October 10, 2009, provided that, among other conditions, (a) the Debtor paid certain fees, (b) interest began to accrue on the Loan at a rate of LIBOR plus 400 basis points, with a LIBOR floor of 2%, (c) the Debtor instituted a hard cash management system whereby all of the excess cash flow would be held by Lender as additional collateral, which arrangement was memorialized by that certain Blocked Account Control Agreement dated June 25, 2009 by and between Debtor and Lender (the "Blocked Account Control Agreement"), and (d) Debtor was prohibited from making distributions to its members or the guarantors. (*Id*. at ¶¶ 13-14).

11. The Debtor notified Special Servicer of its inability to repay the Loan at its October 10, 2009, maturity. Accordingly, in December 2009, Special Servicer agreed to a short term extension to July 10, 2010, provided that, among other conditions, (a) the Debtor paid certain fees, (b) interest continued to accrue on the Loan at a rate of LIBOR plus 400 basis points, with a LIBOR floor of 2%, (c) the Loan hard cash management system contemplated above and memorialized with the Blocked Account Control Agreement continued, with excess cash flow to be applied to reduce

1  the then outstanding principal balance of the Loan; and (d) the Debtor was prohibited from making
2  distributions to its members or any guarantor. (*Id*. at ¶ 15).

3      12. On July 12, 2010, Special Servicer sent the Debtor a reservation of rights letter
4  notifying the Debtor that (A) a default had occurred because the Debtor had failed to pay the
5  outstanding principal amount on July 10, 2010, the then existing maturity date, and (B) Lender had
6  a right to exercise all of its rights and remedies under the Loan Documents. (*Id*. at ¶ 16).

7      13. Pursuant to these agreements, a lock box account was established at U.S. Bank
8  National Association (the "Lockbox"). Starting in July 2009, all rents from the Property were
9  deposited in the Lockbox. From such deposited funds, the Lender deducted on a monthly basis the
10 following payments: (i) amounts due for the tax and insurance reserve; (ii) monthly interest due;
11 and (iii) $15,000 toward the Loan's principal balance. Funds in the Lockbox were then released to
12 the Debtor to pay its operating expenses. Subsequently, any excess cash was swept by Lender and
13 applied toward the Loan's principal balance. The Debtor unilaterally ceased making deposits in the
14 Lockbox after November 9, 2010, and has made no further deposits in violation of the Loan
15 Documents. The Debtor made principal and interest payments on December 9, 2010, and January
16 9, 2011, but has made no further payments to the Lender. As a result, to ensure that taxes were paid
17 current on the property, on February 25, 2011 Lender was forced to advance its own funds for taxes.
18 (*Id*. at ¶ 17).

19     14. The outstanding balance of the Loan as of the Petition Date was $3,078,190.76,
20 comprised of principal in the amount of $2,895,322.16, monthly interest in the amount of
21 $57,914.05, and default interest in the amount of $124,954.55. (*Id*.).

**Lender Begins Foreclosure Proceedings in January 2011**

23     15. On January 14, 2011, Lender initiated foreclosure proceedings on the Property. (*Id*.
24 at ¶¶ 18-19).

25     16. In accordance with Nevada law, the foreclosure sale for the Property was scheduled
26 for May 11, 2011. Due to the Debtor's bankruptcy filing, however, Lender did not proceed with the
27 foreclosure sale. (*Id*. at ¶ 20).

### The Vast Majority of the Debtor's Leases Are Short Term

17. During the term of this Loan, the Debtor periodically provided Special Servicer with the rent rolls for the Property. Based on a review of the rent rolls and conversations with David Gaffin, Debtor's manager, it appears that the vast majority of the Debtor's tenants are on a month to month tenancy or on short term tenancies of 6 months or less. (*Id*. at ¶ 21).

### DEBTOR'S ADEQUATE PROTECTION PROFFER IS INSUFFICIENT

The Debtor's adequate protection proffer is insufficient. The Loan has been extended for years and has been in default since July 10, 2010, yet the Debtor seeks adequate protection that is more appropriate for a long-term loan for a stable property. As noted in more detail below, the Debtor fails to satisfy its burden to use cash collateral pursuant to Bankruptcy Code § 363(p)(1).

### The Debtor Has Provided No Evidence of Value
### Nor That the Value of the Property Is Not Decreasing

The Debtor's sole "evidence" of value is the unsubstantiated declaration of its manager that the value of the Property is "at least" $6,500,000. (Motion at 3). The Debtor and Mr. Gaffin provide absolutely no basis for this value, such as an appraisal. Nor does the Debtor's valuation account for the more risky short-term nature of the Debtor's leases with its tenants. Moreover, the Debtor provides no evidence that the value of the Property is not declining, a position that is virtually impossible to hold in the Nevada real estate market. In fact, the Debtor's failure to refinance the Property, after making a significant effort to do so, is evidence that the Property is worth much less than the Debtor's unsupported estimate. In sum, the Debtor's unsupported assertion of value is insufficient to prove that the Lender is adequately protected. *See United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 637 (10th Cir. 1988) (owner of land qualified to testify as to value, but a basis for valuation must exist to have probative value). On this basis alone, the Court should deny the Motion.

