BROWNSTEIN HYATT FARBER SCHRECK, LLP
Jeffrey S. Rugg (State Bar No. 10978)
jrugg@bhfs.com
Julia Brand (pro hac vice)
jbrand@bhfs.com
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
Telephone: 702.382.2101
Facsimile: 702.382.8135

Attorneys for CT Investment Management Co., LLC in its capacity as Special Servicer to Wells Fargo Bank, N.A.

Date Filed: July 19, 2011

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re: | Case No. BK-11-17208-BAM |
| DESERT OASIS APARTMENTS, LLC, | Chapter Number: 11 |
| Debtor, | |
| | **WELLS FARGO BANK'S OBJECTION TO DESERT OASIS APARTMENT, LLC'S DISCLOSURE STATEMENT** |
| | Hearing Date: August 23, 2011<br>Hearing Time: 10:00 a.m. |

CT Investment Management Co., LLC as Special Servicer to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2003 FL1 (the "Lender") respectfully submits this objection to the *Desert Oasis Apartments, LLC's Disclosure Statement* [*docket no. 56*] (the "Disclosure Statement"), filed by Desert Oasis Apartments, LLC (the "Debtor").

///

///

///

## I. INTRODUCTION

The Debtor's Disclosure Statement provides inadequate information and describes a facially unconfirmable plan of reorganization. The Debtor proposes to force the Lender to accept payments on its fully matured obligation over 10 years, amortized over 25, which leaves a balloon payment of more the $2,300,000 (or approximately 74% of the original obligation). Moreover, the property that the Debtor proposes as collateral for the obligation is, by the Debtor's own admission, subject to a cloud on the title. The Debtor further proposes to ignore a contingent, disputed, unliquidated claim and essentially allow a potential $10 million obligation to ride through bankruptcy. At the same time, the Debtor leaves it equity interests unimpaired, thereby preserving any potential value from the sale of the property for equity. The risk of this folly is borne entirely by the Lender.

The Plan is fatally flawed and cannot satisfy numerous requirements under the Bankruptcy Code. The Plan is not "fair and equitable" with regard to the treatment of the Lender's claim. The Plan as described in the Disclosure Statement is entirely unfeasible. The Disclosure Statement fails to provide any meaningful financial information and other information required for creditors to assess the Plan and make an informed decision about how to vote, including the complete absence of any discussion of a potential $10 million asset of the estate. The Court should not waste time, money or judicial resources proceeding any further with the proposed Plan and Disclosure Statement. The Disclosure Statement cannot be approved until the Debtor addresses the numerous unresolved issues identified herein.

## II. BACKGROUND

### 1. The Debtor's History with the Lender

The Debtor's inability to perform as required under the loan documents with the Lender is well established and has been presented in other pleadings to the Court.[1] The Debtor clearly does not dispute the Lender's description of the history because the relevant portions of those pleading have been copied verbatim into the Disclosure Statement.[2]

---

[1] *See e.g.,* Wells Fargo's *Opposition to Emergency Motion for an Order Authorizing the Use of Cash Collateral on an Interim Basis* [*docket no.* 29].
[2] *See* Disclosure Statement, pp. 8-11.

A few points are worth reiterating. The Lender has bent over backwards with this borrower in order to give them every reasonable opportunity. Nonetheless, the Debtor has repeatedly failed to meet its financial obligations no matter how generously modified. Moreover, the Debtor has been entirely unsuccessful in it efforts to refinance or sell the property and has shown no signs of progress in dealing with the issues that it claims impairs its ability to sell or refinance.

The Debtor's obligation to Lender (the "Loan") originally matured in August 2006. The Debtor has unsuccessfully attempted to refinance or sell the property since that time. The Lender agreed to no less than six extensions of the maturity date. Despite making every reasonable effort to work with the Debtor, the Lender has been strung along by the Debtor for nearly five years. The Debtor again defaulted at the extended maturity date in July 2010. In January 2011, the Lender initiated foreclosure proceedings. With a foreclosure sale scheduled for May 11, 2011, the Debtor filed its chapter 11 case on May 10, 2011.