### Excess Cash Flow Should Be Paid to Lender

"The general purpose of adequate protection is to ensure that the secured creditor ultimately receives what it would have received had bankruptcy not intervened." *In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010). To preserve this purpose, the proper level of

1  adequate protection is determined on a case-by-case basis and is a function of many factual
2  variables. *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir.
3  1987). As noted by the Debtor, (Motion at 8), the Court must exercise care that the Lender's
4  property rights are not eroded and that the values and risks bargained for by the Lender pre-petition
5  are not detrimentally affected. *Id*. In this regard, the Court may take account of the parties' pre-
6  petition conduct in determining the proper level of adequate protection. *See In re Colonial Ctr.,
7  Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993).

      Here, if the Court determines that the Debtor may use the Lender's cash collateral, the bargain struck between the parties pre-petition—the payment of excess cash flow to the Lender—should be honored post-petition as well, particularly given the inability of the Debtor to refinance the Property for years, the failure of the Debtor to pay taxes pre-petition which were then paid by Lender and the filing of its petition on the eve of a foreclosure sale.[2] After loan maturity, the parties bargained for the excess cash flow payments. The Debtor's economics have not changed, and the institution of bankruptcy proceedings should not work to the detriment of Lender.

      The Debtor is a sophisticated investor and is managed and owned by individuals who have a significant financial and real estate background and understood the risks and benefits in paying the Lender the Excess Cash Flow. In the same way that courts have enforced pre-petition waivers of the right to object to a secured lender's motion for relief from stay, *e.g.*, *In re Bryan Road, LLC*, 382 B.R. 844, 848 (Bankr. S.D. Fla. 2008), this Court should enforce the bargain struck by the Debtor and the Lender with respect to the Excess Cash Flow. The Debtor should not be permitted to amass a post-petition war chest with the Lender's cash collateral that will ultimately be used only to the detriment of the Lender.

      The Debtor has shown no ability to refinance a long-matured loan. Given the state of the Las Vegas real estate market, the almost-impossible prospect of the Debtor's reorganization, the lack of evidence of value, and the Debtor's inability to show that the value of the Property is not declining, the Lender is not adequately protected by the Debtor's proposed budget and in particular

---

[2] If the Court approves use of cash collateral, the Lender does not object to payment of the Debtor's expenses as detailed in the Debtor's Budget attached to the Motion.

is not adequately protected without receipt of the excess cash flow from the Property.

### The Debtor's Proposed Cash Collateral Order and Proposed Protections for the Lender Are Insufficient

The Debtor's proposed two-page interim cash collateral order is simply too vague to provide the Lender with the adequate protection required for the Property.  More specifically, any cash collateral order must state:

- Cash collateral used to pay expenses must be limited exclusively to those items listed in the Debtor's budget.
- Any changes to the Debtor's budget must require approval of this Court;
- Lender's replacement lien must have the same extent, validity and priority as its pre-petition liens.
- The Debtor shall deliver to Lender, on a weekly basis, a reconciliation showing (a) actual disbursements as actual cash receipts during the previous week compared with the amounts set forth for such week in the Budget; (b) the cumulative actual disbursements and receipts for the period of the Budget through and including the previous week compared with the budgeted amounts for the corresponding period; and (c) a summary of outstanding post-petition accounts payable;
- The Debtor shall permit representatives, agents, employees, counsel, and their other advisors to have reasonable access to the Debtor's premises, records, personnel, and advisors during normal business hours (upon reasonable prior notice) and shall cooperate with, and provide to such representatives, agents, employees, counsel, and other advisors all such information as they may reasonably request.
- The interim order must have an end date after which the Debtor may no longer use lender's cash collateral without its consent;
- To the extent the Court orders use of Cash Collateral over the Lender's objection and allows the Debtor to retain any cash collateral in excess of its expenses, such cash must be held in a segregated debtor-in-possession account, which funds may not be

used absent further approval of this Court.

## CONCLUSION

For the foregoing reasons, the Motion should be denied, or in the alternative, the Motion should be granted with the modifications requested herein.

DATED this 23rd day of May, 2011.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: ___/s/ Jeffrey S. Rugg_____
    Jeffrey S. Rugg, Esq., Bar # 10978
    100 N. City Parkway, Suite 1600
    Las Vegas, Nevada 89106

    Attorneys for CT Investment Management Co., LLC in its capacity as Special Servicer to Wells Fargo Bank, N.A.