The Lender is owed not less than $3,078,190.76, comprised of a principal amount of $2,895,322.16, monthly interest of $57,914.05, and default interest in the amount of $124,954.55, plus reasonable attorney's fees.

In advance of its Petition, the Debtor began using the Lender's cash collateral to build a legal war chest and following the Court's order on use of the cash collateral, the Debtor has continued using the Lender's cash collateral. *See docket no.* 41 (approving the use of cash collateral on an interim basis) and *docket no.* 46 (approving, on a final basis, the use of cash collateral through December 31, 2011.

On June 24, 2011, the Debtor filed (i) *Desert Oasis Apartment, LLC's Disclosure Statement* [*docket no.* 56]; and (ii) *Desert Oasis Apartment, LLC's Plan of Reorganization Dated June 21, 2011* [*docket no.* 57].

2. **The Gonzales Claim**

The Disclosure Statement describes the claims related to a loan by Tom Gonzales of more than $40 million to the Debtor and other entities.[3]  As a result of various disputes, Gonzales

---

[3] *See* Disclosure Statement, pp. 4-8.

1  commenced an action naming the Debtor, Lender and other defendants (the "Gonzales
2  Litigation"). Among other relief, Gonzales claims that he is currently owed $10 million and that
3  he has a lien securing such claim that covers, among other property, the property of the Debtor
4  which secures the Loan (the "Property").[4] Moreover, Gonzales seeks declaratory relief that his
5  lien is senior to the Lender's lien in the property and for foreclosure of his interests in the
6  Property.[5]

## III.  APPLICABLE LAW

To approve a disclosure statement, the Court must conclude that it contains "adequate information." The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make and informed judgment about the plan . . .

11 U.S.C. § 1125(a)(1).

The disclosure statement is intended to be a primary source of information for creditors and interest holders to consult in making an informed decision about the approval or rejection of a plan of reorganization. *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571 (B.A.P. 9th 1996). *See also*, *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) (noting that the "paramount position" of the disclosure statement in the confirmation process) and *In re East Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pen. 1982) (disclosure statement should not be approved unless it contains "information sufficient to allow parties voting on the plan the opportunity to arrive at an independent judgment"). The "disclosure statement must contain all pertinent information bearing on the success or failure of the proposals in the plan of reorganization [and] should likewise contain all information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

---

[4] *See* Disclosure Statement, p. 12.
[5] *See* Disclosure Statement, p. 12.

The determination of whether the information in a disclosure statement is adequate is made on a case by case basis and should take into account all relevant facts. *In re Applegate Property, Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991) and *In re Dakota Rail, Inc*., 104 B.R. 138, 143 (Bankr. D. Minn. 1989).

Courts have developed a non-exclusive list of the type of information required to be included in a disclosure statement, including:

1. the circumstances that gave rise to the filing of the bankruptcy petition;

2. a complete description of the available assets and their value;

3. the anticipated future of the debtor;

4. the source of the information provided in the disclosure statement;

5. a disclaimer, which typically indicates that no statement or information concerning the debtor or its assets are authorized, other than those set forth in the disclosure statement;

6. the condition and performance of the debtor while in Chapter 11;

7. information regarding claims against the estate;

8. a liquidation analysis;

9. the accounting and valuation methods used to produce the financial information in the disclosure statement;

10. information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

11. a summary of the plan of reorganization;

12. an estimate of all administrative expenses, including attorney's fees and accountant's fees;

13. the collectability of any accounts receivable;

14. any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

15. information relevant to the risks being taken by the creditors and interest holders;

16. the actual or projected value that can be obtained from avoidable transfers;

17. the existence, likelihood and possible success of non-bankruptcy litigation;

18. the tax consequences of the plan; and

19. the relationship of the debtor with affiliates.

*In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990), *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71; *In re S.E.T. Income Props., III*, 83 B.R. 791, 792 (Bankr. N.D. Okl. 1988), and *In re Metrocraft Publ'g. Serv., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

## IV. DISCUSSION

### A. The Disclosure Statement Should Not Be Approved Because the Plan of Reorganization is Unconfirmable on Its Face.

As a preliminary matter, the Court should consider the facially unconfirmable nature of the Plan before devoting further attention to the adequacy of the information contained in the Disclosure Statement. Where a plan is patently unconfirmable because it violates the requirements for confirmation set forth in Section 1129, the disclosure statement should not be approved. *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999), *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991), *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). It is proper for the Court to consider these issues in the context of this objection to the Disclosure Statement because the defects in the Debtor's Plan render it unconfirmable and it would be a waste of judicial resources and impose unnecessary expense on the estate and its creditors. *In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. 1987) *aff'd* 80 B.R. 448 (N.D. Ill. 1987); *In re Weiss-Wolf, Inc.*, 59 B.R. 653, 656 (Bankr. S.D.N.Y. 1986), *In re Pecht*, 53 B.R. 768, 769-70 (Bankr. E.D. Va. 1986), *In re McCall*, 44 B.R. 242, 243 (Bankr. E.D. Penn. 1984), *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832-33 (Bankr. D.S.C. 1984) and *In re Genesse Cement, Inc.* 31 B.R. 442, 443-44 (Bankr. E.D. Mich. 1983).

#### 1. The Proposed Treatment of the Lender's Claim Does Not Satisfy the Requirement that it be 'Fair and Equitable'

A plan may be confirmed over the objection of an impaired non-accepting class only if it does not discriminate unfairly and is fair and equitable. 11 U.S.C. § 1129(b)(1). To "cramdown" a secured creditor under Section 1129(b)(2) of the Bankruptcy Code, the Debtor must satisfy one of the three requirements enumerated in Section 1129 (b)(2)(A). *In re Arnold & Baker Farms*, 85

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106-4614

F.3d 1415, 1420 (9th Cir. 1996) (to cramdown a secured creditor, a plan must satisfy either section 1129 (b)(2)(A)(i), (ii) or (iii)). *See also In re Monarch Beach*, 166 B.R. at 433. The three tests set forth in section 1129 (b)(2)(A)(i-iii) of the Bankruptcy Code are as follows:

> (1) The creditor retains the lien securing its claim and receives deferred cash payments with a present value at least equal to the claim;
>
> (2) The property securing the claim is sold, subject to Section 363(k), and the lien attaches to the full proceeds of the sale; the lien on the proceeds is then to be treated as described in test (1) or (3); or
>
> (3) The creditor is to realize the indubitable equivalent of its secured claim.

*Arnold & Baker Farms*, 85 F.3d at 1420.

The Debtor does not satisfy the first test because the Debtor proposes that the Lender retain a lien while the Debtor has not resolved and does not propose to resolve the purported claim of a senior lien in the Property, while admitting that "[p]ending the outcome of the Gonzales litigation, the Debtor does not have clear title to the Property." Regardless of the Debtor's and the Lender's belief about the merits of the Gonzales Litigation, the litigation represents a serious cloud on title to the Property that the Debtor relies on to meet its obligation to provide security for its payment obligations to Lender under the Plan.

Additionally, the proposed interest rate of no more than prime plus two[6] is entirely inadequate to protect against the risk the Lender is forced to accept. The Debtor proposes to force the Lender to make a ten year loan on an obligation that originally matured nearly five years ago reserving a balloon payment of nearly 75% of the original principal, secured by collateral that is subject to a cloud on title. There is the added risk of fluctuations in the rental market or the occupancy rate of the apartments, which are the sole source for payments required under the Plan. The proposed interest rate is not remotely adequate to account for such risks. Further, and perhaps most importantly, if Gonzales is successful in his litigation, even at the Debtor's optimistic valuation of $6.5 million for the Property, there is no security for the Debtor's

---

[6] The Disclosure Statement states in some places that the interest rate to be paid to the Lender is 5% and in other places that the interest rate will be 5.25% (*see below*). In either case, the rate is inadequate.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106-4614

obligations under the Plan.

The Debtor also cannot satisfy the third test[7] of providing the Lender the "indubitable equivalent" of its secured claim for the same reasons discussed above. Offering a lien on the Property with the unresolved cloud on title and the terms of repayment proposed by the Debtor is not the indubitable equivalent of being able to realize the current value of the property to the Lender. "Indubitable equivalent" means a secured creditor should not be subjected to any increased risk. *Arnold & Baker Farms*, 85 F.3d at 1422; *see also In re Wiersma*, 227 Fed.Appx. 603, 606-07 (9th Cir. 2007) (secured creditor should not bear increased risk with substituted collateral in the context of indubitable equivalent).

2.  **The Plan Does Not Specifically Provide for the Treatment of All Claims**.

The Code requires that a plan "*shall* specify the treatment of any class of claims or interests that is impaired under the plan." (*emphasis added*) 11 U.S.C. § 1123(a)(3). It is fundamental in bankruptcy that a debtor deal with the claims against the estate and propose a plan for dealing with the claims and a disclosure statement explaining the treatment. In this regard, the Disclosure Statement is entirely inadequate.

Gonzales appears to have a contingent, unliquidated, disputed claim but the Debtor proposes to ignore the claim, in effect, allowing it to ride through bankruptcy. The Disclosure Statement describes the Gonzales Claim as unimpaired.[8] However, Gonzales asserts the right to immediate payment of $10 million, a senior lien in the Property and the right to foreclose.[9] Ignoring the claim is not the same as it being unimpaired. What does it mean to the estate and creditors if the claim is allowed to "ride through?" The unresolved claim casts a cloud over the entire process because it is entirely foreseeable that the Debtors' Plan will be meaningless if the outcome of the Gonzales Litigation is not as the Debtor predicts.

Simply, the Plan makes no allowance for the possibility of dealing with the Gonzales claim if the Debtor turns out to be wrong about either owing the money or Gonzales having a lien.

---

[7] The Debtor is not proposing a sale of the Property through the Plan and thus, analysis of the second test of Section 1129(b)(2)(A) is unnecessary.
[8] *See* Disclosure Statement, p. 19.
[9] *See* Disclosure Statement, p. 12.

Further, if the Debtor is wrong, the Plan violates the absolute priority rule because equity will retain its interest while creditors are placed at risk. Under these circumstances the Plan cannot be confirmed and the disclosure statement describing such a plan should be rejected out of hand.

### 3. **The Plan Is Not Remotely Feasible**.

The Ninth Circuit has explained that the purpose of the "feasibility" test of Section 1129(a)(11) is "to avoid confirmation of visionary schemes which promise creditors more under a proposed plan than the debtor can possibly attain after confirmation." *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985). In applying the feasibility test, courts must determine whether the plan proponent can, as a practical matter under the circumstances, actually do what the plan proposes. *See*, *e.g.*, *Financial Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'nship*, 116 F.3d 790, 801 (5th Cir. 1997). To satisfy the "adequate information" requirement of Section 1125 of the Bankruptcy Code, the Debtors must provide the Court and voting constituencies with sufficient information to make a feasibility determination. *In re Radco Props.*, 402 B.R. 666, 682-83 (Bankr. E.D.N.C. 2009).

Providing adequate financial information and projections is not merely an option. Not only are projections required but the Debtor must provide concrete evidence in support of the projections it has included in the Disclosure Statement. *In re Grandfather Mountain Ltd. P'ship*, 207 B.R. 475, 485 (Bankr. M.D.N.C. 1995). To satisfy the feasibility and adequate information tests, these projections cannot be speculative, unrealistic or conjectural. *In re Nelson*, 84 B.R. 90, 93 (Bankr. W.D. Tex. 1988); *see also In re Cardinal Congregate I*, 121 B.R. at 765.

The Disclosure Statement is entirely devoid of any analysis or evidentiary support regarding feasibility. Regarding it ability to initially fund the Plan, the Disclosure Statement explains that the Debtor believes that it will have sufficient cash on hand to make the payments required on the effective date.[10] The entirety of the Debtor's feasibility analysis regarding its ability to make the payments required under the Plan consists of a single sentence: "In this case, existing monthly rent payments are more than sufficient to fund the monthly payments required

---

[10] *See* Disclosure Statement, p. 25.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 NORTH CITY PARKWAY, SUITE 1600
LAS VEGAS, NV 89106-4614

by the Plan."[11]

The Lender is not required simply to accept the Debtor's belief that it will be able to make the payments required under the Plan. The Debtor bears the burden on these issues and the Disclosure Statement provides no meaningful information.

There are no financial projections provided in connection with the Disclosure Statement. There is no discussion of what projected occupancy rates are and whether the types of current leases (e.g., short term or long term) are likely to affect overall occupancy rates. There is absolutely no evidentiary support for the assertion that the rents will be sufficient. The current monthly rental income is hardly a satisfactory basis upon which to base the conclusion that the Lender will be protected by that source *for ten years after confirmation*.

**B.    The Disclosure Statement Lacks Adequate Information.**

1.    **There is No Explanation Regarding Avoidance Actions**

The Disclosure Statement notes that the Debtor "does not intend to pursue preference, fraudulent conveyance, or other avoidance actions."[12] It is not clear whether the Debtor believes that it may have such causes of action and simply has decided not to pursue them or whether the Debtor does not believe any such causes of action exist. The Debtor should be required to explain this more fully.

2.    **There is No Discussion of Risk Factors**.

As discussed above, the Disclosure Statement should discuss factors that may affect the Debtor's ability to perform under the Plan, including but not limited to the risks associated with the Gonzales Litigation, potential fluctuations in occupancy rates.

3.    **What Interest Rate Is Being Paid to the Lender?**

The Disclosure Statement is inconsistent about the interest rate to be paid to the Lender. Page 1 says the Lender will be paid 5.25% and page 18 states that the rate is 5%.

4.    **The Proposed Treatment of Insiders Is Unclear**

The Disclosure Statement states the total amount of non-insider unsecured claims as

---

[11] *See* Disclosure Statement, p. 25.
[12] *See* Disclosure Statement, p. 15.

1  $27,650.17.[13] The Disclosure Statement describes that non-insider unsecured claims will be paid $3,000 a month for 12 months. There is no explanation as to why there is a treatment that provides for $36,000 to pay $28,000 in claims.

Further, the section describing the treatment of unsecured claims provides in part, "Desert Land, LLC, Citation Financial, LLC and Compass Investment Holdings, LLC (holding claims of approximately $7,161,000) have agreed to subordinate their claims to the claims of other unsecured creditors . . . ."[14] The section summarizing the debts of the Debtor identifies the amount of Insider Unsecured Claims as $7,169,734.61. The Disclosure Statement does not explain the different amounts and why some insider claims are not being subordinated.

### 5. The Alleged Counterclaim Against Gonzales Must Be Explained

In the summary of current and historical financial conditions, the Debtors includes a $10 million asset described as "Counterclaim Against Gonzales." If the Debtor actually believes that it has a counterclaim worth this amount against Gonzales, it should be required to account for it under the Plan.

///

///

///

///

---

[13] *See* Disclosure Statement, p. 16.
[14] *See* Disclosure Statement, p. 19.

## V. CONCLUSION

The fundamental problem with the Disclosure Statement is the plan of reorganization that it describes. The Debtor proposes to ignore a $10 million claim that purports to be secured by a senior lien in the Debtor's sole asset. The Debtor further proposes to force the Lender to extend credit on terms that verge on ridiculous. At the same time, while the Lender is the exclusive bearer of risk under the Plan, equity remains in place, unimpaired in the hopes of realizing any potential value from a sale. The Plan simply cannot be confirmed and the Lender respectfully requests that the Court deny approval of the Disclosure Statement.

DATED this 19th day of July, 2011.

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: /s/ Jeffrey S. Rugg
Jeffrey S. Rugg, Esq., Bar # 10978
Julia Brand (pro hac vice)
100 N. City Parkway, Suite 1600
Las Vegas, Nevada 89106

Attorneys for CT Investment Management Co., LLC in its capacity as Special Servicer to Wells Fargo Bank, N.A.