LENARD E. SCHWARTZER (NV Bar No. 0399)
JEANETTE E. MCPHERSON (NV Bar No. 5423)
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
Email: bkfilings@s-mlaw.com

Counsel for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

**DESERT OASIS APARTMENTS, LLC,**

Debtor.

Case No. BK-S-11-17208-BAM

Chapter 11

Hearing Date: August 23, 2011
Hearing Time: 10:00 a.m.
Place: Courtroom #3

**DESERT OASIS APARTMENTS, LLC'S AMENDED DISCLOSURE STATEMENT TO DEBTOR'S AMENDED PLAN OF REORGANIZATION**





SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## TABLE OF CONTENTS

I. INTRODUCTION ..... 4

A. Purpose of This Document ..... 5

B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..... 5

1. *Time and Place of the Hearing to Confirm the Plan* ..... 6

2. *Deadline For Voting to Accept or Reject the Plan* ..... 6

3. *Deadline For Objecting to the Confirmation of the Plan* ..... 6

4. *Identity of Person to Contact for More Information* ..... 6

C. Disclaimer ..... 6

II. BACKGROUND ..... 7

A. Description and History of the Debtor's Business ..... 7

1. *The Gonzales Loan* ..... 7

2. *Desert Land & Desert Oasis Bankruptcy Action* ..... 8

3. *Gonzales' Appeal of the Subordination Language in the Settlement Agreement* ..... 11

4. *JP Morgan Chase Loan* ..... 11

5. *The Gonzales Action* ..... 15

6. *Reduction of the Loan Balance* ..... 18

B. Insiders of the Debtor ..... 18

C. Property Value ..... 19

D. Management of the Debtor Before and During the Bankruptcy ..... 19

E. Events Leading to Chapter 11 Filing ..... 19

F. During the Bankruptcy Case ..... 19

G. Projected Recovery of Avoidable Transfers ..... 20

H. Claims Objections ..... 20

I. Current and Historical Financial Conditions ..... 20

III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ....................21

A. What is the Purpose of the Plan of Reorganization? ....................21

B. Claims....................22

1. Class 1. *Administrative Expenses and Priority Claims*

2. Class 2. *Bank Secured Claim*

3. Class 3. *Gonzales Claim*

4. Class 4. *Class of General Unsecured Claims*

5. Class 5. *Class of Equity Interest Holders*

C. Means of Implementing the Plan....................25

D. Risk Factors ....................25

E. Executory Contracts and Unexpired Leases....................26

F. Tax Consequences of Plan ....................26

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ....................27

A. Who May Vote or Object ....................27

B. Votes Necessary to Confirm the Plan....................28

1. *Votes Necessary for a Class to Accept the Plan*....................29

2. *Treatment of Nonaccepting Classes* ....................29

C. Liquidation Analysis ....................29

D. Feasibility ....................30

1. *Ability to Initially Fund Plan*....................30

2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*30

V. EFFECT OF CONFIRMATION OF PLAN ....................31

A. Discharge....................31

B. Modification of Plan....................32

C. Final Decree ....................32

LIST OF EXHIBITS....................33

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# I. INTRODUCTION

**DESERT OASIS APARTMENTS, LLC** (the "Debtor" or "Desert Oasis") Parcel Number 162-28-310-001 (the "Property"). The Property consists of approximately 6.4 acres located on the south side of Mandalay Bay Road approximately 800 feet east of Las Vegas Boulevard. On the Property is an apartment complex consisting of 128 one- and two-bedroom units. Approximately, 92%-95% of the apartment units are occupied by tenants ("Tenants"). The Property is worth approximately $6,500,000[1] and is subject to a loan in the approximate amount of $3,076,000 now held by Wells Fargo Bank, N.A., as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1 (the "Bank") which has matured. The current owner obtained title to the Property in August of 1999.

The Debtor has proposed an Amended Plan of Reorganization (the "Plan"). The Plan provides for one class of priority claims; one class of secured claims; one class of unsecured claims; and one class of equity security holders. **Under the Plan, the rights of Tenants are unimpaired.** The Bank will receive distributions which the proponent of this Plan has valued at 100 cents on the dollar. The Plan proposes to pay the Bank's claim in full over a period of 10 years using the rental income from Tenants to pay interest at the rate of 4.5% per annum interest and principal amortized over 25 years and a balloon payment on or before 10 years. The final payment will be accomplished through sale or refinancing as the mortgage markets become more normal. Tenants with priority claims for deposits will be paid 100% in the normal course of operation of the apartment complex. Under the Plan, the unsecured claim of Tom Gonzales is unimpaired. Under the Plan, the unsecured creditors, except insiders, will be paid over eleven months without interest. Under the Plan, insiders will agree to subordinate their claims to the claims of other unsecured creditors. This Plan also provides for the 100% payment of all other administrative, including fees payable to the Office of the United States Trustee, and priority claims upon confirmation

---

[1] The Market Value of the Property, "As Is – As Stabilized" as of May 26, 2011, was determined by RCS APPRAISAL, INC. to be $6,000,000. The Debtor's opinion is that the Property's market value is $6,500,000.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

This is the AMENDED DISCLOSURE STATEMENT (the "Disclosure Statement") in the chapter 11 case of **DESERT OASIS APARTMENTS, LLC**. This Disclosure Statement contains information about the Debtor and describes the **DESERT OASIS APARTMENTS, LLC's AMENDED PLAN OF REORGANIZATION** (the "Plan") filed by the Debtor. A full copy of the Plan is attached to this Disclosure Statement as **Exhibit "A."** ***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed at pages 20-22 of this Disclosure Statement. All Creditors holding allowed claims will receive distributions which the proponent of this Plan has valued at 100 cents on the dollar.

**A. Purpose of This Document**

This Disclosure Statement describes:

- The Debtor's assets and liabilities;
- The Debtor and significant events during the bankruptcy case;
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the plan is confirmed);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why the Proponent believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

**B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1. *Time and Place of the Hearing to Confirm the Plan*

The hearing at which the Court will determine whether confirm the Plan will take place on a date and time to be set by the Court at the United States Bankruptcy Court, Foley Federal Building, 300 Las Vegas Boulevard South, Las Vegas, Nevada.

2. *Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to Schwartzer & McPherson Law Firm, 2850 South Jones Boulevard, Suite 1, Las Vegas, Nevada 89146-5308. See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by on a date to be set by the Court or it will not be counted.

3. *Deadline For Objecting to the Confirmation of the Plan*

Objections to the confirmation of the Plan must be filed with the Court and served upon Schwartzer & McPherson Law Firm, 2850 South Jones Boulevard, Suite 1, Las Vegas, Nevada 89146-5308 by on a date to be set by the Court.

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Schwartzer & McPherson Law Firm, 2850 South Jones Boulevard, Suite 1, Las Vegas, Nevada 89146-5308

C. **Disclaimer**

***The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.***

## II. BACKGROUND

### A. Description and History of the Debtor's Business

#### 1. *The Property*

The Debtor was formed for the purpose of acquiring the Property in 1999. The Property is identified as the Oasis, a 127-unit apartment complex located approximately one-half mile south of Tropicana Avenue and about one-fourth mile east of Las Vegas Boulevard within the unincorporated township of Paradise in Clark County, Nevada. It is identified as Assessor's Parcel Number 162-28-310-001. The project consists of 127 units that were built in 1984. The Property consists of 110,391 square feet of net rentable area with 16 two-story buildings with a mixture of one-bedroom, and two-bedroom units ranging in size from 681 to 1,013 square feet. The average unit size is 869 square feet. The Property also includes a rental office, laundry, swimming pool and a spa. Each unit includes a designated one-car covered parking stall. At this time, approximately 95% of the apartment units are occupied.

#### 2. *The Gonzales Loan*

On December 7, 2000, Tom Gonzales ("Gonzales") loaned $41.5 million ("Gonzales Loan") to Desert Land, LLC ("Desert Land") and Desert Oasis to finance Desert Land and Desert Oasis' acquisition of certain property in Las Vegas, Nevada[2]. The Gonzales Loan was secured by a Deed of Trust recorded against property owned by Desert Land and Desert Oasis, commonly known by the parties as Parcel "A"[3] In addition, in further consideration for the Gonzales Loan, Desert Land and Desert Oasis deeded to Gonzales an undivided five percent (5%) ownership interest in Parcel "A", and deeded another undivided half a percent (0.5%) ownership interest to a different investor[4]. As

2. The primary business of Desert Land, Desert Ranch and Desert Oasis was to assemble large parcels of real estate along Las Vegas Boulevard, in Las Vegas, Nevada, for development, joint venture, or sale.

3. The property comprising Parcel "A", under the Gonzales Loan and the Deed of Trust was made up of various smaller parcels owned by Desert Land, and the Property owned by Desert Oasis.

4. Barry Fieldman was deeded an undivided 0.5% interest. Because Desert Land and Desert Oasis deeded 5.5% of their interest in Parcel "A" to Gonzales and Fieldman, the Deed of Trust was only secured by a 94.5% interest in Parcel "A'.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

additional security for the Gonzales Loan, Desert Land assigned and granted to Gonzales a security interest in Desert Lands' unexercised option to purchase four parcels of property near Parcel "A' from FLT Trust ("FLT Option").

Additional security for the Gonzales Loan included Desert Ranch, LLC ("Desert Ranch") guaranteeing the loan and pledging Gonzales a thirty-two and a half percent (32.5%) interest in New World, LLC[5], which owned additional parcels of real estate south of Parcel "A", commonly referred to by the parties as Parcels "B", "C", and "D".

3. *Desert Land & Desert Oasis Bankruptcy Action*

On May 31, 2002, Desert Land and Desert Oasis each filed separate voluntary bankruptcy petitions, which the bankruptcy court ordered jointly administered[6]. On August 26, 2002, Desert Land and Desert Oasis filed and sought approval of their joint disclosure statement and joint plan of reorganization. However, Gonzales and Makena Entertainment, LLC filed an opposition to Desert Land and Desert Oasis' proposed joint disclosure statement and plan, and so the bankruptcy court held a hearing on the motion on September 25, 2002. At the hearing the bankruptcy court ruled that various amendments be made to the disclosure statement.

On January 2, 2003, Desert Land and Desert Oasis filed an amended disclosure statement, which the bankruptcy court approved on January 8, 2003. A contested confirmation hearing for the amended disclosure statement was set for January 29, 2003. On January 24, 2003, Gonzales filed an objection to the debtors' confirmation plan of reorganization, petitioning the Court to hear the matter at the scheduled contested hearing on the objection to the plan. Desert Land and Desert Oasis then filed their amended plan of reorganization on January 29, 2003.

At the contested confirmation hearing in January, 2003, Gonzales and Desert Oasis, Desert Land, and Desert Ranch announced to the bankruptcy court that they had arrived at a settlement. The

---

5. At the time of the Gonzales Loan transaction, Desert Ranch owned 65% of New World, LLC, Gonzales and his assignees owned 30%, and Makena Entertainment, LLC owned the remaining 5%.

6. Desert Ranch, LLC also filed a separate voluntary bankruptcy petition on May 31, 2002, which the bankruptcy court ordered jointly administered with Desert Land and Desert Oasis.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

bankruptcy court then suspended confirmation of the disclosure statement and plan of reorganization so that the parties could memorialize their Settlement Agreement. The terms of the settlement provided that:

(1) Gonzales would extinguish his note, reconvey his deed of trust, and release Desert Ranch's guarantee and pledge so that Desert Land and Desert Oasis would own 100 percent of Parcel "A";

(2) Gonzales would receive $10 million if Parcel "A" upon the occurrence of certain triggering events on any part of Parcel "A" ("Parcel "A" Transfer Fee")[7];

(3) Gonzales and Fieldman would convey to Desert Land and Desert Oasis their total 5.5 percent interest in Parcel "A"; and

(4) In exchange, Gonzales was to receive Desert Ranch's 65 percent interest in New World.

*See* **Exhibit "D"**, BAP Decision, at 5:26-23.

Also under the settlement, for the parcel of property owned by Desert Oasis constituting Parcel "A", Gonzales agreed to subordinate his deed of trust[8] to a loan of up to $5 million so that the property could be used to secure a loan[9]. Gonzales also allowed his five percent (5%) interest in the Desert Oasis parcel to be encumbered by the loan. Thus, by the settlement agreement between them,

---

7. Gonzales asserts and the Debtor disputes:
As additional consideration for Gonzales' release of his note and deed of trust, he received the rights that would result in payment to the Parcel A Transfer Fee upon the occurrence of certain triggering events on any part of Parcel A, whether owned by Desert Oasis or Desert Land.

8. The single parcel of property owned by Desert Oasis constituting Parcel "A" was also eventually reconveyed by Gonzales to Desert Oasis, per the terms of the settlement, on June 6, 2003. The Deed of Reconveyance was duly recorded in the Official Records of Clark County Nevada on June 6, 2003, as Document No. 0000735.

9. The bankruptcy court later approved Desert Oasis, Desert Land, and Desert Ranch's loan for $2 million from Eagle Mortgage Company. Gonzales asserts and the Debtor disputes:
Debtor inaccurately describes the agreed-to subordination under the settlement agreement. The agreement discussed was a separate interim agreement wherein the Mr. Gonzales' deed of trust would be subordinated to a loan for interim purposes pending the completion of settlement of documentation and the actual reconveyance of the his deed of trust. Any implication that this was an agreement to subordinate beyond interim financing pending the completion of the settlement documentation is an incorrect implication.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the parties essentially agreed that Desert Oasis and Desert Land would get Parcel "A", Gonzales would get Parcels "B", "C", and "D", and would receive the Parcel "A" Transfer Fee upon the occurrence of a qualifying land transfer associated with Parcel "A".

Despite their having arrived at a settlement, over the next few months the parties were unable to document the settlement in a manner acceptable to all parties. The sole dispute preventing the parties from finalizing the settlement was Desert Oasis, Desert Land, and Desert Ranch's demand that the $10 million Parcel "A" Transfer Fee be subordinated to future additional financing obtained by Desert Oasis and Desert Land, secured by Parcel "A". *See* **Exhibit D**, BAP Decision, 6:11-14, 23-25; 10:20-23. Gonzales refused to include such a mandatory subordination clause in the settlement agreement. Finally, on April 21, 2003, after numerous previous hearings on the matter, with the parties still deadlocked, the bankruptcy court declared that an oral settlement agreement had already been reached and entered an Order confirming Desert Oasis, Desert Land, and Desert Ranch's Second Amended Plan of Reorganization. This Confirmation Order with the Settlement Agreement attached is attached hereto as **Exhibit "C"**. With respect to the treatment of the Parcel "A" Transfer Fee which had been the sole reason for the hold up in finalizing the settlement agreement, the bankruptcy court ruled that Desert Oasis, Desert Land, and Desert Ranch could subordinate the Parcel "A" Transfer Fee up to $45 million in financing. Interestingly, such a subordination was not even required since Gonzales had no lien against the Parcel "A" property, having given up his deed of trust in the settlement. The Court-approved Settlement Agreement specifically provided: "The Parcel A Transfer Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be subordinate to any Parcel A Permitted Financing."[10] This provision was not overturned by the appellate courts.

The Desert Land confirmation order specifically dismissed the Chapter 11 bankruptcy proceedings of Desert Oasis and Desert Ranch, and that an subsequent order was entered dismissing both cases.

---

10. Gonzales disputes the Debtor's analysis of this language.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4. *Gonzales' Appeal of the Subordination Language in the Settlement Agreement*

On May 5, 2003, Gonzales filed a notice of appeal from the confirmation order. The Bankruptcy Appeal Panel of the Ninth Circuit ("BAP Court") heard a request for a stay pending appeal and, ultimately, denied that request. The BAP heard the argument on the appeal on October 23, 2003, and issued a final decision on March 31, 2004. In its decision, the BAP Court confirmed that the sole issue being appealed and considered by the court was the subordination provision in the settlement agreement. *See* **Exhibit "D"**, BAP Decision 10:20-23. Namely, appellant Gonzales contended that while the parties did indeed arrive at a settlement, the bankruptcy court had erred when it ordered the inclusion of a subordination provision as part of the agreement, as Gonzales had never agreed to any such provision. *See* **Exhibit "D"**, BAP Decision 10:13-20. The BAP Court specifically identified the subordination language from the Bankruptcy Court Order, which was at issue in the appeal, as the following:

> Gonzales will subordinate his right to the payment of the Parcel Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 day written notice to Gonzales, such subordination agreement(s) as may be reasonably required by title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

**Exhibit "D"**, BAP Decision 7:15-19.

Upon a hearing of the matter, and as reflected in the March 21, 2004 BAP Decision, the BAP Court ordered that the subordination provision be eliminated from the settlement agreement and bankruptcy court order, and that otherwise the bankruptcy court's order confirming Desert Land and Desert Oasis' second amended plan of reorganization was affirmed. Upon further appeal to the Court of Appeals, the BAP's decision was affirmed. See **Exhibit "E"**.

5. *JP Morgan Chase Loan*

In between the Bankruptcy Court's Order Confirming the Second Amended Plan of Reorganization, and the BAP Decision by the BAP Court, JP Morgan Chase issued a loan to Desert Oasis in the amount of $5,200,000.00 (the "Loan"). The Loan was secured by a Deed of Trust duly recorded against a parcel of property owned by Desert Oasis ("Desert Oasis Parcel") which was part

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

of Parcel "A". As noted above, the Desert Oasis Parcel, together with Desert Land's other parcels of property comprising Parcel "A", was the subject matter of bankruptcy dispute.

The Loan was later assigned by JP Morgan Chase to Wells Fargo Bank, N.A. as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1 (the "Bank" or "Wells Fargo"). CT Investment Management Co., LLC is the "Special Servicer" for Wells Fargo. The history of the Loan, as described by the Bank's counsel, is as follows:

a. On July 21, 2003, Original Lender made the Loan to the Debtor in the principal amount of $5,200,000, as evidenced by a note, a properly recorded deed of trust, a properly recorded assignment of leases and rents, properly recorded financing statements, and a guaranty executed by the Debtor's managers, David B. Gaffin and B. Howard Bulloch (collectively, the "Loan Documents").

b. The original maturity date for the Loan was August 10, 2006 (the "Original Maturity Date"). The Loan was secured by the apartment complex that is the subject of the Motion (the "Property") and the rents generated by the Property.

c. In connection with a securitization, the Loan was transferred by Original Lender to Wells Fargo Bank, N.A., a national banking association, as trustee for J.P. Morgan Chase Commercial Mortgage Securities Corp., a Delaware corporation, as lender ("Lender").

d. Midland Loan Services, Inc., a Delaware corporation ("Midland"), is the Loan's servicer. Pursuant to a participation agreement dated as of August 17, 2004, between Original Lender and Capital Trust, Inc. ("Capital Trust"), Lender appointed Special Servicer, which has authority to assert Lender's interests with respect to the Loan.

Gonzales requests that we note that in Desert Oasis' prior bankruptcy, it did not apply for or obtain financing pursuant to 11 U.S.C. § 364. Similarly, the Disclosure Statement should reflect that neither the Desert Land confirmation order nor Desert Land's confirmed plan provided for any notice, any hearing, any findings, or any approval of any specific loan to Desert Oasis, nor for the grant of any super priority lien to any specific lender (or to any lender) for a loan to Desert Oasis, under § 364.

Gonzales requests that we note that The Disclosure Statement states that the loan between Debtor and JP Morgan Chase (since assigned to Wells Fargo) was made during the time between the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

order confirming Desert Land's plan and the decision of the Bankruptcy Appellate Panel. Debtor apparently seeks to imply the loan was part of the bankruptcy proceedings, and thus seeks to mislead creditors in soliciting a vote on the plan. However, as Debtor states in the Disclosure Statement, the original loan was made on July 21, 2003, at which time Desert Oasis, was not a debtor in any bankruptcy case. The portion of Parcel A owned by Desert Oasis was not property of the estate at that time, as the bankruptcy of Desert Oasis had been ordered dismissed both on April 21, 2003 and June 23, 2003.

**The Loan Maturity Date Is Extended Multiple Times through 2010**

e. On August 2, 2006, Special Servicer agreed to waive a debt coverage ratio of 2.0 to 1 and extend the Original Maturity Date by one year to August 10, 2007, provided that, among other conditions, the Debtor paid certain fees and made a payment of $1,025,000, which funds were to be applied to reduce the then currently outstanding principal amount of the Loan.

f. On July 30, 2007, Special Servicer again agreed to waive a debt coverage ratio of 2.0 to 1, waive the prohibition of partial payment of the Loan, and to extend the maturity date by an additional year to August 10, 2008, provided that, among other conditions, the Debtor paid certain fees and made a payment of $340,000, which funds were to be applied to reduce the then currently outstanding principal amount of the Loan.

g. The Debtor notified Special Servicer of its inability to repay the Loan at its August 10, 2008, maturity. Accordingly, on August 11, 2008, Special Servicer agreed to a two-month extension, provided that, among other conditions, the Debtor paid certain fees and made a payment to Midland of $250,000, which funds were to be applied to reduce the then currently outstanding principal amount of the Loan.

h. Debtor again notified Special Servicer of its inability to repay the Loan at its December 10, 2008, maturity. On December 4, 2008, Special Servicer agreed to another extension to April 10, 2009, provided that, among other conditions, the Debtor paid certain fees and made a payment of $235,000, which funds were to be applied to reduce the then currently outstanding principal amount of the Loan.

**Debtor Defaults in April 2009**

i. On April 14, 2009, Special Servicer sent the Debtor a reservation of rights letter notifying the Debtor that a default had occurred because the Debtor had failed to pay the Loan on April 10, 2009, the then existing maturity date.

**The Parties Agree to a Forbearance; Debtor begins Paying Excess Cash Flow to Lender**

j. On April 17, 2009, Lender, the Debtor, and the two guarantors (B. Howard Bulloch and David Gaffin) entered into a Pre-Negotiation Agreement, wherein the parties agreed on certain terms regarding discussions they were conducting related to the Loan. As a result, the parties agreed to extend the maturity date to October 10, 2009, provided that, among other conditions, (a) the Debtor paid certain fees, (b) interest began to accrue on the Loan at a rate of LIBOR plus 400 basis points, with a LIBOR floor of 2%, (c) the Debtor instituted a hard cash management system whereby all of the excess cash flow would be held by Lender as additional collateral, which arrangement was memorialized by that certain Blocked Account Control Agreement dated June 25, 2009 by and between Debtor and Lender (the "Blocked Account Control Agreement"), and (d) Debtor was prohibited from making distributions to its members or the guarantors.

k. The Debtor notified Special Servicer of its inability to repay the Loan at its October 10, 2009, maturity. Accordingly, in December 2009, Special Servicer agreed to a short term extension to July 10, 2010, provided that, among other conditions, (a) the Debtor paid certain fees, (b) interest continued to accrue on the Loan at a rate of LIBOR plus 400 basis points, with a LIBOR floor of 2%, (c) the Loan hard cash management system contemplated above and memorialized with the Blocked Account Control Agreement continued, with excess cash flow to be applied to reduce the then outstanding principal balance of the Loan; and (d) the Debtor was prohibited from making distributions to its members or any guarantor.

l. On July 12, 2010, Special Servicer sent the Debtor a reservation of rights letter notifying the Debtor that (A) a default had occurred because the Debtor had failed to pay the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

outstanding principal amount on July 10, 2010, the then existing maturity date, and (B) Lender had a right to exercise all of its rights and remedies under the Loan Documents. (*Id*. at ¶ 16).

m. Pursuant to these agreements, a lock box account was established at U.S. Bank National Association (the "Lockbox"). Starting in July 2009, all rents from the Property were deposited in the Lockbox. From such deposited funds, the Lender deducted on a monthly basis the following payments: (i) amounts due for the tax and insurance reserve; (ii) monthly interest due; and (iii) $15,000 toward the Loan's principal balance. Funds in the Lockbox were then released to the Debtor to pay its operating expenses. Subsequently, any excess cash was swept by Lender and applied toward the Loan's principal balance. The Debtor unilaterally ceased making deposits in the Lockbox after November 9, 2010, and has made no further deposits in violation of the Loan Documents. The Debtor made principal and interest payments on December 9, 2010, and January 9, 2011, but has made no further payments to the Lender. As a result, to ensure that taxes were paid current on the property, on February 25, 2011 Lender was forced to advance its own funds for taxes.

n. According to the Lender, the outstanding balance of the Loan as of the Petition Date was $3,078,190.76, comprised of principal in the amount of $2,895,322.16, monthly interest in the amount of $57,914.05, and default interest in the amount of $124,954.55.

**Lender Begins Foreclosure Proceedings in January 2011**

o. On January 14, 2011, Lender initiated foreclosure proceedings on the Property.

p. In accordance with Nevada law, the foreclosure sale for the Property was scheduled for May 11, 2011.

6. *The Gonzales Action*

On January 13, 2011, Gonzales brought an action commencing the litigation in the Eighth Judicial District Court for the State of Nevada (the "Gonzales Action"). The defendants are:

DESERT LAND, LLC, a Nevada limited liability company;

DESERT OASIS APARTMENTS, LLC, a Nevada limited liability company;

DESERT OASIS INVESTMENTS, LLC, a Nevada limited liability company;

SPECIALTY TRUST, a Maryland corporation;

SPECIALTY STRATEGIC FINANCING FUND, LP, a Delaware limited partnership;

EAGLE MORTGAGE COMPANY; and

WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF J. P. MORGAN CHASE COMMERCIAL MORGAN SECURITIES CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004 FL1; SPECIALTY MORTGAGE CORP., a Nevada corporation.

By his Complaint, Gonzales seeks to enforce the $10 Million Parcel "A" Transfer Fee against Desert Land and Desert Oasis, asserting that these parties made a qualifying land transfer (exercise of the FLT Option) under the terms of the settlement agreement, which would entitle Gonzales to payment of the Parcel "A" Transfer Fee. In addition to filing a breach of contract action, to enforce payment of the Parcel "A" Transfer Fee Gonzales is seeking to treat his Parcel "A" Transfer Fee right as a lien against the property. Accordingly, Gonzales has named lenders in this action who hold interests against the Parcel "A" properties, and is seeking a declaration of priority and foreclosure against the Parcel "A" properties.

Mr. Gonzales alleges in his litigation that the obligation to pay the Parcel A Transfer Fee has been triggered. He alleges that the payment was triggered by the transfer of an option to Desert Oasis Investments, LLC. Mr. Gonzales also asserts upon information and belief, to be added as amendment to the current complaint, that payment of the Parcel A Transfer Fee also has have been triggered by a prior or existing lease of the property or will be triggered by a pending or contemplated lease.

On February 23, 2011, the Gonzales Action was removed to Bankruptcy Court by Specialty Trust, Inc., a debtor and debtor in possession in its own Chapter 11 case pending in the United States Bankruptcy Court for the District of Nevada as Case No. BK-N-10-51432-GWZ. On May 11, 2011, Judge Zive heard Desert Land's and Desert Oasis Investment's Motion for Withdrawal of Reference Pursuant to 28 U.S.C. §157(d). On June 13, 2011, Judge Zive's Order and Recommendation was entered recommending withdrawal of the Gonzales Action to District Court. The Gonzales Action should now be pending in the United States District Court for the District of Nevada. On August 23, 2011, Judge Zive's Order and Recommendation was transmitted to the United States District Court for the District of Nevada.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Wells Fargo Bank has filed a Motion to Dismiss the Gonzales Action on the grounds that Gonzales, as a matter of law, does not have a lien on Parcel A. Wells Fargo Bank argues:

> Here, the intentions of the parties are clearly stated. Per the terms of the Settlement Agreement, Plaintiff was solely granted a right to a Parcel "A" Transfer Fee upon a qualifying land transfer associated with the Parcel "A" property. As already noted, the Parcel "A" Transfer Fee clause does not use any words conveying or transferring an actual title interest in the Parcel "A" property. Rather, the clear terms of the Settlement Agreement provide that the Parcel "A" Transfer Fee "**shall not constitute a mortgage, deed of trust, or other lien on Parcel A"**. *See supra*. (emphasis added). Because there was no intent by the parties to create a lien, this Court should not grant Plaintiff's Parcel "A" Transfer Fee any lien consideration.

Desert Land, Desert Oasis Investments and the Debtor intend to join in this motion and support this argument. It is expected that the Gonzales Action will result in a determination that Gonzales does not have a lien on the Property of the Debtor.

Desert Land, Desert Oasis Investments and the Debtor would also argue that since Gonzales did not obtain a stay pending appeal, the loans made in between the Bankruptcy Court's Order Confirming the Second Amended Plan of Reorganization and the BAP Decision by the BAP Court, are protected by the provisions of Bankruptcy Code §364(e) which provides:

> (e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

Desert Land, Desert Oasis Investments and the Debtor intend to prosecute counterclaims against Gonzales for slander of title and other claims.

Pending the outcome of the Gonzales Action, the Debtor does not have clear title to the Property.

Gonzales states his contentions with regard to the Gonzales Action as follows:

a. Gonzales' complaint does not assert that there is a lien, but seeks a judicial determination to confirm that his rights regarding the Parcel A Transfer Fee constitutes part of a right or an interest given in Parcel A.

b. A notice of *lis pendens* was not recorded in regards to Gonzales' litigation.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

c. Pursuant to the terms of Desert Land's confirmed plan, any sale, transfer, or other conveyance of all, or any part of Parcel A (with certain specified exceptions), which occurred concerning any portion of Parcel A, triggers Gonzales' rights in the entirety of Parcel A, including that portion of Parcel A owned by Desert Oasis.

d. Gonzales has asserted the occurrence of a trigger event in his complaint, and, further, Desert Oasis is aware of (1) a lease made on a portion of Parcel A owned by Desert Land, and (2) Desert Oasis is aware that there are other existing and/or future leases to be made upon Desert Land's portion of Parcel A, which Gonzales asserts are, or would be, additional trigger events.

7. *Reduction of the Loan Balance*

The principal balance of the Loan was, originally, $5,200,000. The principal balance on the Loan has been substantially reduced since the Loan by principal reduction payments made on the following dates:

| | |
|---|---|
| August 2, 2006 | $1,025,000 |
| July 30, 2007 | 340,000 |
| August 11, 2008 | 250,000 |
| December 4, 2008 | 235,000 |
| June 1, 2009 to January, 2011 | 15,000/month |

The principal balance now due is approximately $2,895,322. Interest and fees accrued, pre-petition, were approximately $247,536. Some of these fees and costs may be disputed.

**B. Insiders of the Debtor**

In a limited liability company, the equity interest holders are the members. Debtor's insiders as defined in §101(31) of the United States Bankruptcy Code (the "Code") include the members and the manager. The managers of the Debtor are as follows:

| | |
|---|---|
| David Gaffin | Manager |

The owners of the Debtor are:

| | |
|---|---|
| Compass Investments, LLC | 99.5% |
| Bruce E. Bulloch | 0.5% |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Compass Investments, LLC is managed by Howard Bulloch and David Gaffin.

**C. Property Value**

The Debtor estimates the Property is worth approximately $6,500,000 based upon its cash flow as an apartment complex. In addition, the Property is part of an assemblage of adjacent real estate with frontage on Las Vegas Boulevard which could be developed as a hotel/resort/casino. The value of the Property for this purpose may be $12 million to $24 million.

**D. Management of the Debtor Before and During the Bankruptcy**

The person in control of the Debtor is David Gaffin.

**E. Events Leading to Chapter 11 Filing**

The Loan made to Desert Oasis by J P Morgan Chase Bank was originally due in July, 2006. The parties to the Loan negotiated extensions on August 2, 2006, July 30, 2007, August 11, 2008, December 4, 2008, June 1, 2009 and December 4, 2009. Pursuant to these agreements, the balance of the Loan became due July 10, 2010. Despite good faith attempts by both parties, no further extension of the Loan was negotiated. In November, 2010, the Debtor ceased depositing all its rental income in a lock-box controlled by the Bank. The Debtor did make principal and interest payments through January, 2011. On January 14, 2011, Wells Fargo had a Notice of Default & Election to Sell filed. On April 18, 2011, Wells Fargo had filed and served an notice that a sale under the power of sale contained in the deed of trust would be held on May 11, 2011. On May 10, 2011, the Debtor filed its petition.

**F. During the Bankruptcy Case**

Since the filing of the debtor's bankruptcy case, the debtor has employed Schwartzer & McPherson Law Firm as its bankruptcy counsel. The fees of Schwartzer & McPherson will be based, generally, on the time spent by counsel.

The Debtor has sought and obtained authority to use the Bank's cash collateral for normal operations and maintenance of the Property. Under the cash collateral order the Debtor is paying the Bank monthly interest at the non-default rate of 6% per annum.

The Debtor has sought and obtained authority to honor pre-petition tenant deposits.

On August 19, 2011, the Special Servicer filed a complaint in the bankruptcy case, Adversary No. 11-01228, which seeks declaratory relief that Gonzales does not have a valid lien on the Property and/or Wells Fargo's lien has priority over Gonzales' lien. Gonzales may argue that the claims in this litigation are compulsory counterclaims in the Gonzales Action previously filed.

**G. Projected Recovery of Avoidable Transfers**

The Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

**H. Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

The Debtor does intend to pursue its counterclaim against Tom Gonzales in the action pending in the Gonzales Action.

**I. Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets are as follow:

| | | |
|---|---|---|
| Real Property | $ 6,500,000.00 | |
| Counterclaim Against Gonzales | 10,000,000.00[11] | |
| Property & Equipment | 236,872.56 | |
| Monies owed to Debtor | $ 1,330,369.69 | |
| Total Assets | | $ 18,067,242.25 |

The identity and balance owed of Debtor's debts are as follows:

| | |
|---|---|
| Wells Fargo Bank | $ 3,076,716.23 |
| Tenant Security Deposits | $ 17,215.00 |
| Insider Unsecured Claims | $ 7,169,734.61 |

11. Disputed and unliquidated.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| | | |
|---|---|---|
| Gonzales Claim | $10,000,000.00[12] | |
| Non-Insider Unsecured Creditors | $ 27,650.17 | |
| Total Unsecured Claims | $17,197,384.78 | |
| Total Debts | | $20,291,316.01 |
| Net Equity | | $ (2,224,073.77) |

The Debtor post-petition operations as shown by the Monthly Operating Reports filed with the Bankruptcy Court consist of the rent paid by the Tenants, the operating expenses and costs paid by the Debtor, the interest payments paid by the Debtor to Wells Fargo Bank. No other funds have been received or disbursed since the filing of the petition in this case. The Debtor's operations produce a positive cash flow, before interest, amortization and depreciation of approximately $34,000 per month.

Attached as Exhibit "F", is a schedule showing the cash flow of the apartments for the past __ years and a projection for the next 10 years. The projections are the Debtor's best estimate of future cash flow based upon its past and current occupancy, rents and expenses. The projections show that the Debtor should have no problem in making the monthly payments required by the Plan.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

12. Not yet due or payable and also an obligation of affiliates of the Debtor.

.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**B. Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has placed these claims in Class 1.

1. Class 1. *Administrative Expenses and Priority Claims*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

Tenant security deposits are entitled to priority under §507(a)(7). The Bankruptcy Court has approved honoring all tenant deposits. Debtor intends to pay Tenant security deposits in the ordinary course of business, that is, when the tenant is entitled to return of his or her security deposit. Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it be paid on the effective date of the Plan

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Monthly Expenses Arising in the Ordinary Course of Business After the Petition Date | $50,000 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court. | $50,000 | Paid in full on the effective date of the Plan (or when approved by the Court) in full from the pre-petition retainer received from Debtor. |
| Office of the U.S. Trustee Fees | $1,625 | Paid in full on the effective date of the Plan or when due if later. |
| TOTAL | $101,625 | |

The Debtor is unaware of any Priority Tax Claims.

2. Class 2. *Bank Secured Claim*

| **Description** | **Impairment** | **Treatment** |
|---|---|---|
| *Secured claim of the Bank*<br><br>Collateral description : the Property<br><br>Allowed Secured Amount: $3,100,000 (estimated)<br><br>Priority of lien: 1st priority | impaired | Class 2 is impaired by this Plan. The Bank will be paid its pre-petition claim in full, including principal, accrued interest and costs and reasonable attorneys' fees. This amount shall be paid with interest at the rate of 4.5% per annum from the Petition Date. Beginning on 1st day of the 1st month following the Effective Date, the Bank shall be paid an amount necessary to amortize its claim over 25 years together with interest. In addition payments for insurance and real estate taxes will be escrowed. The principal and interest payment would be approximately $17,250 per month. Payment would be made from the rent collected from the Tenants. The balance of the Claim shall be all due and payable in 10 years from the Effective Date. This balloon payment at the end of 10 years would be approximately $2,253,000. This balance will be paid from the proceeds of sale or refinancing or from a capital investment made by the owners of the equity interest. There will be no pre-payment penalty. The loan will be assumable. The Bank shall retain its lien on the Property with the same priority as it held on the date of the Debtor's Petition. |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3. Class 3. *Gonzales Claim*

| **Description** | **Impairment** | **Treatment** |
|---|---|---|
| Class 3 – Tom Gonzales ($10,000,000) | unimpaired | Class 3 is unimpaired by this Plan. Tom Gonzales will be paid the Parcel A Transfer Fee pursuant to the terms of the Desert Land Plan of Reorganization. That payment is due when, and only when, there is a Parcel A Transfer as defined in that plan. This claim is unsecured. This claim is subject to setoffs and counterclaims by the Debtor. |

4. Class 4. *Class of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code. The following chart identifies the Plan's proposed treatment of Class 4 which contain general unsecured claims against the Debtor:

| **Description** | **Impairment** | **Treatment** |
|---|---|---|
| Class 4 - General Unsecured Creditors (approximately, $7,197,000) | impaired | Class 4 is impaired by this Plan. Non-Insider General Unsecured Creditors will be paid in full, without interest from the rent collected from the Tenant. Beginning on 1st day of the 1st month following the Effective Date, Class 4 will be paid $3,000 per month pro rata for approximately 12 months.<br>Desert Land, LLC, Citation Financial, LLC and Compass Investments Holdings, LLC (holding claims of approximately $7,161,000) have agreed to subordinate their claims to the claims of other unsecured creditors and will be paid only after all other unsecured creditors are paid in full and reasonable reserves for maintenance and repair of the Property have been funded. |

5. Class 5. *Class of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor. In a limited liability company ("LLC"), the equity interest holders are the members. The following chart sets forth the Plan's proposed treatment of the one class of equity interest holders:

| Description | Impairment | Treatment |
|---|---|---|
| Class 5- Equity Security Holders of the Debtor | unimpaired | Class 5 is unimpaired by this Plan. Equity Security Holders (the members of the Debtor) will retain their equity interest in the Debtor. |

**C. Means of Implementing the Plan**

1. *Source of Payments*

Payments and distributions under the Plan will be funded by the rents paid by the Tenants and by sale or refinancing at or before the end of 10 years. The Debtor asserts that there is substantial equity in the Property in excess of the debt to the Bank. In normal times, the Property could easily be refinanced. However, due to the alleged lien of Gonzales and the current economic situation in which there are almost no loans for commercial property in Las Vegas available, makes immediate refinancing unavailable. The Gonzales lien will be eliminated by a final order in the Gonzales Action and, it is reasonable to expect that competition for and availability of commercial lending for apartment complexes will return at some time within the next ten years.

2. *Post-confirmation Management*

The Post-Confirmation Managers of the Debtor shall be David Gaffin, the current manager. The Manager will be compensated from funds in excess of the required payments under this plan. For the foreseeable future, on-site management will be continue to handled by West Corp Management Group.

**D. Risk Factors**

The proposed Plan has the following risks:

1. Business Risk-There is an inherent risk in all real estate in that the value of the property is, in part, dependent on general economic conditions in the community. In the unlikely event

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

that the value of the property decreases below $3,100,000 over the next ten years it may be impossible for the Debtor to refinance the Property and pay off the loans as required by the Plan.

2. Tenant Risk- There is an inherent risk in that the current level of tenant occupancy and tenant rents, although expected to remain the same in the future, could decline in the future. In the event of a substantial reduction in occupancy or rent levels, the Debtor will not have the ability to make the payments required by the Plan.

3. Refinancing Risk-The current market does not provide opportunities for refinancing Las Vegas properties at almost any rate. It is unlikely that this condition will continue. With the elimination of the alleged Gonzales lien and the continued amortization of the Loan, it is more likely than not that refinancing will become available.

These long-term risks are shared by the Bank and Equity Security Holders In the event of the failure of the Debtor to make the payments to the Bank required by the Plan, the Bank would have the right to foreclose on the Property.

**E. Executory Contracts and Unexpired Leases**

The Plan lists all executory contracts and unexpired leases that the Debtor will assume under the Plan. Tenant leases will be assumed. Other executory contracts and unexpired leases related to the operation of the Property may be assumed. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

**F. Tax Consequences of Plan**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

The following are the anticipated tax consequences of the Plan:

1. Tax consequences to the Debtor of the Plan:

a. Under the Internal Revenue Code, the rent paid by the Tenants is considered income. Interest paid to the Bank is deductible. In addition, depreciation of the Property is deductible. The Debtor expects to incur minimal income.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

b. The Debtor is not an income tax-paying entity. The Debtor's income and/or losses are passed through to its equity holders.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 2 and 4 are impaired and that holders of claims and interests in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1, 3 and 5 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

1. *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case is August 9, 2011 (for non-governmental creditors) and November 8, 2011 (for government units).***

2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3. *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- holders of claims or equity interests in unimpaired classes;
- tenants because they are holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and
- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan.***

**B. Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class,

and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section [B.2.].

1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

**C. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement as **Exhibit "B."**

In a liquidation, the Property would be foreclosed upon by the Bank, the successful bidder at the foreclosure sale would obtain title to the Property free and clear of subordinate liens and, possibly, the Lease. Gonzales and other the unsecured creditors would receive a dividend of approximately 12%. Members of the Debtor would receive nothing.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**D. Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1. *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. If necessary, the members of the Debtor will contribute the funds necessary to pay Administrative Claims and Priority Claims. The retainer received by Debtor's counsel should be sufficient to pay Debtor's counsel's fees and costs.

2. *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments. In this case, existing monthly rent payments are more than sufficient to fund the monthly payments required by the Plan. A schedule of the Debtor's past cash flow and projected cash flow is attached as Exhibit "F". These projections show that based on past cash flow the projected cash flow will be more than sufficient to make the payments required by the Plan.

The Gonzales claim is for the Parcel "A" Transfer Fee as described in the Order Confirming the Desert Land Confirmation Order and section II.A above. This claim is due when a portion of Parcel "A" is sold. The obligation for the Parcel "A" Transfer Fee is shared with Desert Land, LLC. Desert Land owns 7 adjacent parcels of land worth $30,000,000 to $60,000,000. At this time, none of this land is subject to secured debt. Desert Land would likely be able to sell land or obtain financing to pay the Gonzales claim.

3. *Confirmation Requirements*

The Plan is Fair and Equitable to the Bank

The Plan satisfies the first test in § 1129(b)(2)(A). Under the Plan, the Bank retains its lien. The Bank has objected to the Plan being Fair and Equitable because the Gonzales lien question is not decided prior to confirmation. That is not a requirement of the statute. Bankruptcy Code §1129(b)(2)(A)(i)(I) only requires that the "creditor *retains* the lien securing its claim". The statute does not require a debtor to guarantee, improve or increase the priority of a creditor's lien. Both the Debtor and the Bank agree that Gonzales' alleged lien must be inferior to the Bank's lien because (a) Gonzales has no right to a lien and (b) because the Bank's lien was given pursuant to an order of the bankruptcy court and (i) the appeal from that order was taken and (ii) no stay pending appeal was granted. See Bankruptcy Code §364(e).

The Bank Will Receive The Indubitable Equivalent Of Its Claim

The Bank is entitled to the indubitable equivalent of its claim. 11 U.S.C. § 361(3). That can be provided by interest being paid on the claim. The Plan provides the Bank with a stream of monthly payments as required by subsection II of §1129(b)(2)(A)(ii). The "value" of the stream of payments requires payment of an appropriate rate of interest, considering the terms, quality of the security and any risk to be borne by the affected creditor.

U.S. government interest rates are lower--actually much lower than just a few weeks ago. The 10-year Treasury Note is now hovering at just under 2.5 % [2.40% as of August 8, 2011]. 2.5% is today's so-called "riskless rate." The proposed rate of 4.5% is a full 2% greater than the return possible from investing in similar maturity Treasury bonds. Percentage-wise, that is 80% higher interest rate in a situation where the Bank has minimal risk of default and there are no marketing costs. The Debtor asserts that 80% higher return is a sufficient risk premium for a 92%-95% occupied apartment building with 127 units and therefore over a 100 diversified sources of revenues for repayment.

## V. EFFECT OF CONFIRMATION OF PLAN

### A. Discharge

On the effective date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

**B. Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

**C. Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. The Debtor intends to file a motion for a final decree as soon as it begins making the payments to the secured and unsecured creditors under the Plan. Alternatively, the Court may enter such a final decree on its own motion.

Respectfully submitted,

DESERT OASIS APARTMENTS, LLC

By:/s/ David Gaffin
David Gaffin, Manager

The Plan Proponent

Prepared by:

SCHWARTZER & McPHERSON LAW FIRM

By: /s/ Lenard E. Schwartzer
Lenard E. Schwartzer, Esq.
*Counsel for the Debtor and Debtor in Possession*
*And Plan Proponent*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBITS

**Exhibit A –** Proposed Plan of Reorganization
**Exhibit B –** Liquidation Analysis
**Exhibit C –** Confirmation Order
**Exhibit D –** BAP Decision
**Exhibit E –** 9th Circuit Decision
**Exhibit F** – Cash Flow History and Projections

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# Exhibit A

# Copy of Proposed Plan of Reorganization

LENARD E. SCHWARTZER (NV Bar No. 0399)
JEANETTE E. MCPHERSON (NV Bar No. 5423)
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
Email: bkfilings@s-mlaw.com

Counsel for Debtor and Debtor in Possession

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re<br><br>**DESERT OASIS APARTMENTS, LLC,**<br><br>Debtor. | Case No. BK-S-11-17208-BAM<br>Chapter 11<br><br>Hearing Date:<br>Hearing Time:<br>Place: Courtroom #3 |
|---|---|

**DESERT OASIS APARTMENT, LLC'S AMENDED PLAN OF REORGANIZATION**

**ARTICLE I**

**SUMMARY**

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of DESERT OASIS APARTMENT, LLC (the "Debtor"). The Debtor owns the real property and improvements located in Las Vegas, NV described as Assessor's Parcel Number 162-28-310-001 (the "Property"). The Property consists of approximately 6.4 acres located on the south side of Mandalay Bay Road approximately 800 feet east of Las Vegas Boulevard. On the Property is an apartment complex consisting of 128 one- and two-bedroom units. Approximately, 92%-95% of the apartment units are occupied by tenants ("Tenants"). The Property is worth approximately $6,500,000 and is subject to a loan in the approximate amount of $3,076,000 now held by Wells Fargo Bank, N.A., as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1 (the "Bank") which has matured.

The current owner obtained title to the Property in August of 1999.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

This Plan provides for one class of priority claims; one class of secured claims; one class of unsecured claims; and one class of equity security holders. **Under the Plan, the rights of Tenants are unimpaired.** The Bank will receive distributions which the proponent of this Plan has valued at 100 cents on the dollar. The Plan proposes to pay the Bank in full over a period of 10 years using the rental income from the Tenants to pay market rate interest of 4.5% per annum and principal amortized over 25 years and a balloon payment at the end of 10 years obtained through sale or refinancing when the mortgage markets become more normal. Tenants with priority claims for deposits will be paid 100% in the normal course of operation of the apartment complex. Under the Plan, the unsecured claim of Tom Gonzales is unimpaired. Under the Plan, the unsecured creditors, except insiders, will be paid over eleven months without interest. Under the Plan, insiders will agree to subordinate their claims to the claims of other unsecured creditors. This Plan also provides for the 100% payment of all other administrative, including fees payable to the Office of the United States Trustee, and priority claims upon confirmation.

All creditors and equity security holders should refer to Articles III through V of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01 Class 1. All allowed claims entitled to priority under § 507 of the Code.

2.02 Class 2. The claim of the Bank, to the extent allowed as a secured claim under § 506 of the Code.

2.03 Class 3. The claim of Tom Gonzales.

2.04 Class 4. All unsecured claims allowed under § 502 of the Code.

2.05 Class 5. Equity interests in the Debtor.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**ARTICLE III**

**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,**

**U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS**

3.01 Unclassified Claims. Under section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

3.02 Administrative Expense Claims. Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

3.03 Priority Tax Claims. Each holder of a priority tax claim will be paid on the Effective Date of this Plan, in cash.

3.04 United States Trustee Fees. All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date.

**ARTICLE IV**

**TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

4.01 Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | unimpaired | Class 1 is unimpaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, upon the later of the effective date of this Plan as defined in Article VIII, or the date on which such claim is allowed by a final non-appealable order. |

| Class 2 – Secured Claim of Bank (approximately $3,100,000) | impaired | Class 2 is impaired by this Plan. The Bank will be paid its claim in full, including principal, accrued interest and costs and reasonable attorneys' fees. This amount shall be paid with interest at the rate of 4.5% per annum from the Effective Date. Beginning on 1st day of the 1st month following the Effective Date, the Bank shall be paid an amount necessary to amortize its claim over 25 years together with interest. In addition payments for insurance and real estate taxes will be escrowed. The balance of the Claim shall be all due and payable in 10 years from the Effective Date. There will be no pre-payment penalty. The loan will be assumable. The Bank shall retain its lien on the Property with the same priority it held of the date of the Debtor's Petition. |
|---|---|---|
| Class 3 – Tom Gonzales ($10,000,000) | unimpaired | Class 3 is unimpaired by this Plan. Tom Gonzales will be paid the Parcel A Transfer Fee pursuant to the terms of the Desert Land Plan of Reorganization. That payment is due when, and only when, there is a Parcel A Transfer as defined in that plan. This claim is unsecured. This claim is subject to setoffs and counterclaims by the Debtor. |
| Class 4 - General Unsecured Creditors | impaired | Class 4 is impaired by this Plan. Non-Insider General Unsecured Creditors will be paid in full, without interest from the rent collected from the Tenant. Beginning on 1st day of the 1st month following the Effective Date, Class 4 will be paid $3,000 per month pro rata for approximately 9 months.<br>Desert Land, LLC, Citation Financial, LLC and Compass Investments Holdings, LLC have agreed to subordinate their claims to the claims of other unsecured creditors and will be paid only after all other unsecured creditors are paid in full and reasonable reserves for maintenance and repair of the Property have been funded. |
| Class 5- Equity Security Holders of the Debtor | unimpaired | Class 5 is unimpaired by this Plan. Equity Security Holders (the members of the Debtor) will retain their equity interest in the Debtor. |

**ARTICLE V**

**ALLOWANCE AND DISALLOWANCE OF CLAIMS**

5.01 Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02 Delay of Distribution on a Disputed Claim. No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03 Settlement of Disputed Claims. The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**ARTICLE VI**

**PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

6.01 Assumed Executory Contracts and Unexpired Leases.

(a) The Debtor assumes the following executory contracts and/or unexpired leases effective upon the:

- Leases with Tenants.
- Westcorp Management Group - property management

(b) The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the order confirming this Plan, upon the effective date of this Plan. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan.

**ARTICLE VII**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

The means for implementation of this Plan is the rents paid by Debtor's existing and future Tenants. The Debtor will sell or refinance the Property within 120 months following the Effective Date. The proceeds from such sale or refinance shall be used to fund the balloon payment to the Bank as set forth in the Plan. If the Property is sold, the Debtor and its affiliates which own the adjacent land will pay the Parcel A Transfer fee to Gonzales from the sales proceeds.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**ARTICLE VIII**

**GENERAL PROVISIONS**

8.01 Definitions and Rules of Construction. The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan. Additionally, the following definitions apply:

a. The "Bank" shall mean Wells Fargo Bank, N.A., as trustee for the Registered Holders of JPMorgan Chase Commercial Mortgage Pass-Through Certificates, Series 2004-FL1.

b. The "Property" shall mean the real property and improvements thereon located in Las Vegas, NV described as Assessor's Parcel Number 162-28-310-001 (the "Property") consisting of approximately 6.4 acres located on the south side of Mandalay Bay Road and approximately 800 feet east of Las Vegas Boulevard.

c. The "Tenants" shall mean the tenants who rent apartment units on the Property.

d. The "Effective Date" of this Plan is the fifteenth business day following the date of the entry of the order of confirmation. But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

e. The "Desert Land Plan of Reorganization" is that plan of reorganization that was confirmed in the case of *In re Desert Land, LLC*, Case No. BK-S-02-16202-RCJ by an order entered April 13, 2003 as amended by decisions of the Bankruptcy Appellate Panel for 9th Circuit and the Court of Appeals for the 9th Circuit.

f. The "Parcel A Transfer Fee" is the fee provided to be paid to Tom Gonzales in the Desert Land Plan of Reorganization when, and only when, there is a Parcel A Transfer as defined in the Desert Land Plan of Reorganization.

8.02 Severability. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.03 Binding Effect. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

8.04 Captions. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.05 Controlling Effect. Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Nevada govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

8.06 Governance. The Debtor will maintain its current form of governance and its current managers until such managers are replaced as provided in its existing Operating Agreement.

8.07 Revesting of Assets in the Debtor. Upon confirmation of the Plan, all property of the estate of the Debtor shall be revested in the Debtor, pursuant to 11 U.S.C. § 1141(c), which shall retain such property as the Reorganized Debtor free and clear of all claims and interests of the creditors, except as set forth in the Plan.

8.08 Disbursing Agent. The Debtor will serve as disbursing agent and shall make all payments required under the Plan. The disbursing agent may employ or contract with other entities to assist in or to perform the distribution of the property and shall serve without bond.

8.09 Request for Application of 11 U.S.C. § 1129(b). The Debtor, as Plan proponent, will request the Court to find that the provisions for dissenting classes provide for fair and equitable treatment of said creditors, and to confirm its Plan notwithstanding the requirements of § 1129(a)(8) as to such classes.

8.10 Post-Confirmation Management of the Debtor. The Debtor shall be managed post-confirmation by its current manager, David Gaffin.

8.11 Post-Confirmation Litigation. The Debtor anticipates post-confirmation litigation with Tom Gonzales over the enforcement of the terms of the Plan of Reorganization entered in the Desert Land, LLC Chapter 11 case, as amended by the decisions of the Bankruptcy Appellate Panel for the 9th Circuit and the Court of Appeals for the 9th Circuit, and except for collection matters that may occur in the normal course of the Debtor's business, and the determination of certain claims. The Debtor reserves the right to prosecute any objections to claims.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

8.12 Post-Confirmation Default. In the event the Debtor becomes delinquent in duty or obligation under the Plan, the affected creditor or creditors may provide written notice of such default to the Debtor and its counsel at the following addresses:

Lenard E. Schwartzer, Esq.
Schwartzer & McPherson Law Firm
2850 S. Jones Blvd, Ste. 1
Las Vegas, NV 89146-5308

Desert Oasis Apartments, LLC
10181 Park Run Drive, Ste. 200
Las Vegas, NV 89145

The Debtor shall thereafter have fifteen (15) business days from receipt of said notice in which to cure the default. In the event such default remains uncured, the affected creditor or creditors may bring the matter before the Bankruptcy Court. At any hearing, the Bankruptcy Court may consider the reason for the default and the ability of the Debtor to bring the payment(s) current in a reasonable period of time. The Bankruptcy Court may also consider conversion of the case to a Chapter 7 of the Code or dismissal if the same is in the best interests of creditors.

8.13 Federal Income Tax Consequences of the Plan. The Plan will have limited tax consequences. The Debtor, as a limited liability company, has elected to be treated as a partnership for federal income tax purposes and, therefore, does not pay federal income tax. The Plan does not call for forgiveness of any debt. Creditors are advised to discuss with their own tax advisor any tax effect to the creditor of such payments.

8.14 Injunction. From and after the Effective Date, and except as provided in the Plan and the Confirmation Order, all entities that have held, currently hold, or may hold a Claim, are permanently enjoined from taking any of the following actions on account of any such Claims: (i) commencing or continuing in any manner any action or other proceeding against the Debtor, or its Property; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Debtor or the Reorganized Debtor, or their respective property; (iii) creating, perfecting or enforcing any lien or encumbrance against the Debtor or the Reorganized Debtor, or their respective property; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor, or their

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

respective property; or (v) commencing or continuing any action, in any manner or any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

8.15 Exculpation. From the Petition Date through the Effective Date, the Debtor and its managers, attorneys, agents and employees shall not have any liability to the Debtor or any other claimants or creditors, or other parties in interest in the Bankruptcy Case for any act or omission in connection with or arising out of the Bankruptcy Case, including, without limitation, prosecuting confirmation of the Plan, confirmation of the Plan, and the administration of the estate, the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects, such persons will be entitled to rely on the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Case and the Plan.

8.16 Post-petition Employment of Counsel. Following the Effective Date, the Debtor may continue to employ counsel for necessary legal services. Counsel may be paid from the Debtor without further order of the Court.

8.17 Closing Case. The estate shall be deemed to be fully administered upon the commencing of distributions to the Class 1 creditor and the case may be closed.

**ARTICLE IX**

**DISCHARGE**

Discharge. The Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date.

Respectfully submitted,

Desert Oasis Apartments, LLC
By *__/s/David Gaffin____*
David Gaffin, Manager
The Plan Proponent

Prepared by:

SCHWARTZER & McPHERSON LAW FIRM

By:________________________________
Lenard E. Schwartzer, Esq.
*Counsel for the Debtor and Debtor in Possession*
*And Plan Proponent*

# Exhibit B

## Liquidation Analysis

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# Exhibit B

## Liquidation Analysis

***Plan Proponent's Estimated Liquidation Value of Assets (foreclosure by the Bank)***

| | |
|---|---|
| **Assets** | |
| a. Cash on hand | $ 100,000 |
| b. Real Property (based upon Appraisal by RCS Appraisal, Inc.) less 10% discount for foreclosure or Chapter 7 bankruptcy sale[1] | $ 5,400,000 |
| ***Total Assets at Liquidation Value*** | $ 5,500,000 |
| **Less:** Costs of Sale (estimated at 10% of sales price) | $ 54,000 |
| **Less:** Secured Claim of Bank ($3,100,000) | $ 3,100,000 |
| **Less:** Chapter 7 trustee fees and expenses | $ 150,000 |
| **Less:** Chapter 11 administrative expenses (not previously paid by retainer) | $ 0 |
| **Less:** Priority claims, excluding administrative expense claims | $ 0 |
| Balance for unsecured claims | 2,196,000 |
| ***Percentage of Claims Which Unsecured Creditors*** [2] ***Would Receive Or Retain in a Chapter 7 Liquidation:*** | 13% |
| ***Percentage of Claims Which Non-Insider Unsecured Creditors Will Receive or Retain under the Plan:*** | 100% |

1. The RCS Appraisal, Inc market value of $6,000,000 requires an exposure period of approximately 12 months.

2. Includes $10,000,000 claim of Gonzales which would be due upon sale of the Property and $7,197,000 claims of insiders which will be subordinated under the Plan.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# Exhibit C

# CONFIRMATION ORDER IN DESERT LAND CASE

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

ORIGINAL

FILED AND ENTERED ON DOCKET

'03 APR 21 A10 :09

U.S. BANKRUPTCY COURT PATRICIA GRAY, CLERK

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
3800 Howard Hughes Pkwy, Suite 1100
Las Vegas, NV 89109
Telephone: (702) 693-4230
Facsimile: (702) 892-0122
Attorneys for Debtors

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

In re

DESERT LAND, LLC,

Debtor.

_____________________________________/

In re

DESERT OASIS APARTMENTS, LLC,

Debtor.

_____________________________________/

In re

DESERT RANCH, LLC,

Debtor.

_____________________________________/

BK-S-02-16202 RCJ
Chapter 11

BK-S-02-16204
Desert Oasis Apartments, LLC
BK-S-02-16205
Desert Ranch, LLC

**ORDER CONFIRMING DESERT LAND'S SECOND AMENDED PLAN OF REORGANIZATION; APPROVING SETTLEMENT AGREEMENT; APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND DISMISSING CASES OF DESERT OASIS APARTMENTS AND DESERT RANCH**

Date: January 29, 2003
Time: 9:30 a.m.

On January 29, 2003 through January 31, 2003, the Court held a hearing to consider the confirmation of the Plan of Reorganization for Desert Land, LLC ("Desert Land"); Desert Oasis Apartments, LLC ("Desert Oasis Apartments") and Desert Ranch, LLC ("Desert Ranch") (collectively, the "Debtors") appeared by and through their principals, Howard Bulloch and David Gaffin and their counsel, Lenard E. Schwartzer, Esq. of Schwartzer & McPherson Law Firm; creditor Consolidated Mortgage Corporation ("CMC")

appeared through its counsel, Denise Abramow, Esq. and Candace C. Carlyon, Esq. of Shea & Carlyon; creditor Aspen Financial Corporation ("Aspen") appeared through its counsel, Nile Leatham, Esq. of Kolesar & Leatham; creditor Tom Gonzales ("Gonzales") and his affiliates appeared in person and through their counsel, Gerald M. Gordon, Esq. and Matthew C. Zirzow, Esq. of Gordon & Silver; and the Office of the U.S. Trustee appeared through Scott Farrow, Esq.

The Court having heard the testimony of the witnesses, reviewed the documents admitted into evidence and, on January 31, 2003, having heard the settlement reached among Gonzales and the Debtors as presented by their counsel, and having been presented with a written Settlement Agreement which will be executed by Gonzales and the Debtors (the "Settlement Agreement"), a copy of which is attached to the Plan as Exhibit "A" and good cause appearing therefor;

IT IS ORDERED, ADJUDGED AND DECREED that the Debtors have given proper notice of the confirmation hearing and that the Second Amended Plan of Reorganization (the "Plan"), a copy of which has been attached to this Order as Exhibit "1", which modifies the original Plan of Reorganization either (i) treats creditors the same or better than they were treated under the original Plan or (ii) has the consent of the creditors affected thereby (those creditors being CMC, Aspen and Gonzales); and

IT IS ORDERED that the Plan meets all the requirements for confirmation set forth in Bankruptcy Code § 1129; and

IT IS ORDERED that the Plan be, and hereby is, confirmed and shall be binding on all creditors of Desert Land; and

IT IS ORDERED that the Settlement Agreement between the Debtors and Gonzales, a copy of which is attached hereto (the "Settlement Agreement"), is approved and shall be binding on the parties thereto and, on or before the Effective Date, shall be executed by the parties thereto ; and

IT IS ORDERED that in accordance with the provisions of the Plan the transfers of property and interests required by the Plan and the Settlement Agreement shall be exempt

from transfer taxes pursuant to Bankruptcy Code § 1146; and

IT IS ORDERED that (a) Desert Oasis Investments, LLC ("Desert Oasis Investments") is strictly prohibited from seeking bankruptcy protection until CMC is paid in full; (b) Desert Oasis Investments will not accrue unsecured debt until CMC is paid in full; (c) Desert Oasis Investments will execute a stipulation that the automatic stay of 11 U.S.C. §362 will terminate to permit CMC to foreclose on the Arby Avenue Property (as defined in the Plan) if any bankruptcy petition is filed by or against Desert Oasis Investments; and (d) Desert Oasis Investments may not further transfer of the Arby Avenue Property until CMC is paid in full, without the prior written consent of CMC; and

IT IS ORDERED that (i) The Ranch, LLC ("The Ranch") is strictly prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) The Ranch shall not incur or allow any unsecured debt to be incurred until Aspen is paid in full; (iii) The Ranch shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the Eldorado Lane Property (as defined in the Plan) if any bankruptcy petition is filed by or against The Ranch; (iv) The Ranch shall not further transfer or encumber the Eldorado Lane Property or any interest therein, until after Aspen is paid in full, without the prior written consent of Aspen; and (v) The Ranch shall irrevocably amend its Operating Agreement to provide that it may not file a voluntary bankruptcy petition without the written permission of Aspen, until after Aspen is paid in full; and

IT IS ORDERED that (i) Desert Land is strictly prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) Desert Land will not incur or allow unsecured debt to be incurred (except in the ordinary course of business) until Aspen is paid in full; (iii) Desert Land shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the Desert Oasis Motel Property (as defined in the Plan) if any bankruptcy petition is filed by or against Desert Land ; (iv) Desert Land shall not further transfer or encumber the Desert Oasis Motel Property or any interest therein, until Aspen is paid in full, without the prior written consent of Aspen; and (v) Desert

Land shall immediately amend its Operating Agreement to provide that it may not file a voluntary bankruptcy petition without the written permission of Aspen, until after Aspen is paid in full; and

IT IS ORDERED that the executory contracts and unexpired leases of Desert Land (the "Assumed Contracts") are hereby assumed and, the executory contracts and unexpired leases relating to property or businesses on the real estate described as Parcels B, C and D (south of Four Seasons Drive, Las Vegas, Nevada) are assigned to New World, LLC, specifically the following:

(A) Ground Lease dated September 1, 1999 between Mary Bartsas as landlord and Desert Land, LLC as tenant (which may have been previously assigned to New World, LLC);

(B) Management contract between Hospitality Associates and Desert Land, LLC for the Glass Pool Inn;

(C) Management contract between Hospitality Associates and Casa Malaga Motel Inc. for the Casa Malaga Motel;

(D) Billboard lease or rental agreement between Outdoor Media Group and Casa Malaga Motel Inc. Outdoor Media Group has been purchased by Viacom Outdoor Inc.; and

(E) Billboard lease or rental agreement between Seiler, LLC and Desert Land, LLC. Seiler, LLC has been purchased by The Lamar Companies; and

IT IS ORDERED that the cases of Desert Oasis Apartments and Desert Ranch be, and hereby are, dismissed; and

IT IS ORDERED that the modifications in the Second Amended Plan do not materially adversely affect any holder of a Claim or Interest, or other party in interest to the Second Amended Plan. As such, pursuant to Fed. R. Bankr. P. 3019, these modifications do not require additional disclosure pursuant to Section 1125 of the Bankruptcy Code or resolicitation of acceptances or rejections of the Plan under Section 1126 of the Bankruptcy Code, nor do they require the holders of Claim or Interests be afforded any

opportunity to change previously cast acceptances or rejections of the Plan; and

IT IS ORDERED that the Settlement Agreement is hereby authorized and approved pursuant to 11 U.S.C. §§ 105 and 1123(b) and Fed. R. Bankr. P. 9019, as a fair and equitable settlement among the parties thereto, and as an integral part of the Plan, and is in the best interests of the Debtors, their estates and holders of claims, and shall be binding on the parties thereto; and

IT IS ORDERED that Debtors and all other necessary parties are authorized and empowered, without further Court order, to execute and deliver any instrument, security agreement or document, and to perform any act, that is necessary, desirable, or required for the consummation of the Plan, including, without limitation executing any appropriate documents contemplated by, related to or in accordance with the Settlement Agreement, to effectuate and consummate the transactions provided for in the Settlement Agreement; and

IT IS ORDERED that except as otherwise provided in this Confirmation Order, immediately upon the entry of this Confirmation Order, the terms of the Plan shall be, and hereby are, deemed binding upon Reorganized Desert Land and the other Debtors, any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are impaired under the Plan or whether the holders of such Claims or Equity Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with Reorganized Desert Land and any and all entities who are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing; and

IT IS ORDERED that consistent with the Plan and Settlement Agreement, Reorganized Desert Land and the other Debtors are hereby authorized to perform and transfer all of the transferred or exchanged assets free and clear of all liens, claims, interests and encumbrances (except as otherwise provided in the Plan and this

Confirmation Order) as provided for in the Settlement Agreement and to take all actions necessary or appropriate to implement, consummate and effectuate the transactions contemplated thereby, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Settlement Agreement and the transactions contemplated thereby, and to take all further actions as may be reasonably requested by any of the parties for the purpose of assigning, transferring, granting, conveying and conferring to the parties or reducing to possession any or all of the transferred or exchanged assets, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Settlement Agreement, all without further action by the Court or corporate action by the directors, members or stockholders (or similar positions) of Debtors; and

IT IS ORDERED that this Confirmation Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report any title or state of title in or to any of the transactions contemplated or occurring pursuant to the Plan, this Confirmation Order or the Settlement Agreement; and

IT IS ORDERED that except as provided in the Settlement Agreement, consummation of the transactions contemplated therein does not and will not subject Gonzales to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against Debtors, any affiliate of Debtors, or any other person by reason of such transfers and assignments under the laws of the United States, any state, territory or possession applicable to such transactions; and

IT IS ORDERED that the terms and provisions of the Plan and the Settlement Agreement, together with the terms and provisions of this Confirmation Order, shall be binding in all respects upon the Debtors, Gonzales, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to all non-debtor parties to the Assumed Contracts, and persons asserting a claim against or interest in the Debtors' estate or any assets to be transferred or exchanged to Gonzales pursuant to the Settlement Agreement, and shall estop any affected non-debtor to any Assumed Contract from asserting any consent, approval, offset or similar right under any Assumed Contract; and

IT IS ORDERED that any non-debtor party to an Assumed Contract which asserts that Desert Land has defaulted under an Assumed Contract and has not cured such default prior to the Confirmation or that the Assumed Contract cannot be assigned to New World, LLC shall appear at a hearing before the Bankruptcy Court on Apr 28, 2003 **at the hour of** 2:30 pm and file and serve any objections in writing on counsel for the Debtors and Gonzales at least one (1) business day before the hearing or be forever barred from asserting such default or claim; and

IT IS ORDERED that until entry of a final decree, Desert Land shall file with the clerk of this Court, not later than twenty (20) days from the end of each calendar quarter which occurs after the entry of this Order, a report of action taken by Desert Land and the progress toward consummation of the Plan; and

IT IS ORDERED that the Debtor shall mail, by first class mail, a copy of this Order to all creditors and parties in interest, including all non-debtor parties to the Assumed Contracts, within two (2) business days of the entry of this Order.

DATED: April 21 2003

ROBERT CLIVE JONES
U.S. BANKRUPTCY JUDGE

P:\WorldPortResorts\Pleadings\Order Confirm Plan 041303.wpd

Prepared by:

SCHWARTZER & McPHERSON LAW FIRM

Lenard E. Schwartzer, Esq.
3800 Howard Hughes Pkwy, Suite 1100
Las Vegas NV 89109
Attorneys for Debtors and Debtors in Possession

Approved as to form and content:

KOLESAR & LEATHAM

Nile Leatham, Esq.
3320 W. Sahara Ave., Suite 380
Las Vegas, NV 89102
Attorneys for Aspen Financial Services

Approved/Disapproved as to form:

GORDON & SILVER

Gerald M. Gordon, Esq.
Matthew C. Zirzow, Esq.
3980 Howard Hughes Pkwy, 9th Fl.
Las Vegas, NV 89109
Attorneys for Gonzales

Approved/Disapproved/Reviewed

OFFICE OF THE U.S. TRUSTEE

Scott Farrow, Esq.
600 Las Vegas Blvd. S., Suite 430
Las Vegas, NV 89101

Approved as to form and content:

SHEA & CARLYON

Candace C. Carlyon, Esq.
Denise Abramow, Esq.
233 S. Fourth St., Suite 200
Las Vegas, NV 89101
Attorneys for Consolidated Mortgage Corporation

Prepared by:

SCHWARTZER & McPHERSON LAW FIRM

Lenard E. Schwartzer, Esq.
3800 Howard Hughes Pkwy, Suite 1100
Las Vegas NV 89109
Attorneys for Debtors and Debtors in Possession

Approved as to form and content:

KOLESAR & LEATHAM

Nile Leatham, Esq.
3320 W. Sahara Ave., Suite 380
Las Vegas, NV 89102
Attorneys for Aspen Financial Services

Approved/Disapproved as to form:

GORDON & SILVER

Gerald M. Gordon, Esq.
Matthew C. Zirzow, Esq.
3980 Howard Hughes Pkwy, 9th Fl.
Las Vegas, NV 89109
Attorneys for Gonzales

Approved/Disapproved/Reviewed

OFFICE OF THE U.S. TRUSTEE

Scott Farrow, Esq.
600 Las Vegas Blvd. S., Suite 430
Las Vegas, NV 89101

Approved as to form and content:

SHEA & CARLYON

Candace C. Carlyon, Esq.
Denise Abramow, Esq.
233 S. Fourth St., Suite 200
Las Vegas, NV 89101
Attorneys for Consolidated Mortgage Corporation

**EXHIBIT "1"**

Lenard E. Schwartzer
Nevada Bar No. 0399
Jeanette E. McPherson
Nevada Bar No. 5423
Schwartzer & McPherson Law Firm
3800 Howard Hughes Pkwy, Suite 1100
Las Vegas, NV 89109
Telephone: (702) 693-4230
Facsimile: (702) 892-0122
Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br>DESERT LAND, LLC,<br>Debtor.<br>_______________/ | BK-S-02-16202 RCJ<br>Chapter 11 |
| In re<br>DESERT OASIS APARTMENTS, LLC,<br>Debtor.<br>_______________/ | BK-S-02-16204<br>Desert Oasis Apartments, LLC<br>BK-S-02-16205<br>Desert Ranch, LLC<br><br>**SECOND AMENDED PLAN OF REORGANIZATION** |
| In re<br>DESERT RANCH, LLC,<br>Debtor.<br>_______________/ | Date: January 29, 2003<br>Time: 9:30 a.m. |

Desert Land, LLC ("Desert Land"), Desert Oasis Apartments, LLC ("Desert Oasis") and Desert Ranch, LLC ("Desert Ranch") (collectively, the "Debtors") by and through their counsel, Schwartzer & McPherson Law Firm, are proposing this Plan Of Reorganization (the "Plan") pursuant to 11 U.S.C. § 1123, and are seeking approval of the Plan by the creditors and members of Desert Land and by the Court. Under the Plan, the debts of Desert Land are reorganized and the Chapter 11 cases of Desert Oasis and Desert Ranch are dismissed.

///

## ARTICLE I

## DEFINITIONS:

"Allowed Claim" shall mean a pre-petition claim against or an interest in Desert Land to the extent that such claim or interest has been scheduled as undisputed, non-contingent and liquidated. Claims may also be allowed by virtue of their having been filed under § 1111(a) and by specific order of the Court.

"Administrative Expense or Claim" shall mean those expenses incurred after the commencement of the case and which are allowed under § 503 of the Code. Such expenses include wages, salaries, rents, taxes, management fees, trade credits and the like which are incurred in the ordinary course of the Debtors' business, after the commencement of the case, which shall be paid in the ordinary course of the Debtors' business. Such expenses include all of the fees and costs for Debtors' counsel which shall be paid on the Effective Date or when allowed by the Court.

"Aspen" shall mean Aspen Financial Services, Inc. or its affiliates.

"Bankruptcy Code" or "Code" refers to Title 11 of the United States Code.

"Bankruptcy Court" or "Court" refers to the United States Bankruptcy Court for the District of Nevada, Southern Division, or such other Court where the venue may be proper.

"Case" shall mean these joint proceedings for the Debtors for relief under Chapter 11 presently pending in this Court.

"Claim" shall mean the right to payment or performance as defined under § 101(4) of the Code.

"CMC" shall mean Consolidated Mortgage corporation or its affiliates.

"Confirmation" shall mean the entry of an order of the Court which approves this Plan.

"Creditor" shall mean any entity that has a claim against Desert Land or the estate, and which arose prior to the filing of the case.

"Debtors" means, collectively, Desert Land, LLC, Desert Oasis Apartments, LLC and Desert Ranch, LLC.

"Effective Date of the Plan" or "Effective Date" shall mean the first business day ten (10) days after Confirmation.

"Fieldman" shall mean Barry Fieldman, Makena Entertainment Las Vegas Boulevard, LLC and their affiliates as defined in Bankruptcy Code § 101(31).

"Gonzales" shall mean Tom Gonzales and his affiliates as defined in Bankruptcy Code § 101(31).

"Members" shall mean members of Desert Land as of the Petition Date and their affiliates as defined in Bankruptcy Code § 101(31).

"New World" shall mean New World LLC, a Nevada limited liability company.

"Parcel A" shall have the same meaning as set forth in the Settlement Agreement.

"Petition Date" means the day these cases were filed, e.g., May 31, 2002, and upon which an order for relief was entered.

"Plan" means this plan of reorganization under § 1121 proposed by the Debtors, which may be amended or modified, from time to time.

"Priority Claims" shall mean those allowed claims and expenses that are defined in § 507 of the Code, or that otherwise arise by operation of law.

"Secured Creditor" shall mean any creditor of Desert Land holding an allowed secured claim under the Code.

"Settlement Agreement" shall mean the agreement between the Debtors and Gonzales attached hereto as Exhibit "A"

"Unsecured Creditor" shall mean any creditor of Desert Land who is not a Secured Creditor and who is holding an allowed claim which is not a Priority Claim.

## ARTICLE II

## CLASSIFICATION OF CREDITORS AND INTERESTS

The Debtors hereby propose the following classification of creditors, pursuant to 11 U.S.C. § 1123(a)(1):

CLASS 1 shall consist of priority creditors of Desert Land.

CLASS 2 shall consist of Unsecured Creditors of Desert Land.

CLASS 3 shall consist of the Secured Creditors of Desert Land. Class 3 shall be divided into a subclass for each Secured Creditor.

a. Gonzales

b. CMC

c. Aspen (debt secured by Eldorado Lane Property)

d. Aspen (debt secured by Desert Oasis Motel Property)

CLASS 4 shall consist of the Members.

**ARTICLE III**

**<u>TREATMENT OF CLASSES</u>**

<u>Class 1</u>: These Claims will be paid in full upon confirmation except to the extent that the claim holders agree to some other treatment.

<u>Class 2</u>: These Claims shall will be paid in full in six (6) equal monthly installments beginning within thirty (30) days of the Effective Date of the Plan, except that the claim of The Ranch LLC shall be subordinated to all claims and shall not be paid until all other Unsecured Creditors have been paid in full and funds are available from the sale or refinancing of Desert Land's property.

<u>Class 3</u>: Each Claim in Class 3 shall be paid up to 100% of the Claim to be paid as follows:

A. <u>Gonzales</u>. Pursuant to and subject to the terms and conditions as more fully set forth in the Settlement Agreement by and among Debtors and Gonzales, the debt to Gonzales will be cancelled. On the Effective Date, and pursuant to the terms and subject to the conditions as more fully set forth in the Settlement Agreement:

(a) On or before the Effective Date, Desert Ranch will convey its 65% membership interest in New World to Gonzales free and clear of any and all liens and encumbrances.

(b) On or before the Effective Date, Gonzales will convey his undivided 5% interest in Parcel A to Desert Land free and clear of any and all liens and encumbrances other than those of record as of Confirmation.

(c) On or before the Effective Date, Gonzales will cancel that certain debt in the amount of $41.5 million made by Gonzales to Desert Land and Desert Oasis, any accrued interest and attorneys' fees and costs and will reconvey the deed of trust on Parcel A and release all other security for the debt.

(d) On or before the Effective Date, Gonzales will cause Fieldman to convey Fieldman's undivided 0.5% interest of Parcel A to Desert Land free and clear of any and all liens and encumbrances other than those of record as of Confirmation.

(e) *Parcel A Transfer Fee*. Concurrently with a Parcel A Transfer, Desert Land and/or Desert Oasis shall pay to Gonzales a cash payment (the "*Parcel A Transfer Fee*") of either (i) $7.5 million in the event that (A) there is a Bona Fide Escrow opened for the Parcel A Transfer on or before 90 days following Confirmation (as defined in the Debtors' Plan) and in fact closes within six months of the date such Bona Fide Escrow was opened or (B) the Parcel A Transfer Fee is paid within six months of Confirmation; or (ii) $10 million in the event that the Parcel A Transfer occurs more than 90 days following Confirmation, with the exception of an escrow for a Parcel A Transfer which was opened on or before 90 days following Confirmation and does in fact close within six months of the date that such escrow was opened. Notwithstanding the foregoing to the contrary, (i) upon a Parcel A Equity Transfer, Desert Land and/or Desert Oasis shall not be required to pay the entire Parcel A Transfer Fee, but shall pay Gonzales 50% of the Net Proceeds received from the Parcel A Equity Transfer until such time as the Parcel A Transfer Fee has been paid in full; and (ii) all payments on account of a Parcel A Equity Transfer shall be credited to and reduce the amount of the Parcel A Transfer Fee subsequently due. The Parcel A Transfer Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be subordinate to any Parcel A Permitted Financing. Gonzales will subordinate his right to the payment of the Parcel Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 days written notice to Gonzales, such subordination agreement(s) as may be reasonably required by

the title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

As used in this Plan:

"*Bona fide escrow*" shall mean (i) an escrow opened with a party who deposits the greater of $1,000,000 or 5% of the purchase price in escrow (up to $2,500,000), (ii) which provides that the deposit will become non-refundable in 90 days from the opening of the escrow unless the escrow is cancelled, and (iii) which provides that the escrow must close within six (6) months from the opening of the escrow.

"*Mortgage*" shall mean a mortgage, deed of trust, security agreement and/or collateral assignment securing a bona fide loan for value.

"*Net proceeds*" shall mean the gross proceeds of a Parcel A Equity Transfer, less the transaction costs directly related to the Parcel A Equity Transfer paid to unrelated parties, including, but not limited to, brokerage commissions paid to parties other than Howard Bulloch and/or David Gaffin. Net proceeds shall not include consideration wholly in the form of stock, membership, partnership or other equity interests in a corporation, limited liability company, partnership or other entity wholly owned or controlled by Howard Bulloch or David Gaffin or their trusts. Gonzales acknowledges and agrees that membership interests in Desert Land and/or Desert Oasis may be transferred in consideration of past services or other consideration and that, so long as the Net Proceeds received by the transferor are nothing more than such past consideration, the Net Proceeds shall be deemed to be zero.

"*Parcel A Transfer*" shall mean: (a) the sale, transfer or other conveyance of all or any part of Parcel A, other than (i) a Parcel A Mortgage or (ii) sales, transfers or other conveyances or purchases for easements or to realign property lines, or condemnations involving less than 5% of the gross Parcel A land area; or (b) the sale, transfer or other conveyance of any legal or beneficial interest in the entity or entities that own Parcel A (a "*Parcel A Equity Transfer*").

"*Parcel A Permitted Financing*" shall mean (i) one or more Mortgages against Parcel

A or any part thereof, securing financing in the principal amount of up to $25,000,000 at any one time outstanding and (ii) a Mortgage securing the purchase of the real property subject to the FLT Option, the proceeds of which are used exclusively for the purchase of such real property.

(f) The $25,000,000 portion of the Parcel A Permitted Financing shall be used to pay expenses of Desert Land and The Ranch, LLC to maintain, develop and promote the sale of the property owned by these entities, to pay the expenses of these entities, to repay or refinance the loans secured by the property owned by Desert Land or The Ranch, LLC (which in the case of The Ranch, LLC are the three loans in the approximate amount of $2,200,000 each from Aspen Financial Services), to pay reasonable compensation to Howard Bulloch and David Gaffin and up to $5,000,000 (the "safe harbor" amount) for any purpose, including a distribution to members. Desert Land shall deliver to Gonzales' counsel a report on expenditures from Parcel A Permitted Financing on August 1, 2003 and the first day of each three (3) months thereafter until the Parcel A Transfer Fee has been paid in full.

(g) A memorandum will be recorded in the Office of the County Recorder of Clark County, Nevada to give notice of Gonzales' right to the Parcel A Transfer Fee and that the right to the Parcel A Transfer Fee will be subordinate to Parcel A Permitted Financing which may encumber all or portions of Parcel A.

(h) Gonzales and the Debtors shall be bound to the terms of the Settlement Agreement.

B. Consolidated Mortgage Corporation. On the Effective Date, the 19.2 acres of undeveloped real property which is subject to the deed of trust for the benefit of CMC (the "Arby Avenue Property") shall be conveyed to Desert Oasis Investments, LLC ("Desert Oasis Investments"), a Nevada limited liability company owned by Howard Bulloch and David Gaffin or their trusts. Beginning on the Effective Date, (a) payment shall be made of the interest accrued on the note secured by the Arby Avenue Property (the "CMC Note") at the non-default rate provided in the CMC Note from February 1, 2003 to the end

of the month of the Effective Date and (b) monthly payments on the first day of each month beginning after the Effective Date of current interest only at the non-default rate provided in the CMC Note. All principal and interest (at the non-default rate provided in the CMC Note) accrued prior to February 1, 2003 and attorneys' fees and costs (but not penalties or late charges) will be all due and payable August 1, 2003. CMC will retain its existing lien on the property transferred to Desert Oasis Investments. Payments made by Desert Oasis Investments or Desert Land shall be deemed made for fair and adequate consideration. In the event of default by Desert Land or Desert Oasis Investments, CMC shall be immediately entitled to record a Notice of Breach and Election to Sell the Arby Avenue Property, and all past-due interest shall be recalculated at the default rate specified in the CMC Note, and shall all then be due and payable. Additional terms for this class are as follows:

1. The Confirmation Order shall provide that (a) Desert Oasis Investments is strictly prohibited from seeking bankruptcy protection until CMC is paid in full; (b) Desert Oasis Investments will not accrue unsecured debt until CMC is paid in full; (c) Desert Oasis Investments will execute a stipulation that the automatic stay of 11 U.S.C. §362 will terminate to permit CMC to foreclose on the Arby Avenue Property if any bankruptcy petition is filed by or against Desert Oasis Investments; and (d) Desert Oasis Investments may not further transfer the Arby Avenue Property until CMC is paid in full without the prior written consent of CMC.

2. On the Effective Date, Desert Land or Desert Oasis Investments will pay to CMC a forbearance fee equal to the difference between the default rate of interest under the CMC Note and the contract rate under the CMC Note (the "CMC Forbearance Fee") in the approximate amount of $38,000.

3. On the Effective Date, Desert Land or Desert Oasis Investments will commence monthly interest payments to CMC on the first day of each month

at the non-default rate, for a period ending August 1, 2003 (the "Initial CMC Payment Period"). If payments during the Initial CMC Payment Period are timely made and no other events of default have occurred, on the date that the sixth payment is due, Debtor shall have the option of obtaining a six (6) month extension (the "CMC Extension Period") upon the payment of an extension fee equal to 1% of the principal balance in the approximate amount of $75,000.

4. During the CMC Extension Period, Desert Land or Desert Oasis Investments will pay to CMC six (6) monthly interest payments at the non-default rate on the first day of each month. At the expiration of the CMC Extension Period, if the debt is not paid in full, CMC may commence foreclosure on the Arby Avenue Property.

5. Interest for the period prior to Confirmation will accrue at the non-default rate and will be payable at the end of either the Initial CMC Payment Period, or if the extension has been obtained, at the end of the CMC Extension Period.

6. Interest will accrue at the non-default rate from Confirmation.

7. In the event of any default under the terms of this section B of the Plan (the section that applies to the treatment of CMC), CMC may immediately reinstate default interest.

8. Desert Land or Desert Oasis Investments will pay all attorney's fees, costs, and foreclosure costs (which, to Confirmation, are estimated to be in the approximate amount of $20,000) no later than the end of the Initial CMC Payment Period, or if the extension has been obtained, at the end of the CMC Extension Period.

9. In event of appeal of the order confirming the Plan by a party other than CMC, Desert Land and Desert Oasis Investments will continue to perform their obligations under the Plan to CMC regardless of the appeal or of a stay pending appeal.

C. Aspen.

1. On the Effective Date, the two (2) five-acre parcels of undeveloped real property which are subject to deeds of trust for the benefit of Aspen (the "Eldorado Lane Property") shall be conveyed to The Ranch, LLC ("The Ranch"). Beginning on the Effective Date, payments on the notes secured by the Eldorado Lane Property (the "Aspen Eldorado Notes") for the period from February 1, 2003 through July 31, 2003 shall be made on the Effective Date (for the period of February 1, 2003, through the first business day of the calendar month in which the Effective Date occurs) and continuing on the first business day of each succeeding calendar month in the following amounts: (a) accrued interest at the non-default rate for the preceding month(s), plus (b) one-half of the amount of such accrued interest at the non-default rate for the preceding month(s) (until all accrued and unpaid interest for the period prior to February 1, 2003 shall have been paid). By these payments, current interest, as well as all accrued but unpaid interest at the nondefault rate for the period prior to February 1, 2003, shall be paid by August 1, 2003. All principal and accrued interest (at the non-default rate provided in the respective Aspen Eldorado Note) shall be due and payable August 1, 2003. Aspen shall retain its existing lien on the property transferred to The Ranch. Payments made by The Ranch or Desert Land shall be deemed made for fair and adequate consideration. In the event of any default by Desert Land or The Ranch, Aspen shall be immediately entitled to record a Notice of Breach and Election to Sell the Eldorado Lane Property, and all interest past due shall be recalculated at the default rate specified in the respective Aspen Eldorado Note, and shall all then be due and payable. Additional terms for this class are as follows:

a. The Confirmation Order shall provide that (i) The Ranch is strictly prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) The Ranch shall not incur nor allow any unsecured debt to be incurred until Aspen is paid in full; (iii) The Ranch shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the Eldorado Lane Property if any bankruptcy petition is filed by or against The Ranch; (iv) The Ranch shall not further transfer nor

encumber the Eldorado Lane Property or any interest therein, until after Aspen is paid in full, without the prior written consent of Aspen; and (v) The Ranch shall irrevocably amend its Operating Agreement to provide that it may not file a voluntary bankruptcy petition without the written permission of Aspen, until after Aspen is paid in full.

b. On or before August 1, 2003, Desert Land or The Ranch shall pay to Aspen a forbearance fee equal to the difference between the default rate of interest and the contract rate (the "Aspen Eldorado Forbearance Fee") in the approximate amount of $21,000.

c. If payments prior to August 1, 2003 as stated above are timely made and no event of default hereunder have occurred, on or before August 1, 2003, Desert Land or The Ranch shall have the option of obtaining a three (3) month extension (the "Aspen Eldorado Extension Period"), so long as:

i. during the Aspen Eldorado Extension Period, Desert Land or The Ranch shall pay to Aspen on the first business day of such month interest payments calculated at the non-default rate, and

ii. at the expiration of the Aspen Eldorado Extension Period, if the debt is not paid in full, Aspen may complete foreclosure on the Eldorado Lane Property, and all accrued and unpaid interest shall be recalculated at the default rate of interest specified in the Aspen Eldorado Note and shall then be due and payable.

d. Interest will accrue at the non-default rate.

e. In the event of any default under the terms of this section C.1 of the Plan (the section that applies to the treatment of Aspen), Aspen may immediately reinstate the default interest rate Aspen Eldorado Notes.

f. Desert Land or The Ranch shall pay all attorney's fees, costs, and foreclosure costs (which, to Confirmation, are estimated to be, when combined with the

fees incurred relating to the Aspen Desert Oasis Note, in the approximate amount of $30,000) no later than 6 months from Confirmation, or if the extension has been obtained, at the end of the Aspen Eldorado Extension Period.

g. In event of appeal of the order confirming the Plan, Desert Land and The Ranch shall continue to perform their obligations to Aspen under the Plan, regardless of the appeal or of a stay pending appeal.

2. The 3.02 acre parcel of real property on which is located the Desert Oasis Motel, and which is subject to a deed of trust for the benefit of Aspen Financial Corporation (the "Desert Oasis Motel Property") shall remain titled in the name of Desert Land. Beginning on the Effective Date, payments on the notes secured by the Desert Oasis Motel Property (the "Aspen Desert Oasis Motel Notes") for the period from February 1, 2003 through July 31, 2003 shall be made on the Effective Date (for the period of February 1, 2003, through the first business day of the calendar month in which the Effective Date occurs) and continuing on the first business day of each succeeding calendar month in the following amounts: (a) accrued interest at the non-default rate for the preceding month(s), plus (b) one-half of the amount of such accrued interest at the non-default rate for the preceding month(s) (until all accrued and unpaid interest for the period prior to February 1, 2003 shall have been paid). By these payments, current interest, as well as all interest accrued for the period prior to February 1, 2003, shall be paid. All principal and accrued interest (at the non-default rate provided in the respective Aspen Desert Oasis Motel Note) shall be all due and payable on August 1, 2003. Aspen shall retain its existing lien on the Desert Oasis Motel. In the event of a default by Desert Land, Aspen shall be immediately entitled to record a Notice of Breach and Election to Sell the Desert Oasis Motel Property, and all interest past due shall be recalculated at the default rate specified in the respective Aspen Desert Oasis Motel Note, and shall then be due and payable. Additional terms for this class are as follows:

a. The Confirmation Order shall provide that (i) Desert Land is strictly prohibited from seeking bankruptcy protection until Aspen is paid in full; (ii) Desert Land

will not incur or allow unsecured debt to be incurred (except in the ordinary course of business) until Aspen is paid in full; (iii) Desert Land shall execute a stipulation that any automatic stay of 11 U.S.C. §362 shall terminate to permit Aspen to foreclose on the Desert Oasis Motel Property if any bankruptcy petition is filed by or against Desert Land; (iv) Desert Land shall not further transfer or encumber the Desert Oasis Motel Property or any interest therein, until Aspen is paid in full, without the prior written consent of Aspen; and (v) Desert Land shall immediately amend its Operating Agreement to provide that it may not file a voluntary bankruptcy petition without the written permission of Aspen, until after Aspen is paid in full.

b. On or before August 1, 2003, Desert Land shall pay to Aspen a forbearance fee equal to the difference between the default rate of interest and the contract rate (the "Aspen Desert Oasis Forbearance Fee") in the approximate amount of $60,000.

c. If payments prior to August 1, 2003 as stated above are timely made and no events of default hereunder have occurred, on the date that the sixth monthly payment is due, Desert Land shall have the option of obtaining a three (3) month extension (the "Aspen Desert Oasis Extension Period"), so long as:

i. During the Aspen Desert Oasis Extension Period, Desert Land or The Ranch shall pay to Aspen on the first business day of such month interest payments calculated at the non-default rate,

ii. at the expiration of the Aspen Desert Oasis Extension Period, if the debt is not paid in full, Aspen may complete foreclosure on the Desert Oasis Motel Property, and all interest accrued and unpaid interest shall be recalculated at the default rate of interest specified in the Note and shall then be immediately due and payable.

d. Interest shall accrue at the non-default rate.

e. In the event of any default in under the terms of this section C.2 of the Plan (the section that applies to the treatment of Aspen), Aspen may immediately reinstate the default interest rate on the Aspen Desert Oasis Note.

f. Desert Land shall pay all attorney's fees, costs, and foreclosure costs (which, to Confirmation, are estimated to be, when combined with the fees incurred relating to the Aspen Eldorado Note, in the approximate amount of $30,000) no later than 6 months from Confirmation, or if the extension has been obtained, at the end of the Aspen Desert Oasis Extension Period.

g. In event of appeal of the order confirming the Plan by a party other than Aspen, Desert Land shall continue to perform its obligations under the Plan to Aspen, regardless of the appeal or of a stay pending appeal.

h. Desert Land shall pay its debts to third parties promptly and timely, but in no event later than 15 days after the due date, unless contested in good faith by Desert Land. Monthly, Desert Land shall provide Aspen with a copy of the monthly management report from the management company operating the Desert Oasis Motel and a statement that all accounts payable are current or, if applicable, the nature of the dispute with regard to unpaid claims.

Class 4: The Members shall retain their interests in the Debtors as of the Petition Date. The Desert Ranch case will be dismissed. The Desert Oasis case will be dismissed.

## ARTICLE IV

## CLASSES IMPAIRED BY THE PLAN

All classes of creditors of Desert Land will be impaired by the plan except Class 1. Members of Desert Land are impaired.

## ARTICLE V

## MEANS FOR THE PLAN'S IMPLEMENTATION

Funding of the plan and of ongoing operations of the business will be implemented

through several means:

(a) By refinancing property of the Debtors.

(b) Future earnings from the sale or lease of the properties owned by Desert Land.

(c) Howard Bulloch and David Gaffin.

Debtors may also utilize any net proceeds of any causes of action, rights, claims and demands belonging to it as an additional source of funding for the Plan. Desert Land shall hold all assets free and clear of all claims and interests of creditors and equity security holders and free and clear of all liens, encumbrances, liabilities and obligations of debtors and debtors-in-possession, except as otherwise specifically stated in the Plan.

Howard Bulloch and David Gaffin (and their assigns) shall retain 100% of the membership interests in Desert Land subject to all creditors being paid in full.

Debtors, and all other necessary parties, are authorized and empowered, without further Court order, to execute and deliver any instrument, security agreement or document, and to perform any act, that is necessary, desirable, or required for the consummation of the Plan, including, without limitation, executing any appropriate documents contemplated by, related to or in accordance with the Settlement Agreement, to effectuate and consummate the transactions provided for in the Settlement Agreement.

Consistent with the Plan and Settlement Agreement, Reorganized Desert Land and the other Debtors are hereby authorized to perform and transfer all of the transferred or exchanged assets free and clear of all liens, claims, interests and encumbrances (except as otherwise provided in the Plan and this Confirmation Order) as provided for in the Settlement Agreement and to take all actions necessary or appropriate to implement, consummate and effectuate the transactions contemplated thereby, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Settlement Agreement and the transactions contemplated thereby, and to take all further actions as may be reasonably be requested by any of the parties for the purpose of assigning, transferring, granting, conveying and conferring to the parties or

reducing to possession any or all of the transferred or exchanged assets, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Settlement Agreement, all without further action by the Court or corporate action by the directors, members or stockholders (or similar positions) of Debtors.

**ARTICLE VI**

**ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

All executory contracts of Desert Land not heretofore assumed are hereby assumed. All unexpired leases of Desert Land not heretofore assumed are hereby assumed.

The executory contracts and unexpired leases of Desert Land which relate to the real estate owned by New World will be assigned to New World, specifically the following:

(A) Ground Lease dated September 1, 1999 between Mary Bartsas as landlord and Desert Land, LLC as tenant;

(B) Management contract between Hospitality Associates and Desert Land, LLC for the Glass Pool Inn;

(C) Management contract between Hospitality Associates and Casa Malaga Motel Inc. for the Casa Malaga Motel; and

(D) Billboard lease or rental agreement between Outdoor Media Group and Casa Malaga Motel Inc. Outdoor Media Group has been purchased by Viacom Outdoor Inc.; and

(E) Billboard lease or rental agreement between Seiler, LLC and Desert Land, LLC. Seiler, LLC has been purchased by The Lamar Companies.

**ARTICLE VII**

**CONTEMPLATED COMPENSATION FOR SERVICES, COSTS AND EXPENSES**

No compensation has been paid or promised by these the Debtors or to the Debtors' knowledge by any other entity for services, costs or expenses except the following:

Schwartzer & McPherson Law Firm and Jones Vargas shall be paid by Debtors or

their affiliates such fees and costs as the Court may allow upon application.

## ARTICLE VIII

## MANAGEMENT

The managing members of Debtors will not change after reorganization or dismissal. Specifically, Howard Bulloch and David Gaffin shall remain the managing members of Desert Land, Desert Oasis Apartments and Desert Ranch. Tom Gonzales will become the managing member of New World.

## ARTICLE IX

## TRANSFER TAXES

Pursuant to Bankruptcy Code §1146(c), the transfers of property contemplated by the Plan (including but not limited to the transfers of interest in Parcel A to Desert Land by Gonzales and Fieldman, the transfer of property from Desert Land to The Ranch LLC, and the transfer of land from Desert Land to Desert Oasis Investments, LLC) shall not be subject to transfer taxes by Clark County or the State of Nevada.

## ARTICLE X

## DISCHARGE

Upon confirmation, Desert Land will be discharged of all those debts and claims dischargeable under 11 U.S.C. Sec. 1141 and will hold all property of the estate free and clear of all claims and interests, except as otherwise provided in the Plan. While Desert Ranch and Desert Oasis will not receive a discharge, the reorganization of the debt of Desert Land will mean that the debt to Gonzales is cancelled for all purposes. The confirmation will be deemed to be a permanent injunction against the commencement or continuation of any action to enforce a debt or membership interest provided for in the Plan, so long as the terms of the Plan are being complied with.

## ARTICLE XI

## EFFECTIVE DATE

The Plan shall become effective on the Effective Date. In the event of an appeal of the order approving Confirmation and the issuance of a stay that prevents the Plan from being consummated, the Debtors will remain Debtors in Possession until the determination of the issues raised on appeal.

**ARTICLE XII**

**RETENTION OF JURISDICTION**

This Court shall retain jurisdiction after confirmation of the plan; (a) to consider (and reconsider if appropriate) claims and objections thereto; (b) to fix expenses of administration and compensation therefor, (c) to hear and determine any dispute arising under or relating to the plan or arising under or relating to the Chapter 11 reorganization case; (d) to enforce all discharge provisions of the plan; and (e) to make such orders and directions pursuant to 11 U.S.C. Sections 1127 and 1142 as may be necessary or appropriate.

**ARTICLE XIII**

**CLOSING**

This case shall be deemed closed on the Effective Date and the Desert Land may present an order closing the case thereafter. If there are any motions, matters or adversary proceedings pending, the Court may keep the case open.

DATED: April 16, 2003 Debtors-in-Possession

SCHWARTZER & McPHERSON LAW FIRM

Lenard E. Schwartzer, Esq.
Nevada Bar No. 0399
3800 Howard Hughes Parkway, Suite 1100
Las Vegas NV 89109
(702) 693-4230
Attorneys for Debtors and
Debtors in Possession

# EXHIBIT "A"

**SETTLEMENT AGREEMENT**

This Settlement Agreement (this "*Agreement*") is dated for reference purposes only as of April _____, 2003 and made by and among Desert Land, LLC, a Nevada limited liability company ("*Desert Land*"), Desert Oasis Apartments, LLC, a Nevada limited liability company ("*Desert Oasis*"), Desert Ranch, LLC, a Nevada limited liability company ("*Desert Ranch*" and, together with Desert Land and Desert Oasis, the "*Debtors*"), and Tom Gonzales, an unmarried man ("*Gonzales*").

PRELIMINARY STATEMENTS

A. Desert Land, Desert Oasis, and Gonzales are parties to that certain Loan and Security Agreement dated as of December 7, 2000 (the "*Loan Agreement*"), whereby Gonzales extended a Forty-one Million Five Hundred Thousand Dollar ($41,500,000) loan to Desert Land and Desert Oasis (the "*Loan*"). The Loan is evidenced by that certain Promissory Note Secured by Deed of Trust made as of December 7, 2000 (the "*Note*") by Desert Land and Desert Oasis in favor of Gonzales. The Note is secured by that certain Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of December 7, 2000, as amended by that certain Amendment to Deed of Trust dated as of December 18, 2000 (collectively, the "*Deed of Trust*"), made by Desert Land and Desert Oasis, granting Gonzales a first priority lien on, among other things, the real property set forth on Exhibit "A" ("*Parcel A*").

B. As additional collateral to secure the Note, Desert Land executed that certain Collateral Assignment of Purchase Agreement dated as of December 7, 2000 (the "*Assignment*"), whereby Desert Land made a collateral assignment to Gonzales of an option to purchase four (4) parcels from the FLT Trust (the "*FLT Option*").

C. In addition, Desert Ranch executed that certain Guaranty dated as of December 18, 2000 (the "*Guaranty*") of the repayment of Desert Land and Desert Oasis of the Loan, as well as that certain Pledge dated as of December 7, 2000 (the "*Pledge*"), in favor of Gonzales, of a 32.5% membership interest in New World.

D. As consideration for making the Loan, Desert Land and Desert Oasis conveyed to (i) Gonzales, an undivided 5% interest in Parcel A the ("*Gonzales Interest*"), and (ii) Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust ("*Fieldman*"), an undivided .5% interest in Parcel A (the "*Fieldman Interest*").

E. Desert Ranch owns a 65% membership interest in New World, LLC, a Nevada limited liability company ("*New World*") (together with all rights as a member, allocation of profits, losses, gains, deductions and credits, the "*Desert Ranch Interest*"). In addition, Desert Land is a party to various executory contracts and unexpired leases relating to and affecting New World and its assets.

F. New World is the owner in fee simple of that certain property described on Exhibit "B" (the "*New World Parcels*"), with the exception of that certain land owned in fee simple by Mary Bartsas, described on Exhibit "C" (the "*Leasehold Parcel*" and, together with

the New World Parcels and all buildings and improvements thereon and appurtenances thereto, the "*Real Estate*") of which New World holds a leasehold interest.

G. On May 31, 2002, Debtors filed voluntary petitions for relief under 11 U.S.C. §101 et. seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Nevada (the "*Bankruptcy Court*") as Case Nos. BK-S-02-16202-RCJ, BK-S-02-16204-RCJ, and BK-S-02-16205-RCJ (collectively, the "*Bankruptcy Case*").

H. Certain claims and disputes have arisen between the Debtors, on the one hand, and Gonzales, on the other hand, as evidenced by that certain Objection of Tom Gonzales to Confirmation of Plan of Reorganization filed with the Bankruptcy Court. Debtors and Gonzales have reached a settlement of their claims and disputes, in accordance with an agreement entered into in Bankruptcy Court on January 31, 2003, which was approved by the Bankruptcy Court. Pursuant to the terms and conditions of this Agreement and the confirmation of Debtors' Second Amended Plan of Reorganization (the "*Debtors' Plan*"), the Debtors, on the one hand, and Gonzales, on the other hand, desire to formally document their agreement and fully and finally settle all such claims existing between and among them. Capitalized terms used in this Agreement shall have the meanings set forth at the time of their first use or as defined on Schedule 1 attached hereto.

AGREEMENT

In consideration of the foregoing Preliminary Statements, the mutual covenants and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. *Transfer of Assets*. On and subject to the terms and conditions contained in this Agreement, the Parties agree that the following assets will be transferred:

1.1. *Transfers by the Debtors*.

(a) On or before the Closing Date and in conformance with the Debtors' Plan and Confirmation Order, the Debtors shall cause Desert Ranch to transfer the Desert Ranch Interest to Gonzales or his designee, free and clear of any and all liens or other encumbrances.

(b) Concurrently with a Parcel A Transfer, Desert Land and/or Desert Oasis shall pay to Gonzales a cash payment (the "*Parcel A Transfer Fee*") of either (i) $7.5 million in the event that there is Bona Fide Escrow opened for the Parcel A Transfer on or before 90 days following Confirmation (as defined in the Debtors' Plan) and in fact closes within six months of the date such Bona Fide Escrow was opened, or (ii) $10 million in the event that the Parcel A Transfer occurs more than 90 days following Confirmation, with the exception of a Bona Fide Escrow for a Parcel A Transfer which was opened on or before 90 days following Confirmation and does in fact close within six months of the date that such Bona Fide Escrow was opened. Notwithstanding the foregoing to the contrary, upon a Parcel A Equity Transfer, Desert Land and/or Desert Oasis shall pay Gonzales the Parcel A Transfer Fee from the Net Proceeds received from the Parcel A Equity Transfer, *provided, however*, that Desert Land and/or Desert Oasis shall not be required to pay to Gonzales more than fifty percent (50%) of the Net

Proceeds, and, *further, provided*, that if the Parcel A Transfer Fee is not satisfied from the Parcel A Equity Transfer, the remaining balance of the Parcel A Transfer Fee, after deducting amounts paid from the net proceeds of the Parcel A Equity Transfer, shall be paid to Gonzales upon any subsequent Parcel A Transfer. The Parcel A Transfer Fee shall be evidenced by the Parcel A Memorandum, which shall not, however, constitute a mortgage, deed of trust or other lien on Parcel A, and payment thereof shall be subordinate to any Parcel A Permitted Financing. Gonzales will subordinate his right to the payment of the Parcel A Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 days written notice to Gonzales, such subordination agreement(s) as may be reasonably required by the title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

1.2. *Transfers by Gonzales.* On or before the Closing Date, Gonzales shall transfer the Gonzales Interest and cause the Fieldman Interest to be transferred, to Desert Land and/or Desert Oasis or their designee, free and clear of any and all liens or other encumbrances on the ownership interest with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation caused or created by Gonzales or Fieldman. In addition, Gonzales shall (i) cancel the Note, mark it "cancelled" and cause the lien of the Deed of Trust to be fully reconveyed, and (ii) release any and all rights, including all liens, security interests, pledges and assignments Gonzales may have under the Loan Agreement, Note, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document.

1.3. *Closing.* The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Gordon & Silver, Ltd., 3960 Howard Hughes Parkway, 9th Floor, Las Vegas, Nevada, commencing at 10:00 a.m. (Pacific Time) on the first business day following the tenth day following the entry of the Confirmation Order (the "*Closing Date*").

1.4. *Allocations.* As a material inducement to enter into this Agreement, the Parties expressly agree that they shall allocate the transactions set forth in Section 1.2 and 1.3 of this Agreement for all purposes, including, without limitation, financial accounting and Tax returns, in accordance with the schedule attached hereto as Exhibit "D" (the "*Allocation Schedule*"). The Parties shall make all appropriate Tax filings on a basis consistent with the Allocation Schedule and shall use their respective commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or dispute and no Party will take a position on any income, transfer or gains Tax return, before any governmental or regulatory authority charged with the collection of any such Tax or in any judicial proceeding that is inconsistent with the terms of any such allocation set forth on the Allocation Schedule without the prior written consent of the other Parties in their sole and absolute discretion.

2. *Representations and Warranties.*

2.1. *General Statement.* The Parties make the representations and warranties to each other which are set forth in this Section 2. All such representations and warranties and all representations and warranties that are set forth elsewhere in this Agreement and in any schedule, exhibit or document delivered by a Party to another Party pursuant to this Agreement shall survive the Closing for a period of eighteen (18) months (and none shall merge into any instrument of conveyance). No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty. All representations and warranties of the Debtors are made subject to the exceptions that are noted in the disclosure schedules attached hereto delivered by the Parties to each other concurrently herewith (the "*Disclosure Schedule*") and are qualified and supplemented by (i) any and all information contained in the books and records of New World identified in Schedule 2.1 attached hereto (the "*New World Books and Records*"), (ii) the Debtors' schedules and other filings and the bankruptcy court hearings and other proceedings of record within the Bankruptcy Case; and (iii) any matters apparent from a visual inspection of the Real Estate or any improvements thereon. Furthermore, any exceptions noted in a Disclosure Schedule to a specific section of this Agreement shall be deemed incorporated automatically into any other section of this Agreement (and its applicable Disclosure Schedule) if the subject matter of the latter bears a reasonable relationship to the former, the representations overlap or if otherwise necessary or appropriate to make the representations or warranties in the latter more complete or accurate. All exceptions noted in the Disclosure Schedule shall be numbered to correspond to the applicable paragraph of this Agreement to which such exception refers. Reference in this Agreement to the "Debtors" shall mean each person or entity comprising the Debtors, and all of them, collectively, as applicable. All such representations and warranties contained in this Agreement and made by the Debtors, on the one hand, and Gonzales, on the other hand, shall be true and correct as of the date hereof, and true and correct as of the Closing Date. Representations made to the "*actual knowledge*" of Debtors, or any of them, shall mean the actual knowledge of Howard Bulloch or David Gaffin without responsibility for investigation of the falsity of such representation or of the breach of such warranty. As used in this Article 2, the term "*material*" shall mean the sum of $250,000 per item and $1,000,000 in the aggregate. The Parties acknowledge that each of them and New World have been engaged in numerous attempts to develop the Real Estate and Parcel A and that, in connection therewith, plans, drawings, proposals and other development proposals have been reviewed by the Parties and/or New World, and that none of the Parties makes any representation or warranty whatsoever concerning the value of any such plans, drawings or proposals, or, except as set forth in Exhibit D, the Business, the Real Estate or Parcel A.

2.2. *Representations and Warranties of Gonzales.* Gonzales represents and warrants to the Debtors that:

(a) Gonzales has full power and authority to enter into and perform the obligations on his part to be performed pursuant to (i) this Agreement, and (ii) all documents and instruments to be executed by Gonzales pursuant to this Agreement (collectively, the "*Gonzales Ancillary Documents*"). This Agreement has been, and the Gonzales Ancillary Documents will be, duly executed and delivered by Gonzales. This Agreement constitutes a valid and legally binding obligation of Gonzales, enforceable against Gonzales in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy,

reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(b) Except for the approval of the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other person is required for the execution and delivery by Gonzales of this Agreement and the Gonzales Ancillary Agreements, and the consummation by Gonzales of the transactions contemplated by this Agreement and the Gonzales Ancillary Agreements in accordance with their respective terms.

(c) Neither the execution and delivery of this Agreement and the Gonzales Ancillary Documents by Gonzales, nor the consummation by Gonzales of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or governmental authority or of any arbitration award, in each case applicable to Gonzales.

(d) Gonzales is not a party to any unexpired, undischarged or unsatisfied written or oral contract, agreement, indenture, mortgage, debenture, note or other instrument under the terms of which performance by Gonzales according to the terms of this Agreement will be a default, or whereby timely performance by Gonzales according to the terms of this Agreement may be prohibited, prevented or delayed.

(e) Gonzales and Fieldman are, respectively, the lawful owners of the Gonzales Interest and the Fieldman Interest, the same have not been previously assigned or otherwise transferred, and are free and clear of any and all liens, encumbrances and/or rights of others, with the exception of those items affecting the title to Parcel A listed of record as of the Confirmation.

(f) Neither Gonzales, nor any of his Affiliates has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transactions contemplated hereby or introducing the Parties to each other for which the Debtors may be liable.

(g) With respect to the representations and warranties of Desert Ranch regarding New World, Gonzales has no actual knowledge that any of said representations or warranties are false, incomplete or inaccurate in any material respect.

(h) The representations and warranties of Gonzales in this Agreement or in any of the Gonzales' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

2.3. *Representations and Warranties of the Debtors.* The Debtors represent and warrant to Gonzales as follows:

(a) *Organization.*

(i) Each Debtor and New World is duly organized, a limited liability company, validly existing and in good standing under the laws of the State of Nevada and has all necessary power and authority to conduct their respective businesses as such businesses are now being conducted.

(ii) Upon entry of the Confirmation Order by the Bankruptcy Court, each of the Debtors has full power and authority to enter into and perform (a) this Agreement, and (b) all documents and instruments to be executed by any of the Debtors pursuant to this Agreement (collectively, the "*Debtors' Ancillary Documents*"). This Agreement has been, and the Debtors' Ancillary Documents will be, duly executed and delivered by duly authorized representatives of the Debtors. Upon approval of the Bankruptcy Court, this Agreement constitutes a valid and legally binding obligation of each of the Debtors, enforceable against the Debtors in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

(iii) Except for the entry of the Confirmation Order by the Bankruptcy Court, no consent, authorization, order or approval of, or filing or registration with, any governmental authority or other agency is required for the execution and delivery of this Agreement and the Debtors' Ancillary Documents and the consummation by the Debtors of the transactions contemplated by this Agreement and the Debtors' Ancillary Documents.

(iv) Neither the execution and delivery by the Debtors of this Agreement and the Debtors' Ancillary Documents, nor the consummation by the Debtors of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of any of the Debtors' Articles of Organization operating agreement or other constituent document(s), or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or any governmental authority or of any arbitration award, in each case applicable to any of the Debtors.

(v) Section 2.3(a)(v) of the Disclosure Schedule sets forth all members of each of the Debtors and New World, in each case as of the date of this Agreement. Except as shown on

Section 2.3(a)(v) of the Disclosure Schedule, New World has no subsidiaries and there is no outstanding ownership interest in the Debtors or New World, nor any debt or other interest in the Debtors or New World that is convertible into an ownership or voting interest of any kind. No parties other than Desert Ranch have any equity interest in any portion of the Desert Ranch Interest.

(b) *Financial*.

(i) New World's books, accounts and records are, and have been, maintained in a usual, regular and ordinary manner, , and all material transactions to which New World is or has been a party are, in all material respects, fairly and accurately reflected therein.

(ii) The financial statements described in Schedule 2.3(b)(ii) (collectively, the "*Financial Statement*") fairly and accurately presents the financial position of New World as of the date thereof, and the results of operations and cash flows of New World for the period covered by said statement.

(iii) To Debtors' actual knowledge, New World has paid all Taxes due and owing and filed all Returns or extensions thereof in connection therewith by the required filing deadline. There are no liens for delinquent Taxes outstanding against New World. None of New World's Returns are materially inaccurate. New World is not a foreign person.

(iv) Except for liabilities and obligations incurred since the effective date of the Financial Statement listed above in the ordinary course of business consistent with past practices or as set forth in Section 2.3(b)(iv) of the Disclosure Schedule, Debtors have no actual knowledge of any material New World liabilities of any kind, whether accrued, contingent or otherwise, whether due or to become due, the aggregate amount of which would exceed $25,000.

(v) The executory contracts and unexpired leases which are to be assumed by the Debtors and assigned to New World are listed on Schedule 2.3(b)(v).

(c) *Conduct of Business*.

(i) Since the effective date of the latest Financial Statement listed above and except for the Bankruptcy Case or as set

forth in Section 2.3(c)(i) of the Disclosure Schedule, New World has not:

(A) sold, assigned, leased, exchanged, transferred or otherwise disposed of any of its material assets or property relating in any way to the Business or the Real Estate, except for sales or other dispositions of Inventory in the ordinary course of the Business, in accordance with New World's past practices;

(B) To Debtors' actual knowledge, suffered any material casualty, damage, destruction or loss of any assets or property (whether or not covered by insurance) relating in any way to the Business or the Real Estate, on account of fire, flood, riot, strike or other hazard or Act of God;

(C) made (or committed to make) capital expenditures relating in any way to the Business or the Real Estate in an aggregate amount which exceeds $5,000;

(D) borrowed any money or issued any bonds, debentures, notes or other corporate securities evidencing money borrowed, or incurred any other material liabilities other than in the ordinary course of business in each case relating in any way to the Business or the Real Estate;

(E) made any material change in accounting methods or principles relating in any way to the Business ; or

(F) without limitation by the enumeration of any of the foregoing, entered into any material transaction other than in the ordinary course of business, consistent with past practices, other than the transactions contemplated hereby relating to the Business or the Real Estate.

(ii) Except as set forth in Section 2.3 (c)(i) above or Section 2.3(c)(ii) of the Disclosure Schedule, to the actual knowledge of Debtors, New World has not suffered or been threatened with any material change in the conduct or nature of the Business, operations, Assets, liabilities, financial condition or prospects of any of the Real Estate or the Business, including, without limiting the generality of the foregoing, the actual or threatened termination of any

permit, license or government authorization relating to the Business, but excluding matters of a general economic nature.

(d) *Contracts.*

(i) Except those additional matters set forth in Sections 2.3(h)(i) and 2.3(h)(ix), Section 2.3(d)(i) of the Disclosure Schedule sets forth a complete list of all Material Contracts and, to the actual knowledge of Debtors, all other Contracts relating to the Business to which New World is a party, or by which New World or the Real Estate is bound, and identifying the parties thereto and the subject matter thereof, and a designation of all Contracts that are Material Contracts.

(ii) Except as set forth in Section 2.3(d)(ii) of the Disclosure Schedule, no consent of any party to any Material Contract is required for the valid assignment to Gonzales of the Desert Ranch Interest.

(iii) To the actual knowledge of Debtors except as disclosed in section 2.3(d)(iii) of the Disclosure Schedule, all the Contracts are in full force and effect and binding upon the parties thereto, no default by New World has occurred thereunder and: (i) no default by the other contracting parties has occurred thereunder; and (ii) no event, occurrence or condition exists which, with the lapse of time, the giving of notice, or both, or the happening of any further event or condition, would become a default by New World thereunder. New World has not knowingly waived any material rights under any Material Contract. To the actual knowledge of the Debtors, New World is not subject to any legal obligations to renegotiate, nor do Debtors have actual knowledge of a claim for a legal right to renegotiate, any of the Material Contracts.

(e) *Employees.*

(i) To Debtors' actual knowledge, New World has no employee pension benefit plans (as defined in Section 3(2) of the Employment Retirement Income Security Act of 1974, as amended ("*ERISA*")); employee welfare benefit plans (as defined in Section 3(1) of ERISA) ("*Welfare Plan*"); or bonus, deferred compensation, stock purchase, stock option, severance plans, salary continuation, vacation, sick leave, fringe benefit, incentive, insurance, welfare or

similar arrangement ("*Employee Benefit Plan*") maintained, administered or contributed to New World or any Affiliate, as determined under Code section 414(b), (c), (m) or (o) ("*ERISA Affiliate*").

(ii) To Debtors' actual knowledge, neither New World nor any ERISA Affiliate has incurred any liability to the Pension Benefit Guaranty Corporation ("*PBGC*"), and there are no pending or threatened claims against any of the Welfare Plans or Employee Benefit Plans by any employee or beneficiary covered under any Welfare Plans or Employee Benefit Plans or otherwise involving any Welfare Plan or Employee Benefit Plan.

(iii) To Debtors' actual knowledge, the employment of each of the New World' employees is terminable at will without cost to New World except for payment of accrued salaries or wages, benefits and vacation pay.

(iv) Section 2.3(e)(iv) of the Disclosure Schedule contains a true and complete list of all employees who are employed by New World as of the date indicated therein, other than part time, occasional employees, and said list correctly reflects their salaries, wages, and other compensation. Notwithstanding the foregoing, Section 2.3(e)(iv) of the Disclosure Schedule does not include any independent contractors of New World or any of such contractor's employees. New World does not owe any employees any sum other than amounts for accrued salaries, wages, and other compensation.

(f) *Litigation and Claims.*

(i) Except for the Bankruptcy Case or as set forth in Section 2.3(f)(i) of the Disclosure Schedule, there is no litigation, arbitration or other proceeding, in law or in equity, and there are no proceedings or governmental investigations before any commission or other administrative authority, to which New World is a party and, to Debtors' knowledge, no such matters are threatened, against New World, or with respect to the ownership or use of the Business or the Real Estate or any portion thereof, or which if adversely determined, could have a material adverse effect on New World, the Business or the Real Estate.

(ii) To the actual knowledge of Debtors, except as disclosed in this Agreement or the Disclosure Schedules, there are no facts which, if known by a potential claimant or governmental authority, would give rise to a claim, action, arbitration or proceeding which, if asserted or conducted with results unfavorable to New World, would have a material adverse effect on the Business or the Real Estate, or the use of the Business or the Real Estate.

(iii) To the actual knowledge of Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not a party to, bound by, any decree, order or arbitration award (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental authority) currently in effect, relating in any way to the Business or the Real Estate.

(iv) To the actual knowledge of the Debtors, except as otherwise disclosed herein, in the New World Books and Records or within the Bankruptcy Case, New World is not in material breach or violation of any decree, order or arbitration award or law, statute, or regulation of or agreement with, or license or permit from, any federal, state or local governmental authority relating to the Business or the Real Estate (or to which its properties, assets, personnel, business activities or the Business or the Real Estate is subject or to which New World, itself, is subject).

(g) *Environmental Matters.*

(i) To the actual knowledge of Debtors, and except as otherwise disclosed on Disclosure Schedule 2.3(g)(i), New World and the Real Estate are not in material violation of any Environmental Laws or any permits, licenses, authorizations and approvals issued to New World or applicable to the Real Estate. Except as specifically disclosed in Section 2.3(g)(i) of the Disclosure Schedule, to Desert Ranch's actual knowledge, New World has not received any written notice regarding any actual or alleged material violation of any Environmental Law relating to New World or the Real Estate. To the Debtors' actual knowledge, except as disclosed in this Agreement or the Disclosure Schedules, there are no circumstances or conditions involving New World that could reasonably be expected to result in any material claims, liability, investigations, costs or restrictions on the ownership, use or transfer of any of the Real Estate pursuant to any Environmental Law.

(ii) To the actual knowledge of Debtors, (A) during the period in which New World has owned the Real Estate, except for Hazardous Materials customarily used in the operations of the Real Estate or the Business (including, without limitation the gas station at the Smart Mart), there has been no storage (except as set forth in Section 2.3(g)(ii) of the Disclosure Schedule), treatment, generation, transportation or Release of any Hazardous Materials by New World at any Facility (as herein defined) in violation of, or which could give rise to any material obligation under, Environmental Laws; and (B) New World is not subject to any orders, decrees, injunctions or other arrangements with any governmental entity or is subject to any indemnity or other agreement with any third party relating to any material liability under any Environmental Law or relating to Hazardous Materials. Notwithstanding the foregoing, Debtors disclose to Gonzales that there may be asbestos, certain glues or other materials used at the time the improvements on the Real Estate were constructed which may constitute toxic or hazardous substances or require special removal techniques.

(iii) The Debtors have delivered to Gonzales true and complete copies of any reports, studies, analyses, tests, or monitoring possessed or controlled by any of the Debtors or New World pertaining to: (i) Hazardous Materials in, on, or

under any property or facility of New World, or (ii) compliance of New World with Environmental Laws.

(iv) To Debtors' actual knowledge, the property located adjacent to the Real Estate is an airport and fuel farm which has probably suffered a Release of Hazardous Materials. Additional disclosures are contained in Disclosure Schedule 2.3(g)(iv).

(h) *Real Estate.*

(i) Except for the Bartsas Lease and those leases set forth in Section 2.3(h)(i) and Section 2.3(h)(ix) of the Disclosure Schedule and the overnight rental of motel and hotel rooms, none of the Real Estate is subject to any leases or tenancies.

(ii) To the actual knowledge of Debtors, there has been no notice given by any governmental unit that any of the improvements comprising any part of the Real Estate, or the businesses conducted by New World thereon, are in material violation of any building or use or occupancy restriction, limitation, condition or covenant of record or any zoning or building law, code or ordinance or public utility easement, provided that nothing contained in this paragraph is intended to imply that the existing improvements may be rebuilt without complying, at the time of rebuilding, with all such laws, codes and ordinances then in effect.

(iii) The Bartsas Lease landlord has alleged certain defaults by New World, which New World has disputed. To the Debtors' knowledge, the landlord to the Bartsas Lease is *not* in default thereunder. See Disclosure Schedule 2.3(d)(iii).

(iv) To the actual knowledge of Debtors, the improvements located on the Real Estate are currently served by electricity, water, sewage and waste disposal and other utilities adequate to operate such improvement, as currently operated. All of said utilities are installed and operating and all installation and connection charges have been paid for in full.

(v) To the actual knowledge of Debtors, except with respect to the NDOT matters described on Disclosure Schedule Section 2.3(f)(i), the continued maintenance and operation of the Real Estate as currently maintained and operated is

not dependent on facilities located at any other property, and the continued maintenance and operation of any other property is not dependent on facilities comprising the Real Estate. To the actual knowledge of Debtors, no building or other improvement not part of the Real Estate relies on the Real Estate or any part thereof or any interest therein, to fulfill any governmental requirement; and no building or other improvement comprising the Real Estate relies on any property not included within the Real Estate to fulfill any governmental requirement.

(vi) To the actual knowledge of the Debtors, there are no challenges or appeals pending regarding the amount of the real property Taxes on, or the assessed real property Tax valuation of, any of the Real Estate, nor any challenges or appeals pending regarding personal property Taxes on any personal property of New World, or the assessed valuation thereof, and no special arrangements or agreements exist with any governmental authority with respect thereto (the representations and warranties contained in this subparagraph (vi) shall not be deemed to be breached by any prospective general increase in real estate or personal property tax rates).

(vii) To the actual knowledge of Debtors, there are no condemnation proceedings pending or, to the actual knowledge of the Debtors, threatened with respect to any portion of the Real Estate.

(viii) To the actual knowledge of Debtors, except for the Strip Beautification Assessment and as set forth in Section 2.3(h)(viii) of the Disclosure Schedule, there is no special Tax assessment (i.e., in addition to the normal, annual general real estate tax assessment) pending or, to the actual knowledge of Debtors, threatened with respect to any portion of the Real Estate.

(ix) Section 2.3(h)(ix) of the Disclosure Schedule sets forth a list of all billboard leases and rental agreements in connection with the Real Estate.

(x) The representations and warranties of Debtors contained in this Section 2.3(h) are further qualified by all matters of record affecting the Real Estate as of the Closing Date. Furthermore, nothing herein shall constitute a representation or warranty concerning the right, title or

interest of the landlord of the Bartsas lease in or to the real property subject thereto. See Disclosure Schedule 2.3(h)(x).

(i) *Intellectual Property.*

(i) Except as set forth in the definition of "Trademarks," there are no Trademarks owned by (rather than licensed to) New World. Debtors make no representation or warranty whatsoever as to the ownership or exclusivity of any Trademark.

(j) *General.*

(i) Subject to the approval of the Bankruptcy Court, Desert Ranch has the power to sell and convey the Desert Ranch Interest to Gonzales, free and clear of any liens, claims, encumbrances and security interests.

(ii) To the Debtors' actual knowledge, except as disclosed in this Agreement, New World has good title to the Equipment and the other material Assets that constitute personal property of New World, free and clear of liens and encumbrances. To the Debtors' actual knowledge, there are no rights or options of any third party to acquire any ownership interest in any material Assets of New World, other than purchases of Inventory by customers in the ordinary course of the Business.

(iii) To the Debtor's actual knowledge, except as disclosed in this Agreement, the Assets are all owned by New World.

(iv) To the Debtors' actual knowledge, New World possesses all material licenses, permits, registrations, approvals, agreements and consents which are required in order for the New World to conduct the Business as presently conducted and neither New World nor the Debtors has received any notification of any asserted past or present failure to comply with the same.

(v) To the Debtors' actual knowledge, except as set forth in Section 2.3(j)(v) of the Disclosure Schedule, New World, the Assets and the Business are not in violation in any material respect, of existing requirements of Federal, state, local and other laws, regulations and ordinances, and New World has not received any notification of any asserted present failure to comply with any such laws which would prevent the continued operation of the Business in the manner presently operated.

(vi) The representations and warranties of the Debtors in this Agreement (including, without limitation, the information set forth in the Disclosure Schedule), or in any of Debtors' Ancillary Documents, do not and will not contain an untrue statement of material fact, do not and will not omit to state a material fact required to be stated in order to make the representations, warranties or statements contained herein or therein, in light of the context in which they were made, not misleading.

(vii) Neither the Debtors, nor any of their respective Affiliates, has dealt with any person or entity who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment for arranging the transaction contemplated hereby or introducing the parties to each other for which Gonzales may be liable.

3. *Conduct Prior to Closing.*

3.1. *General.* The Debtors, on the one hand, and Gonzales, on the other hand, shall have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in this Section 3.

3.2. *Obligations of the Debtors.*

(a) The Debtors shall reasonably cooperate with Gonzales and its consultants in their due diligence with respect to the Business and the Assets, and with the Debtors' preparations for Closing.

(b) The Debtors shall cause New World to conduct the Business in the ordinary course.

(c) The Debtors shall cooperate with Gonzales in the transfer of all transferable governmental permits, authorizations and approvals necessary for the operation of the Business by New World.

(d) Without the prior written consent of Gonzales, and without limiting the generality of any other provision of this Agreement, Debtors shall not with respect to the Business:

(i) hire any new employee on any basis that is not terminable at will without cost;

(ii) incur or commit to incur any capital expenditures in excess of $5,000, without the prior written consent of Gonzales which shall not be unreasonably withheld or delayed if incurred or committed to in the ordinary course of business in accordance with past practices;

(iii) directly or indirectly, enter into or assume any contract, agreement, obligation, lease, license or commitment, other than in the ordinary course of business in accordance with past practices;

(iv) sell, transfer, encumber or otherwise dispose of any material asset or property, or any interest therein, except for sales, replacements and other dispositions of Inventory in the ordinary course of the Business; or

(v) amend, terminate or give notice of termination with respect to any Material Contract, or waive any material rights thereunder..

(e) The Debtors shall use commercially reasonable efforts to attempt to obtain an estoppel certificate from Mary Bartsas on the Bartsas Lease and from certain other lessors, lessees and other third parties under any Material Contracts as may also be requested by Gonzales no later than five days after execution of this Agreement. Upon delivery of a properly executed estoppel certificate from Mary Bartsas on the Bartsas Lease, Debtors will have no further liability for representations concerning the Bartsas Lease under section 2.3(h)(iii).

(f) For a period of 180 days after the Closing, the Debtors shall reasonably cooperate with Gonzales, or his designee, at no out-of pocket expense to Debtors, in his efforts to obtain approval from the applicable gaming and liquor licensing authorities of the State of Nevada and all other state, county and local regulatory and licensing bodies with authority over gaming activities and devices and liquor licensing in the State of Nevada (collectively, the "*Licensing Authorities*") for (i) a temporary liquor license for off-premises sale of beer and wine for the premises located at 4207 S. Las Vegas Boulevard, Las Vegas, Nevada, doing business as "Smart Mart" ("*Smart Mart*"), and (ii) a change of ownership to permit New World to continue to receive rental payments associated with gaming devices located on or about the Smart Mart under that certain Space Lease Agreement, dated February 9, 1995, between New World and United Coin Machines Co., a Nevada corporation. Without limiting the foregoing, the Debtors shall as promptly as practicable, at any time or from time to time, at either Gonzales' or the Licensing Authorities' request and without further consideration, provide such other information and communications to the Licensing Authorities or other persons as Gonzales or the Licensing Authorities may reasonably request in connection with clauses (i) and (ii) of this Section 3.2(f), as such relate to any request, investigation, inquiry, communication, application or proceeding to or before the Licensing Authorities by Gonzales or by the Licensing Authorities with respect to the matters contemplated by this paragraph.

3.3. *Joint Obligations*. The following shall apply with equal force to the Debtors and Gonzales:

(a) The Parties shall use their respective commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as practicable. Without limiting the generality of the foregoing, Debtors and Gonzales shall use their respective

commercially reasonable efforts to cause New World to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as possible.

(b) The Debtors, on the one hand, and Gonzales, on the other hand, shall promptly give the other written notice (the "*Development Notice*") of the existence or occurrence of any condition that would make any representation or warranty herein contained of either untrue in any material respect or which might reasonably be expected to prevent the consummation of the transaction contemplated hereby.

(c) No Party shall intentionally perform any act (or cause another to perform such act) which, if performed, or intentionally omit to perform any act (or cause another to intentionally omit to perform such act) which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any Party or which would result in any representation or warranty herein contained of said Party being untrue in any material respect as if originally made on and as of the Closing Date.

(d) Each Party shall take all commercially reasonable efforts to ensure that the Bankruptcy Court approves, in an expedient manner, this Agreement and the transactions contemplated hereby in accordance with the prior agreements of the Parties in open court.

4. *Conditions to Closing.*

4.1. *Conditions to the Debtors' Obligations.* The obligation of the Debtors to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at the Debtors' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a) Except for misrepresentations arising because of facts to which the Debtors have consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by Gonzales shall have been true and correct as of the date hereof, and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b) All obligations of Gonzales to be performed hereunder, through and including the Closing Date, shall have been performed.

(c) No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d) No bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against Gonzales.

(e) The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.2. *Conditions to Gonzales' Obligations.* The obligation of Gonzales to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions on or prior to the Closing Date, upon the non-fulfillment of any of which this Agreement may, at Gonzales' option, be terminated pursuant to and with the effect set forth in this Agreement:

(a) Except for misrepresentations arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing), each and every representation and warranty made by the Debtors shall have been true and correct when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

(b) All obligations of the Debtors to be performed hereunder through, and including on, the Closing Date shall have been performed.

(c) No suit, proceeding or investigation shall have been commenced or threatened by any governmental authority or private person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions contemplated hereby, and no order, ruling or judgment shall have been issued with the same effect.

(d) Other than the Bankruptcy Case, no bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding shall have been initiated by or against any of the Debtors.

(e) The Bankruptcy Court shall have entered an order approving this Agreement and the transactions contemplated hereby.

4.3. *Eminent Domain.* If any part or parts of the Parcel A or the Real Estate shall be taken by exercise of the power of eminent domain after the date hereof, as evidenced by written notice received by Gonzales, Debtors or any of them or New World from any federal state or local governmental authority or any other entity having the power of eminent domain, and such taking would, in the reasonable opinion of Gonzales or Debtors, have a material adverse effect on the value of Parcel A or such Real Estate, Gonzales or Debtors shall have the right to terminate this Agreement by giving written notice to the other Party within five (5) days after receiving notice of the taking. If neither Party elects to terminate this Agreement, then this Agreement shall continue in full force and effect. With respect to any such taking after the date hereof, the Party receiving such notice shall furnish the other Party with a copy of the notice of taking promptly after such Party's ' receipt thereof.

5. *Closing.*

5.1. *Form of Documents.* At the Closing, the Parties shall deliver the documents, and shall perform the acts, which are set forth in this Section 5, and such additional or different documents and/or acts as may be reasonably necessary to consummate the

transactions contemplated by this Agreement. All documents that the Debtors shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to Gonzales and his legal counsel. All documents that Gonzales shall deliver shall be as previously agreed, or if not previously agreed, in form and substance reasonably satisfactory to the Debtors and their counsel.

5.2. *Deliveries of Gonzales.* Subject to the fulfillment or waiver of the conditions on Gonzales' obligations set forth in Section 4 or elsewhere in this Agreement, Gonzales shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and deliver or cause to be delivered to the Debtors all of the following:

(a) The Note from Gonzales to the Debtors marked "Cancelled," a full reconveyance of the Deed of Trust, UCC termination statements and releases of any and all interests Gonzales may have in any and all collateral security securing the Loan Agreement, Deed of Trust, Assignment, Guaranty, Pledge, and any other related Loan document;

(b) A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "E" executed by Gonzales, transferring the Gonzales Interest to the Desert Land and Desert Oasis or their designee;

(c) A Grant, Bargain and Sale Deed in the form attached hereto as Exhibit "F" executed by Fieldman, transferring the Fieldman Interest to the Desert Land and Desert Oasis or their designee;

(d) A Memorandum executed by Gonzales, Desert Land and Desert Oasis and any other parties owning a fee interest in Parcel A as of the Closing Date in the form attached as Exhibit "G" with respect to the obligation to pay the Parcel A Transfer Fee to Gonzales in accordance with the terms of this Agreement and that Gonzales' obligation to subordinate the Parcel A Transfer Fee to any Parcel A Permitted Financing;

(e) A counterpart of a written consent of the members of New World, executed by Gonzales, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(f) A closing certificate executed by Gonzales pursuant to which Gonzales represents and warrants to the Debtors that Gonzales' representations and warranties to the Debtors are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue);

(g) Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from Gonzales to consummate the transactions contemplated hereby; and

At the request of Desert Land or Desert Oasis prior to Closing, Gonzales shall, at Closing, execute separate instruments described above in order to convey certain items to the ' Desert Land or Desert Oasis' respective designee.

5.3. *Deliveries of the Debtors.* Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the applicable Debtor(s) shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Gonzales all of the following:

(a) An Assignment of Membership Interest in the form attached hereto as Exhibit "H" executed by Desert Ranch, transferring the Desert Ranch Interest to Gonzales;

(b) A resignation of Desert Ranch as the manager of New World, executed by Desert Ranch;

(c) A counterpart of the Parcel A Memorandum;

(d) Physical possession of the Real Estate and any Assets in their possession, including, without limitation, delivery of any and all keys, codes, combinations, source codes, alarm codes and security codes for the Assets;

(e) An estoppel certificate with respect to the Bartsas Lease, if obtained, and all other estoppel certificates required by this Settlement Agreement;

(f) A counterpart of a written consent of the members of New World, executed by Desert Ranch, authorizing and consenting to New World's performance of the transactions contemplated hereby and any other consents required by this Agreement;

(g) A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed on by Desert Ranch to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(h) An incumbency and specimen signature certificate with respect to each manager of the Debtors executing this Agreement and the Debtors' Ancillary Documents;

(i) A certified copy of the consent of each manager authorizing the execution, delivery and performance of this Agreement and the Debtors' Ancillary Documents;

(j) A closing certificate duly executed by the manager or equivalent representative of each of the Debtors, on behalf of each of the Debtors, pursuant to which each of the Debtors represent and warrant to Gonzales that such of the Debtors' representations and warranties to Gonzales are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue in any respect, specifying the respect in which the same is untrue), and that all documents to be executed and delivered by such of the Debtors at the Closing have been executed by duly authorized representatives of such of the Debtors;

(k) Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from the Debtors to consummate the transactions contemplated hereby;

At the request of Gonzales prior to Closing, the Debtors shall at Closing execute separate transfer instruments described above in order to convey certain items to Gonzales' designee.

5.4. *Deliveries of New World.* Subject to the fulfillment or waiver of the conditions set forth in Section 4 or elsewhere in this Agreement, the Debtors shall execute or cause to be executed, have the signatures acknowledged, as appropriate, and/or deliver or cause to be delivered to Desert Land and/or Desert Oasis or their designee all of the following:

(a) A termination of that certain lease between New World and Desert Ranch dated as of May 15, 2001 executed by New World to become effective at the discretion of Gonzales but not more than 6 months from the Closing Date;

(b) Without limitation by the specific enumeration of the foregoing, all other documents reasonably required from New World to consummate the transactions contemplated hereby.

5.5. *Gonzales' Consent.* Gonzales, as a member of New World, consents to the execution and delivery of the documents set forth in section 5.4 by New World at Closing.

6. *Post-Closing Agreements.*

6.1. *Use of Trademarks; References to the Debtors.* The Debtors shall cease to use and shall not license any third party to use the Trademarks.

6.2. *Sales, Payroll and Other Business Taxes and Fees.* The Debtors shall cause New World to pay all Taxes applicable to the conduct of the Business which were due and payable prior to the Closing in the ordinary course of business in accordance with past practices. Gonzales shall cause New World to pay all Taxes applicable to the conduct of the Business which were incurred prior to the Closing which become due and payable after the Closing in the ordinary course of business and in accordance with past practices.

6.3. *Further Assurances.* The Parties shall execute (and, in the case of Desert Ranch, cause New World to execute) such further documents, and perform such further acts, as may be necessary to comply with the terms of this Agreement and consummate the transactions contemplated hereby, including, without limitation, the execution, delivery and acknowledgement by Gonzales, of any subordination agreements required by the Parcel A Memorandum.

6.4. *Non-Interference.* For a period of two (2) years from the Closing Date, the Debtors (either directly or through their members or Affiliates) will not interfere or attempt to interfere with the assemblage of property by New World which is south of Four Seasons Drive (adjacent to Parcels B, C and D) and Gonzales (either directly or through his Affiliates) will not interfere or attempt to interfere with the assemblage of property by Desert Land which is north of Four Seasons Drive (adjacent to Parcel A). For purposes of this section, "interference" shall not include any actions taken for the purpose of participating in any governmental process or appearing before any governmental agency.

6.5. *Tax Returns.* For the years 2002 and 2003, Gonzales shall have an accountant of his choice prepare the tax returns for New World and deliver a copy of the tax returns to Desert Ranch.

6.6. *Re-Recordation of Memorandum.* Upon exercise of the FLT Option, the Debtors on the one hand and Gonzales and on the other hand shall execute and cause to be recorded the Memorandum in the form attached hereto as Exhibit "I."

7. *Indemnification.*

7.1. *General.* From and after the Closing, the Parties shall indemnify each other as provided in this Section 7. No specifically enumerated indemnification obligation with respect to a particular subject matter as set forth below or elsewhere in this Agreement shall limit or affect the applicability of a more general indemnification obligation as set forth below with respect to the same subject matter.

7.2. *Indemnification Obligations of the Debtors.* The Debtors shall joint and severally indemnify, save and keep harmless Gonzales and his successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a) any inaccuracy in or breach of any representation and warranty made by such Debtors in this Agreement, or in any such Debtors' Ancillary Documents, other than those arising because of facts to which Gonzales has consented in writing (excluding this Agreement itself as such a writing);

(b) any breach by any Debtor of, or failure by any Debtor to comply with, any of its covenants or obligations under this Agreement; or

(c) the failure to discharge when due any liability or obligation of any Debtor or any claim against Gonzales with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.2(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to Gonzales at the date of this Agreement or on the Closing Date; or

(d) any Third-Party Claims to the extent caused by the acts or omissions of Desert Land or Desert Oasis after the Closing Date with respect to Parcel A;

*provided, however,* that in no event shall the Debtors be obligated to pay Gonzales for any Damages sustained or incurred until such time, if any, that the Damages exceed Two Hundred Fifty Thousand Dollars in the aggregate, and then only for Damages in excess of Two Hundred Fifty Thousand Dollars ($250,000).

7.3. *Indemnification Obligations of Gonzales.* Gonzales shall indemnify, save and keep harmless the Debtors and their respective successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

(a) any inaccuracy in or breach of any representation and warranty made by Gonzales in this Agreement or in any of Gonzales Ancillary Documents, other than

those arising because of facts to which any Debtor has consented in writing (excluding this Agreement itself as such a writing);

(b) any breach by Gonzales of, or failure by Gonzales to comply with, any of his covenants or obligations under this Agreement; or

(c) the failure to discharge when due any liability or obligation of Gonzales or any claim against a Debtor with respect to any such liability or obligation or alleged liability or obligation, without regard to the fact that any indemnifiable matter described in this Section 7.3(c) may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to such Debtor at the date of this Agreement or on the Closing Date; or

(d) any Third-Party Claims to the extent caused by the acts or omissions of Gonzales or New World after the Closing Date with respect to the Contracts and the contracts listed in Schedule 2.3(b)(v);

*provided, however*, that in no event shall Gonzales be obligated to pay the Debtors, or any of them, for any Damages sustained or incurred, until such time, if any, that the Damages exceed $250,000 in the aggregate, and then only for Damages in excess of $250,000.

7.4. *No Waiver.* Failure by an Indemnified Party to give prompt notice to an Indemnifying Party above shall not release, waive or otherwise affect the Indemnifying Party's obligation to indemnify hereunder except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure.

7.5. *Cooperation.* Subject to the provisions of Section 7.7, the Indemnifying Party shall have the right, at its own expense, to participate in the defense of any Third Party Claim, and if said right is exercised, the Parties shall cooperate in the investigation and defense of said Third Party Claim.

7.6. *Subrogation.* The Indemnifying Party shall not be entitled to require that any action be brought against any other person before action is brought against it hereunder by the Indemnified Party but shall be subrogated to any right of action to the extent that it has paid or successfully defended against any Third Party Claim in accordance with the terms of this Agreement.

7.7. *Third Party Claims.* Forthwith following the receipt of notice of a Third Party Claim, the Party receiving the notice of the Third Party Claim shall (i) notify the other Party of its existence setting forth with reasonable specificity the facts and circumstances of which such Party has received notice, and (ii) if the Party giving such notice is an Indemnified Party, specifying the basis hereunder upon which the Indemnified Party's claim for indemnification is asserted. The Indemnified Party may, upon reasonable notice, tender the defense of a Third Party Claim to the Indemnifying Party. If:

(a) the defense of a Third Party Claim is so tendered and such tender is accepted without qualification by the Indemnifying Party; or

(b) within thirty (30) days after the date on which written notice of a Third Party Claim has been given pursuant to this Section 7.7, the Indemnifying Party shall acknowledge with qualification its indemnification obligations as provided in this Section 7 in writing to the Indemnified Party, but shall commit to providing defense; then, except as hereinafter provided, the Indemnified Party shall not have the right to defend or settle such Third Party Claim. The Indemnified Party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the Indemnifying Party provided that the Indemnified Party shall be entitled to reimbursement therefor only if the Indemnifying Party shall lose its right to contest, defend, litigate and settle the Third Party Claim as herein provided. The Indemnifying Party shall lose its right to defend and settle the Third Party Claim if it shall fail to diligently contest the Third Party Claim. So long as the Indemnifying Party has not lost its right and/or obligation to defend and settle as herein provided, the Indemnifying Party shall have the exclusive right to contest, defend and litigate the Third Party Claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle shall be given to the Indemnified Party. All expenses (including, without limitation, reasonable attorneys' fees) incurred by the Indemnifying Party in connection with the foregoing shall be paid by the Indemnifying Party. Notwithstanding the foregoing, in connection with any settlement negotiated by an Indemnifying Party, no Indemnified Party shall be required by an Indemnifying Party to (x) enter into any settlement that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation, (y) enter into any settlement that attributes by its terms liability to the Indemnified Party or (z) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. No failure by an Indemnifying Party to acknowledge in writing its indemnification obligations under this Section 7 shall relieve it of such obligations to the extent they exist. If an Indemnified Party is entitled to indemnification against a Third Party Claim, and the Indemnifying Party fails to accept the defense of a Third Party Claim tendered pursuant to this Section 7.7, or if, in accordance with the foregoing, the Indemnifying Party shall lose its right to contest, defend, litigate and settle such a Third Party Claim, the Indemnified Party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such Third Party Claim, and may settle such Third Party Claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle is given to the Indemnifying Party. If, pursuant to this Section 7.7, the Indemnified Party so defends or settles a Third Party Claim, for which it is entitled to indemnification hereunder, as hereinabove provided, the Indemnified Party shall be reimbursed by the Indemnifying Party for the reasonable attorneys' fees and other expenses of defending the Third Party Claim which is incurred from time to time, forthwith following the presentation to the Indemnifying Party of itemized bills for said attorneys' fees and other expenses.

8. *Effect of Termination/Proceeding.*

8.1. *General.* The Parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Section 8.

8.2. *Right to Terminate.* This Agreement and the transactions contemplated hereby may only be terminated by motion made in and granted by the Bankruptcy Court prior to the Closing Date.

8.3. *Remedies.* No Party shall be limited to the termination right granted in Section 8.2 by reason of the nonfulfillment of any condition to such Party's Closing obligations but may, in the alternative, elect to do one of the following:

(a) proceed to Close despite the nonfulfillment of any closing condition, it being understood that consummation of the transaction contemplated hereby shall not be deemed a waiver of a breach of any representation, warranty or covenant or of any Party's rights and remedies with respect thereto;

(b) decline to Close, terminate this Agreement as provided in Section 8.2, and thereafter seek damages to the extent permitted in Section 8.4, but subject to the limitations of that provision; or

(c) seek specific performance of the obligations of the other Party. Each Party hereby agrees that in the event of any breach by such Party of this Agreement, the remedies available to the other Party at law would be inadequate and that such Party's obligations under this Agreement may be specifically enforced.

8.4. *Right to Damages.* If this Agreement is terminated pursuant to Section 8.2, no Party hereto shall have any claim against any other except if the circumstances giving rise to such termination were caused either by the other Party's material breach of any covenants herein contained, or by any of the representations and warranties made herein by such other Party being in a material respect incorrect at the execution of this Agreement, or when restated as of the Closing, in which event termination pursuant to Section 8.2 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said Party, and said Party shall be entitled to recover, without limitation, its costs and expenses which are incurred in pursuing its rights and remedies (including reasonable attorneys' fees), provided that in no event shall any Party be entitled to the recovery of consequential or punitive damages.

9. *Miscellaneous.*

9.1. *Publicity.* At all times at or before the Closing, the Debtors, on the one hand, and Gonzales, on the other hand, will not issue or make any reports, statements or releases to the public with respect to the this Agreement or the transactions contemplated by this Agreement without the consent of the other, which shall not be unreasonably withheld or delayed. Nothing contained in this Agreement shall prevent any Party at any time from furnishing any information to any governmental agency, which such Party is requested or required to furnish to such agency or pursuant to any court order, regulation or applicable law or filing pleadings and documents in the Bankruptcy Case.

9.2. *Notices.* All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail. Notices delivered by mail shall be deemed given three (3) business days after being deposited in the United States mail, postage prepaid, certified mail. Notices delivered by hand or by facsimile shall be deemed given on the day of receipt; notices delivered by nationally recognized private overnight carrier against receipt shall be deemed given on the first business day after sending. All notices shall be addressed as follows:

| | |
|---|---|
| If to the Debtors: | 3951 S. Las Vegas Boulevard<br>Las Vegas, NV 89119<br>Attn: Howard Bulloch<br>Facsimile: (702) 948-3355 |
| with a copy to: | Jones Vargas<br>3773 Howard Hughes Parkway, 3rd Floor South<br>Las Vegas, NV 89109<br>Attn: Michael E. Buckley, Esq.<br>Facsimile: (702) 737-7705 |
| and | Schwartzer & McPherson Law Firm<br>3800 Howard Hughes Parkway, #1100<br>Las Vegas, NV 89109<br>Attn: Lenard E. Schwartzer, Esq.<br>Facsimile: (702) 892-0122 |
| If to Gonzales: | Mr. Tom Gonzales<br>TG Holdings, Inc.<br>110 Mason Circle<br>Concord, CA 94520<br>Facsimile: (925) 969-7870 |
| with a copy to: | Gordon & Silver, Ltd.<br>3960 Howard Hughes Parkway, 9th Floor<br>Las Vegas, NV 89109<br>Attn: James S. Mace, Esq.<br>Facsimile: (702) 796-5555 |

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 9.2. Counsel for any Party may give notice in accordance with this Section on behalf of its client.

9.3. *Expenses.* Except as otherwise provided in this Agreement, each Party shall bear all fees and expenses incurred by such Party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby, including, without limitation, attorneys', accountants' and other professional fees and expenses.

9.4. *Entire Agreement.* This Agreement and the Second Amended Plan of Reorganization confirmed by the Bankruptcy Court in the Bankruptcy Case and the instruments to be delivered by the Parties pursuant to the provisions hereof constitute the entire agreement between the Parties. Each exhibit, and the Disclosure Schedule, shall be considered incorporated into this Agreement. Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the Parties. In the event that there is any conflict between the provisions of this Agreement and the Second Amended Plan of Reorganization, the terms of the Second Amended Plan of Reorganization shall prevail.

9.5. *Non-Waiver*. The failure in any one or more instances of a Party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said Party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving Party.

9.6. *Counterparts*. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument. For purposes of such execution, facsimile counterparts of any signature shall be valid as originals.

9.7. *Severability*. The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

9.8. *Applicable Law; Venue*. This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Nevada applicable to contracts made in that State without giving effect to the conflicts of laws principles thereof. Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or proceeding arising out of or relating to this Agreement, any of the documents referenced in this Agreement or any of the transactions contemplated hereby or thereby, and agrees that any such action, suit or proceeding shall be brought only in such court. Each Party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court in any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum.

9.9. *Binding Effect; Benefit.* This Agreement shall inure to the benefit of and be binding upon the Parties, and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

9.10. *Assignability*. This Agreement shall not be assignable by any Party without the prior written consent of the other Parties. No such assignment shall relieve any Party of any of its liabilities under this Agreement. Any such designee shall be treated as the granting Party for all purposes hereunder. Any assignment in violation of this provision shall be void.

9.11. *Amendments*. This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the Parties.

9.12. *Headings*. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

9.13. *Survival*. All covenants, representations, warranties and other terms and provisions hereof shall survive Closing, and none shall merge into any deed, assignment or other closing instrument or conveyance contemplated hereby, provided that the representations and warranties of the Parties set forth in Section 2 of this Agreement shall be of no further force or effect after the date which is eighteen (18) months after Closing.

9.14. *Service of Process*. The Debtors and Gonzales waive personal service of any and all process upon them, and consents that all services of process be made by certified mail, directed to it at its address as set forth in Section 9.2 as may be amended, and service so made shall be deemed to be completed when received. Nothing in this section shall affect the right of the Debtors or Gonzales to serve legal process in any other manner permitted by law.

9.15. *Time of the Essence*. Time is of the essence for each and every covenant contained in this Agreement.

9.16. *Licensees*. Gonzales acknowledges that he has been informed that Debtors are owned by Howard Bulloch and David Gaffin, Nevada real estate licensees.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first above written.

DESERT LAND:

Desert Land, LLC,
a Nevada limited liability company

By:______________________
Name:____________________
Title: ____________________

DESERT OASIS:

Desert Oasis Apartments, LLC,
a Nevada limited liability company

By:______________________
Name:____________________
Title: ____________________

DESERT RANCH:

Desert Ranch, LLC,
a Nevada limited liability company

By:______________________
Name:____________________
Title: ____________________

GONZALES:

__________________________
Tom Gonzales

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
**4/16/03 1:47 PM**

SCHEDULE 1

**DEFINITIONS**

1. "*Affiliate*" shall mean any person or entity that Controls a Party, which that Party Controls, or which is under common Control with that Party.

2. "*Agreement*" shall mean this Agreement made by and among the Parties.

3. "*Allocation Schedule*" shall have the same meaning as set forth in Section 1.4.

4. "*Assets*" shall mean all assets of New World, including, without limitation, the Real Estate, Contracts and Trademarks.

5. "*Assignment*" shall have the same meaning as set forth in Preliminary Statement B.

6. "*Bankruptcy Case*" shall have the same meaning as set forth in Preliminary Statement G.

7. "*Bankruptcy Code*" shall have the same meaning as set forth in Preliminary Statement G.

8. "*Bankruptcy Court*" shall have the same meaning as set forth in Preliminary Statement G.

9. "*Bona fide escrow*" shall mean (i) an escrow opened with a party who deposits the greater of $1,000,000 or 5% of the purchase price in escrow (up to $2,500,000), (ii) which provides that the deposit will become non-refundable in 90 days from the opening of the escrow unless the escrow is cancelled, and (iii) which provides that the escrow must close within six (6) months from the opening of the escrow.

10. "*Business*" shall mean all business conducted by or on behalf of New World, including, without limitation, the operation, maintenance and development of the Real Estate.

11. "*Closing*" shall have the same meaning as set forth in Section 1.3.

12. "*Closing Date*" shall have the same meaning as set forth in Section 1.3.

13. "*Code*" means the Internal Revenue Code of 1986, as amended.

14. "*Confirmation*" means the date of entry of an order which approves a plan of reorganization filed in the Bankruptcy Case.

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
**4/16/03 1:47 PM**

15. "*Confirmation Order*" shall mean the Order of the Bankruptcy Court confirming Debtors' Plan and approving this Settlement.

16. "*Contract*" shall mean any lease, agreement, contract, commitment or binding contractual obligation of any type or nature (and any amendment, supplement, and modification thereto), whether written or oral, including, without limitation, all purchase orders and purchase contracts, agreements for services, goods, materials or supplies, utility agreements, license agreements, distribution agreements, agency agreements, maintenance agreements, billboard and other advertising agreements, franchise agreements, restrictive covenant agreements, employment and consulting agreements, confidentiality agreements, computer software agreements, leases and subleases of real or personal property, other real estate agreements, loan and security documents, guaranties and other financing agreements, and partnership or joint venture agreements, but the term shall exclude, however, (i) the New World operating agreement, articles of organization and other constituent documents, (ii) arrangements for the overnight occupancy of motel rooms, and (iii) software licensing agreements other than licensing agreements requiring the payment of licensing fees.

17. "*Control*" shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of a person or entity through voting securities, contract or otherwise.

18. "*Damages*" shall mean all liabilities, demands, claims, actions or causes of action, regulatory, legislative or judicial proceedings or investigations, assessments, levies, losses, fines, penalties, damages, costs and expenses, including, without limitation: (i) reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense of any such claim; and (ii) costs and expenses reasonably incurred to comply with Environmental Laws including without limitation, all Environmental Costs, but excluding consequential and punitive damages.

19. "*Debtor*" shall mean Desert Land, Desert Ranch and Desert Oasis.

20. "*Debtors' Ancillary Documents*" shall have the same meaning as set forth in Section 2.3(a)(ii).

21. "*Debtors' Plan*" shall mean the Second Amended Plan of Reorganization filed by the Debtors in the Bankruptcy Case."

22. "*Deed of Trust*" shall have the same meaning as set forth in Preliminary Statement A.

23. "*Desert Land*" shall mean Desert Land, LLC, a Nevada limited liability company.

24. "*Desert Oasis*" shall mean Desert Oasis Apartments, LLC, a Nevada limited liability company.

25. "*Desert Ranch*" shall mean Desert Ranch, LLC, a Nevada limited liability company.

26. "*Desert Ranch Interest*" shall have the same meaning as set forth in Preliminary Statement E.

27. "*Disclosure Schedule*" shall have the same meaning as set forth in Section 2.1.

28. "*Employee Benefit Plan*" shall have the same meaning as set forth in Section 2.3(e)(i).

29. "*Environmental Laws*" shall mean all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever. Environmental Laws include, without limitation, those relating to: manufacture, processing, use, distribution, treatment, storage, disposal, generation or transportation of Hazardous Materials; air, surface or ground water or noise pollution; Releases; protection of wildlife, endangered species, wetlands or natural resources; Containers; health and safety of employees and other persons; and notification requirements relating to the foregoing.

30. "*Equipment*" shall mean all furniture, furnishings, artwork, fixtures, equipment, machinery, appliances, parts, computer hardware, tools, dies, jigs, patterns, molds, motor vehicles, carts, other transportation equipment, signs and signage, linens, utensils, tableware, chinaware, glassware, silverware and all other tangible personal property (other than the Inventory), used or intended for use in the ownership, operation or maintenance of any of the Real Estate or the Business, including, without limitation, any of the foregoing that have been fully depreciated.

31. "*ERISA*" shall have the same meaning as set forth in Section 2.3(e)(i).

32. "*ERISA Affiliate*" shall have the same meaning as set forth in Section 2.3(e)(i).

33. "*Facility*" shall mean any facility as defined in CERCLA.

34. "*Fieldman*" shall mean Barry Fieldman, as trustee of the Barry and Amy Fieldman Trust.

35. "*Fieldman Interest*" shall have the same meaning as set forth in Preliminary Statement D.

36. "*Financial Statement*" shall have the same meaning as set forth in Section 2.3(b)(ii).

37. "*FLT Option*" shall have the same meaning as set forth in Preliminary Statement B.

**DRAFT**
**FOR DISCUSSION**
**PURPOSES ONLY**
**4/16/03 1:47 PM**

38. "*Gonzales*" shall mean Tom Gonzales, a unmarried man.

39. "*Gonzales Interest*" shall have the same meaning as set forth in Preliminary Statement D.

40. "*Gonzales Ancillary Documents*" shall have the same meaning as set forth in Section 2.2(a).

41. "*Guaranty*" shall have the same meaning as set forth in Preliminary Statement C.

42. "*Hazardous Materials*" shall mean: (a) pollutants, contaminants, pesticides, radioactive substances, solid wastes or hazardous or extremely hazardous, special, dangerous or toxic wastes, substances, chemicals or materials within the meaning of any Environmental Law, including, without limitation, any (i) "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et. seq., as amended and reauthorized ("*CERCLA*"), and (ii) any "hazardous waste" as defined in the Resource Conservation and Recovery Act ("*RCRA*"), 42 U.S.C., Sec. 6902 et. seq., and all amendments thereto and reauthorizations thereof; and (b) asbestos-containing material in any form or condition, materials or equipment containing polychlorinated biphenyls, or landfills, surface impoundments, or disposal areas.

43. "*Indemnified Party*" shall mean a Party who is entitled to indemnification from another Party pursuant to Section 7.

44. "*Indemnifying Party*" shall mean a Party who is required to provide indemnification under Section 7 to another Party.

45. "*Inventory*" shall mean all inventory held for sale, consumption or use in the ownership, operation of maintenance of any of the Real Estate or Business.

46. "*Leasehold Parcel*" shall have the same meaning as set forth in Preliminary Statement F.

47. "*Licensed Intellectual Property*" shall mean all rights under licenses to use computer software, trademarks, patents, copyrights, unpatented formulations, manufacture methods and other know-how.

48. "*Loan*" shall have the same meaning as set forth in Preliminary Statement A.

49. "*Loan Agreement*" shall have the same meaning as set forth in Preliminary Statement A.

50. "*Material Contract*" shall mean any Contract: (i) under which the cost of payment or performance required of New World is an amount greater than $25,000 per year; (ii) which would not by its terms be terminable by New World without material cost or obligation, on not more than sixty (60) days' written notice of termination by New World, regardless of the

**DRAFT**
**FOR DISCUSSION PURPOSES ONLY**
**4/16/03 1:47 PM**

amounts otherwise payable thereunder; (iii) containing covenants that in any way purport to restrict the business activity of New World or limit the freedom of New World to engage in any line of business or to compete with any other party, regardless of the amounts payable thereunder; or (iv) constituting or imposing a lien or encumbrance of any type on any of the Real Estate, regardless of amount.

51. "*Mortgage*" shall mean a mortgage, deed of trust, security agreement and/or collateral assignment securing a bona fide loan for value.

52. "*Multiemployer Plan*" shall have the same meaning as set forth in Section 2.3(e)(i).

53. "*Net Proceeds*" for purposes of Section 1.1(b) shall mean the gross proceeds of a Parcel A Equity Transfer, less the transaction costs directly related to a Parcel A Equity Transfer paid to unrelated parties, including, but not limited to, brokerage commissions paid to parties other than Howard Bulloch and/or David Gaffin. Net proceeds shall not include consideration wholly in the form of stock, membership, partnership or other equity interests in a corporation, limited liability company, partnership or other entity wholly owned or controlled by Howard Bulloch or David Gaffin or their trusts.

54. "*New World*" shall mean New World, LLC, a Nevada limited liability company.

55. "*New World Parcels*" shall have the same meaning as set forth in Preliminary Statement F.

56. "*Note*" shall have the same meaning as set forth in Preliminary Statement A.

57. "*PBGC*" shall have the same meaning as set forth in Section 2.3(e)(ii).

58. "*Parcel A*" shall mean the premises described on Exhibit A and, upon exercise of the FLT Option, shall include the FLT option parcels.

59. "*Parcel A Permitted Financing*" shall mean (i) one or more Mortgages against Parcel A or any part thereof securing financing in the principal amount of up to $25,000,000 at any one time outstanding, and (ii) a Mortgage securing the purchase of the real property subject to the FLT Option, the proceeds of which are used exclusively for the purchase of such real property subject to the FLT Option.

60. "*Parcel A Transfer*" shall mean either: (a) the sale, transfer or other conveyance of any legal or beneficial interest in the entity or entities that own Parcel A (a "*Parcel A Equity Transfer*"); or (b) the sale, transfer or other conveyance of all or any part of Parcel A, other than (i) a Parcel A Mortgage or (ii) sales, transfers or other conveyances or purchases for easements or to realign property lines, or condemnations involving less than 5% of the gross Parcel A land area.

61. "*Parcel A Transfer Fee*" shall have the same meaning as set forth in Section 1.1.

62. "*Pledge*" shall have the same meaning as set forth in Preliminary Statement C.

63. "*Real Estate*" shall have the same meaning as set forth in Preliminary Statement F.

64. "*Release*" shall mean any spill, discharge, leak, emission, escape, injection, dumping, or other release or threatened release of any Hazardous Materials into the environment, whether or not notification or reporting to any governmental agency was or is, required, including without limitation any Release which is subject to CERCLA.

65. "*Return*" means any return, declaration, report, statement and other document required to be filed in respect of Taxes.

66. "*Smart Mart*" shall have the same meaning as set forth in Section 3.2(h).

67. "*Tax*" means any federal, state, local, foreign and other net income, gross income, gross receipts, gaming, sales, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, windfall profits, customs, duty or other tax, fee, governmental assessment or charge of any kind whatever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

68. "*Third Party Claims*" shall mean any claims for Damages which are asserted or threatened by a party other than the Parties hereto, their successors and permitted assigns, against any Indemnified Party or to which an Indemnified Party is subject.

69. "*Trademarks*" shall mean all trademarks, service marks, slogans, trade names and trade dress whether registered with the United States Patent and Trademark Office or with the State of Nevada or unregistered and existing at common-law, and all applications therefor, including without limitation, New World's and/or its Affiliates' entire right and interest, if any, in the names "New World," "London Las Vegas" and "Asia-Pacific Resort" and all marks associated with the foregoing.

70. "*Welfare Plan*" shall have the same meaning as set forth in Section 2.3(e)(i).

# Exhibit D

# BAP DECISION

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re:<br><br>DESERT LAND, LLC;<br>DESERT OASIS APARTMENTS, LLC;<br>DESERT RANCH, LLC,<br><br>Debtors. | BAP No. NV-03-1255-KRyB<br><br>Bk. Nos. 02-16202-RCJ<br>02-16204-RCJ<br>02-16205-RCJ |
| TOM GONZALES; MAKENA ENTERTAINMENT, LLC<br><br>Appellants,<br><br>v.<br><br>DESERT LAND, LLC; DESERT OASIS APARTMENTS, LLC; DESERT RANCH, LLC; ASPEN FINANCIAL SERVICES; CONSOLIDATED MORTGAGE,<br><br>Appellees. | **MEMORANDUM**[1] |

FILED
MAR 3 1 2004
NANCY B. DICKERSON, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

Argued and Submitted on October 23, 2003
at Las Vegas, Nevada

Filed - March 31, 2004

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Robert C. Jones, Bankruptcy Judge, Presiding

---

Before: KLEIN, RYAN and BRANDT, Bankruptcy Judges.

---

[1]This disposition is not appropriate for publication and may not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel. See 9th Cir. BAP Rule 8013-1.

The bankruptcy court confirmed the debtors' chapter 11 plan of reorganization on the basis that the parties were bound to a settlement agreement stated on the record during the contested confirmation hearings. A review of the record, however, indicates that the parties lacked the requisite intent to be bound regarding a subordination provision because they did not have a meeting of the minds as to this material term that the court ultimately imposed over the objection of appellant.

We conclude that the bankruptcy court abused its discretion in imposing the settlement agreement to the extent that it included a material term regarding subordination as to which there was no agreement. We, accordingly, exercise our authority under 28 U.S.C. § 2106 and Federal Rule of Bankruptcy Procedure 8013 to MODIFY the order confirming the debtors' chapter 11 plan of reorganization by eliminating the offending term.

FACTS

On December 7, 2000, appellant Tom Gonzales ("Gonzales") loaned $41.5 million to Desert Land, LLC ("Desert Land") and Desert Oasis Apartments, LLC ("Desert Oasis"),[2] secured by real property commonly referred to as Parcel "A".[3] Parcel "A" is

---

[2]Desert Land, Desert Oasis and Desert Ranch, LLC will collectively be referred to as "debtors". Debtors' primary business is to assemble large parcels of real estate along Las Vegas Boulevard for development, joint venture, or sale.

[3]Parcel "A" is made up of various smaller parcels all owned by Desert Land, with the exception of one parcel, which is owned by Desert Oasis. In consideration for the loan, Desert Land and Desert Oasis deeded to Gonzales an undivided 5 percent interest in Parcel "A" and deeded to Barry Fieldman an undivided 0.5 (continued...)

mostly vacant, undeveloped desert land located on or near the "Las Vegas Strip" in the central resort corridor of Las Vegas, Nevada. Debtors' and appellants' valuations of the property differ. Appellants' appraisal value of the property was $77.5 million, whereas debtors' appraisal value was approximately $159.5 million.

As further security for the loan, Desert Land assigned and granted to Gonzales a security interest in Desert Land's unexercised option to purchase four parcels of property near Parcel "A" from the FLT Trust ("FLT Option"). The terms of the FLT Option specify that the property remains FLT Trust's sole property until the option is exercised. Additional security for the loan included Desert Ranch, LLC ("Desert Ranch") guaranteeing the loan and pledging a 32.5 percent interest in New World, LLC ("New World").[4] New World owns three assemblage parcels of real

---

[3](...continued) percent interest in the same property. Thus, Desert Land and Desert Oasis only owned, and Gonzales was only secured by, a 94.5 percent interest in Parcel "A". Further, 3.02 acres of Parcel "A" is owned exclusively by Desert Land, i.e, Gonzales and Fieldman have no interest in this portion of the property. Desert Oasis Motel is located on this 3.02 acres and was separately financed with Aspen Mortgage for $11.9 million. Aspen made approximately four loans to debtors secured by three parcels of property - the foregoing portion of Parcel "A" and two other parcels located several minutes south of Parcel "A".

[4]New World's business consists of assembling real estate parcels for eventual sale to a third party. The membership interests in New World consisted of Desert Ranch owning 65 percent, Gonzales and his assignees owning 30 percent, and Makena Entertainment owning the remaining 5 percent. Desert Land also owns undeveloped real property located several minutes south of Parcel "A". This property is subject to a deed of trust for the benefit of Consolidated Mortgage Corporation securing a loan of approximately $7.5 million.

property, worth approximately $276.6 million, located immediately south of Parcel "A", which the parties commonly refer to as Parcels "B", "C", and "D".

On May 31, 2002, debtors each filed separate voluntary chapter 11 bankruptcy petitions, which the bankruptcy court ordered jointly administered. On August 26, 2002, debtors filed and sought approval of their joint disclosure statement and joint plan of reorganization. Gonzales and Makena Entertainment, LLC[5] (collectively "appellants") filed an opposition to the motion to approve debtors' disclosure statement. On September 25, 2002, the bankruptcy court held a hearing on the motion and required various amendments be made to the disclosure statement.

On January 2, 2003, debtors filed an amended disclosure statement, which the bankruptcy court approved on January 8, 2003. The court then set aside three days for a contested confirmation hearing to begin on January 29, 2003. On January 24, 2003, Gonzales filed an objection to the debtors' confirmation of plan of reorganization. On January 28, 2003, the debtors reached an agreement with debtors' other secured creditors, Aspen Financial ("Aspen") and Consolidated Mortgage Corporation ("CMC").[6] Debtors then filed their amended plan of

[5]Makena is a Nevada LLC indirectly owned by Fieldman and Robert Unger. Makena has a 5 percent membership interest in New World.

[6]Aspen and CMC agreed to have Desert Land's separate property subject to their liens transferred out to bankruptcy remote entities also controlled by debtors' principals, to accept interest only payments for six months and, if all payments were timely made, Desert Land had the ability to extend their loans' maturity dates.

reorganization on January 29, 2003.

On the last day of the contested confirmation hearing, the outline of a settlement between the debtors and Gonzales was announced. The bankruptcy court then suspended the confirmation hearing to allow the parties to document the proposed settlement. The terms of the proposed settlement provided that, (1) Gonzales would extinguish his note, reconvey his deed of trust, and release Desert Ranch's guarantee and pledge so that Desert Land would own 100 percent of Parcel "A", (2) Gonzales would receive $10 million if Parcel "A" was sold or transferred after ninety days, $7.5 million if within ninety days ("Parcel "A" Transfer Fee"), (3) Gonzales and Fieldman would convey to Desert Land and Desert Oasis their interests in Parcel "A", and (4) Gonzales was to receive Desert Ranch's 65 percent interest in New World. Essentially, debtors would get Parcel "A", subject to the Parcel "A" Transfer Fee owed to Gonzales, and Gonzales would get Parcels "B", "C", and "D". Gonzales also agreed to subordinate his deed of trust on Desert Oasis' one parcel to a loan for up to $5 million so that debtors could use the property to secure the loan. Gonzales also allowed his 5 percent interest in that one parcel to be encumbered by the loan. The bankruptcy court later approved the debtors' requested loan on that property through Eagle Mortgage Company for $2 million.

Over the next few months, the parties worked on, but were unable to agree upon, the written details of a proposed settlement agreement. Due to a lack of agreement, Gonzales informed the debtors that he planned on withholding the execution and delivery of the Eagle loan documents until the parties could

agree upon a proposed settlement. On March 10, 2003, the bankruptcy court held the first of several status hearings on the parties' progress in documenting the proposed settlement. The parties admitted they were "deadlocked". The bankruptcy court looked at the transcript from the January 31, 2003, hearing to determine what the agreement was between the parties. The bankruptcy court then ruled that there was a settlement and that it would make "rulings of reasonableness" regarding those terms the parties could not both agree upon.

Several more status hearings were held and the parties were still unable to agree on various terms. For example, at the second status hearing held on March 26, 2003, debtors requested that the Parcel "A" Transfer Fee be subordinated to future additional financing secured by Parcel "A". Appellants responded that that was a substantial change in the proposed deal and they never agreed to it. The bankruptcy court ruled that Gonzales' Parcel "A" Transfer Fee could be subordinated for up to $25 million so that debtors would be able to exercise the FLT Option, among other matters. The bankruptcy court then directed the parties to prepare the settlement documents in accordance with its ruling.

At a status hearing on March 31, 2003, the parties still had not reached a settlement as to all the terms. The main point of contention revolved around the treatment of the Parcel "A" Transfer Fee. The bankruptcy court noted it was losing its patience with the parties and threatened to sanction them $10,000 each if they did not reach a final settlement agreement.

On April 9, 2003, the bankruptcy court ordered Gonzales to

deliver the Eagle loan documents, which Gonzales had been withholding since March 3, 2003.

On April 21, 2003, over appellants' objection, the bankruptcy court entered an order confirming Desert Land's second amended plan of reorganization ("confirmation agreement") and approving the settlement agreement. With respect to the treatment of the Parcel "A" Transfer Fee that the parties were unable to agree upon, the bankruptcy court ruled that, (1) debtors had six months to close upon a potential sale of Parcel "A", (2) upon a Parcel "A" equity transfer, debtors need only pay 50 percent of the net proceeds received from the transfer until the Parcel "A" Transfer Fee was paid in full, and (3) debtors could subordinate the Parcel "A" Transfer Fee to $45 million in financing. The confirmation agreement provided that,

> Gonzales will subordinate his right to the payment of the Parcel Transfer Fee to any such Parcel A Permitted Financing and shall execute, acknowledge and deliver, from time to time, upon no less than 20 days written notice to Gonzales, such subordination agreement(s) as may be reasonably required by the title insurer insuring the liens or security interests related to the Permitted Parcel A Financing.

The court also made rulings with respect to warranties and representations as they related to Gonzales obtaining New World.

Appellants subsequently filed their notice of appeal from the confirmation order. Appellants also filed a motion for stay pending appeal, which we denied.

On May 2, 2003, debtors executed and delivered to Gonzales' counsel the required documents under the confirmation and settlement agreements. On June 4, 2003, the bankruptcy court entered an order granting debtors' emergency motion to enforce

the plan of reorganization, which order was not appealed. On June 6, 2003, pursuant to the bankruptcy court's order, the bankruptcy clerk of court executed certain documents transferring real property interests under the confirmation agreement because appellants' refused to comply.

On June 30, 2003, debtors filed a motion to dismiss the appeal as moot because the confirmed plan had been substantially consummated. Our motions panel denied the motion without prejudice. On August 25, 2003, debtors filed a renewed motion to dismiss the appeal as moot claiming that several transactions with third parties, who are not parties to the appeal, have occurred since the last motion to dismiss was filed and these transactions cannot be undone without affecting the rights of these third parties. Appellants responded that there is effective relief that can be granted to them and the court can vacate the confirmation order and unwind the plan since it has not yet been substantially consummated. This renewed motion to dismiss is currently pending.

At oral argument, appellants limited their request for appellate relief to undoing the subordination.

## JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158(a)(1).

## ISSUE

Whether the bankruptcy court abused its discretion by imposing a subordination term on a settlement agreement between

the parties concerning the debtors' chapter 11 plan of reorganization.

STANDARD OF REVIEW

We review the bankruptcy court's decision to enforce a settlement agreement for an abuse of discretion. Metronet Servs. Corp. v. U.S. West Communications, 329 F.3d 986, 1013-14 (9th Cir. 2003); Maynard v. City of San Jose, 37 F.3d 1396, 1401 (9th Cir. 1994). A bankruptcy court abuses its discretion if it bases its decision "on an error of law or clearly erroneous findings of fact." Maynard, 37 F.3d at 1401 (quoting United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1980)).

DISCUSSION

The bankruptcy court found that the parties entered into a binding settlement agreement at the January 31, 2003 contested confirmation hearing. With the chapter 11 plan still on the table, the court suspended the confirmation hearings to allow the parties to document the proposed deal. During the drafting process, the court scheduled a series of status hearings to follow the parties' progress of documenting the details of the proposed settlement agreement. The record indicates that the court was operating under the understanding that the parties had settled the matter and were simply trying to work out the exact details.

The record also shows that at each status hearing the parties would come into court and hash out their differences and seemingly come to a mutual understanding over the terms of the

settlement agreement. However, when it came to the parties reducing those terms to writing outside of court, the parties would again find themselves at an impasse and back in front of the court in an attempt to re-hash what the parties believed had already been hashed.

In the end, and after several failed attempts to come to a mutual understanding, Gonzales filed with the court, and stated on the record multiple times, his disagreement with the terms contained in the debtors' proposed settlement agreement. Nevertheless, the bankruptcy court approved the settlement agreement and confirmed the chapter 11 plan over Gonzales' objection.

On appeal, appellants contend that the court erred in concluding that a settlement agreement in fact existed between the parties when, from the very beginning, they made the proposed settlement expressly subject to agreeable documentation. Further, they argue because agreeable documentation never came to be, it was error for the court to impose its own terms into the agreement without holding an evidentiary hearing and then approve the agreement over the appellants' objection. At oral argument, however, appellants clarified that their sole remaining challenge to the settlement agreement relates to the subordination provision that they contend was not part of their agreement.

State contract law principles govern the enforcement of settlement agreements. Jeff D. v. Andrus, 899 F.2d 753, 759 (9th Cir. 1989). For a court to enforce a settlement agreement, the agreement must be complete. Callie v. Near, 829 F.2d 888, 890 (9th Cir. 1987). The intent of the parties is key to determining

whether a formal agreement is complete. Rennick v. O.P.T.I.O.N. Care, Inc., 77 F.3d 309, 315 (9th Cir. 1996); see also Ciaramella v. Reader's Digest Assoc., Inc., 131 F.3d 320, 323 (2nd Cir. 1997) (court must determine whether parties intended to be bound by an unexecuted settlement agreement). "[S]ince some measure of agreement must usually be reached before a written draft is prepared, the evidence that the parties intended to be presently bound must be convincing and subject to no other reasonable interpretation." Tropicana Hotel Corp. v. Speer, 692 P.2d 499, 502 (Nev. 1985).

"Whether the parties intended only to be bound upon the execution of a written, signed agreement is a factual issue." Callie, 829 F.2d at 890-91 (emphasis in original). The bankruptcy court stated several times that a settlement between the parties on all material terms had been reached. Circumstances of the settlement negotiations, however, can defeat such a conclusion. Id. at 891. The settlement negotiations in this case demonstrate that each party differed over the meaning attached to those proposed settlement terms laid out before the judge in January and that neither party intended to be bound to the others' proposed meaning.

It is apparent from the transcript of the January 31, 2003, contested confirmation hearing that the parties had agreed to settle their differences. However, it is further apparent that both parties agreed at that hearing that what was being read into the record was only a basic outline of the concepts of a proposed settlement. Appellants stated that the effective date of the settlement agreement would be conditioned upon the finalization

of documentation between the parties. According to appellants, the ultimate form and content of the settlement documents was extremely important to the parties because of the significant tax ramifications of such a deal, among other reasons.

After the January 31, 2003, hearing, appellants spent a great amount of time negotiating and preparing a proposed settlement agreement. Both parties exchanged proposed term sheets evidencing what each believed was the agreement they had reached at the January 31, 2003, hearing. In capital letters on both of those terms sheets, the parties stated, "THIS TERM SHEET IS INTENDED FOR PURPOSES OF DISCUSSION ONLY."

It was not until March 2003 that Gonzales circulated to debtors a written proposed settlement agreement. At the first status hearing on March 10, 2003, debtors' counsel admitted to the court that "at this point in time, it appears that there is a distinct difference in what the understanding was on January 31, and we have reached a deadlock here, I'm afraid, with regard to that." It was at that hearing that the judge declined Gonzales' request for an evidentiary hearing and instead looked at the January 31 transcript to determine what the terms of the settlement included.

The bankruptcy court held several more status hearings due to the parties' inability to agree on various terms to be contained in a proposed settlement. Considerable disagreement revolved around the treatment of the Parcel "A" Transfer Fee. The bankruptcy court then took it upon itself to impose additional settlement terms that the parties were unable to agree upon themselves. However, the court's imposition of those terms

still did not result in a mutually agreed upon settlement between the parties. More status hearings were held, and more terms were imposed by the court.

This continual disagreement between the parties, and imposition of settlement terms by the court, evidences the fact that there was no meeting of the minds between the parties on material terms. Of most importance, the initial agreement at the January 31, 2003, hearing was that Gonzales would receive either $7.5 million or $10 million upon the sale or transfer of Parcel "A", without any mention of subordination. In the end, the court confirmation order provided for a $45 million subordination of that Parcel "A" Transfer Fee. Nowhere in the record is there evidence that appellants agreed to a subordination.[7]

Debtors argue that this case is similar to Doi v. Halekulami Corp., 276 F.3d 1131, 1135-36 (9th Cir. 2002), where the court of appeals held that a binding oral agreement occurred when the parties put their settlement terms on the record in open court. In Doi, the parties settled various employment discrimination claims out of court and then went into court and put those terms on the record. Id. at 1134. The district court judge asked Doi if she agreed to all the terms as stated on the record and Doi replied affirmatively. Id. When the settlement documents were prepared, Doi refused to sign them even though Doi's counsel "stated unambiguously that he believed that the settlement

[7]Although there was a reference in the record at one point to subordination of the Parcel "A" Transfer Fee for up to $25 million, there is no reference to $45 million, nor to any agreement by appellants to subordinate.

documents were satisfactory, and more importantly, that the documents correctly reflected the terms placed on the record." Id. at 1135. On appeal, the court held that all material terms of the agreement were read into the record, Doi expressly agreed to those terms in court, and the written agreement was in full accord with the oral agreement as stated in open court. Id. at 1140. Thus, Doi was bound by the agreement.

Doi, however, appears to be distinguishable from this case because here the record shows that the terms of the settlement placed on the record in January differed in material respects from those approved by the court in April. The parties differed significantly over the meaning of those terms. Further, the parties did not express an intention to be bound by the settlement as it was laid out in court in January. It was always subject to agreeable documentation that never came to be. In other words, the parties never reached a mutual consensus over how to implement their "deal".

It is undisputed that the parties made multiple efforts to complete a mutually agreed upon settlement agreement, but were just not able to do so. Although bankruptcy courts have the power to summarily enforce settlement agreements, "[s]ummary enforcement is inappropriate where material facts concerning the existence or terms of a settlement agreement are in dispute." City Equities Anaheim, LTD v. Lincoln Plaza Dev. Co. (In re City Equities Anaheim, LTD), 22 F.3d 954, 958 (9th Cir. 1994).

Appellants also argue that they made several concessions under the court's threat of sanctions which constituted impermissible coercion and that such concessions should not be

regarded as agreement.

In the absence of an agreement, the court would be obliged to complete the confirmation hearing, making findings regarding confirmability of the joint plan under 11 U.S.C. § 1129, including "cram down" against appellants.

In light of the appellants' position at oral argument, we need not, however, decide whether it was error for the bankruptcy court to enforce an agreement that was incomplete at the hands of he parties, but complete at the hands of the judge. Estate of Travis v. Special Adm'rs, 725 P.2d 570, 571 (Nev. 1986) (no agreement for district court to give effect because when important terms remain unsolved, a binding agreement cannot exist).

The plan has been confirmed and substantial activities have been taken in reliance on the integrity of the unstayed confirmation order. We refused to stay the order and, later, denied a motion to dismiss the appeal as moot because we were not persuaded that we would be unable to fashion a remedy. It would be impractical and inequitable at this late date to force all parties in interest to complete the contested confirmation hearing. Moreover, the appellants now seek only to invalidate the subordination provision that was involuntarily imposed upon them. In any event, the record provided us does not indicate that the subordination has been utilized, nor have appellees shown that in connection with their motions to dismiss, nor did they so indicate at argument.

We are persuaded that the appropriate appellate remedy derives from the material point as to which there continued to be

no agreement - the subordination of the Parcel "A" Transfer Fee. Nothing in the record suggests that Gonzales ever agreed to subordinate that fee to $45 million, and any subordination would plainly be material in the context of this case.

Viewing the plan of reorganization as a whole, it is apparent that the subordination provision is not integral to the overall plan and that the removal of the provision would not cause the plan to collapse.

Federal Rule of Bankruptcy Procedure 8013 permits us to "affirm, modify, or reverse a bankruptcy judge's judgment." Fed. R. Bankr. P. 8013 (emphasis supplied). Rule 8013 is an implementation of 28 U.S.C. § 2106, which provides that "[t]he Supreme Court or any other court of appellate jurisdiction may . . . modify . . . any judgment, decree, or order of a court lawfully brought before it for review, . . . as may be just under the circumstances." 28 U.S.C. § 2106.

The power to "modify" the order confirming the plan enables us to tailor a remedy that does not require further action by the parties or by the court. Here, we can eliminate the subordination provision that constitutes the key point as to which there was no agreement. We will do so on our own, rather than remanding because the passage of time counsels in favor of prompt disposition of this protracted dispute in light of the procedural posture of the chapter 11 case with the confirmed plan. See Felder v. United States, 543 F.2d 657, 671 (9th Cir. 1976). This resolution is superior to the alternative of vacating the order confirming the plan and remanding with instructions that the bankruptcy court resume and complete the

contested confirmation hearing, which (in light of substantial steps taken to consummate the balance of the plan) would introduce chaos.

It follows from this resolution that the pending motion to dismiss the appeal as moot will be denied.

CONCLUSION

Accordingly, we will AFFIRM IN PART, REVERSE IN PART AND MODIFY the bankruptcy judge's order confirming the plan to provide that the provision subordinating the Parcel "A" Transfer Fee be expunged.

RYAN, Bankruptcy Judge, concurring:

I concur with the majority in that a modification of the order confirming the plan (the "Order") is appropriate. However, I disagree with the conclusion that the bankruptcy court erred in determining that there was a meeting of the minds with respect to the material terms of the settlement at the January 31, 2003 hearing (the "Hearing").

The parties began the Hearing by announcing that they had reached a settlement. Counsel for Appellees laid out the terms of the settlement on the record in detail. At no time during the Hearing did Appellants state that their assent to the agreement was conditioned on agreeable documentation. Therefore, the bankruptcy court's finding that the parties had agreed to the material terms of a settlement was not clearly erroneous.

However, I agree that the subordination provision was

improperly imposed by the bankruptcy court. The subordination provision was not part of the agreement read into the record at the Hearing. It was improper for the court to add a material term to which the parties had not agreed. Accordingly, I concur in the majority's resolution of this matter.

U.S. Bankruptcy Appellate Panel
of the Ninth Circuit
125 South Grand Avenue, Pasadena, California 91105
Appeals from Central California (626) 229-7220
Appeals from all other Districts (626) 229-7225

# NOTICE OF ENTRY OF JUDGMENT

BAP No. NV-03-1255 KRyB

RE: Desert Land, LL; Desert Oasis Apartments,LLC ; Desert Ranch, LLC

A separate Judgment was entered in this case on march 31, 2004.

BILL OF COSTS:

Bankruptcy Rule 8014 provides that costs on appeal shall be taxed by the Clerk of the Bankruptcy Court. Cost bills should be filed with the Clerk of the Bankruptcy Court from which the appeal was taken.
9th Cir. BAP Rule 8014-1

ISSUANCE OF THE MANDATE:

The mandate, a certified copy of the judgment sent to the Clerk of the Bankruptcy Court from which the appeal was taken, will be issued 7 days after the expiration of the time for filing a petition for rehearing unless such a petition is filed or the time is shortened or enlarged by order. See Federal Rule of Appellate Procedure 41.

APPEAL TO COURT OF APPEALS:

An appeal to the Ninth Circuit Court of Appeals is initiated by filing a notice of appeal with the Clerk of this Panel. The Notice of Appeal should be accompanied by payment of the $255 filing fee (effective November 1, 2003) and a copy of the order or decision on appeal. Checks may be made payable to the U.S. Court of Appeals for the Ninth Circuit. See Federal Rules of Appellate Procedure 6 and the corresponding Rules of the United States Court of Appeals for the Ninth Circuit for specific time requirements.

CERTIFICATE OF MAILING

The undersigned, deputy clerk of the U.S. Bankruptcy Appellate Panel of the Ninth Circuit, hereby certifies that a copy of the document on which this stamp appears was mailed this date to all parties in interest as designated by the Appellant in the Notice of Appeal.

By: Vicky Jackson-Walker

Deputy Clerk: March 31, 2004

# Exhibit E

# 9th CIRCUIT DECISION

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122



FILED

OCT 25 2005

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

In Re: DESERT LAND, LLC DESERT OASIS APARTMENTS, LLC; In Re: DESERT RANCH, LLC
Debtors

---

DESERT LAND, LLC;
DESERT OASIS APARTMENTS, LLC;
DESERT RANCH, LLC

Appellants,

v.

TOM GONZALES; MAKENA ENTERTAINMENT, LLC a Nevada Limited Liability Company

Appellee.

No. 04-16005

BAP No. NV-03-1255-KRyB

MEMORANDUM*

RECEIVED
Harold S. Marenus, Clerk
U.S. BKCY.APP.PANEL
OF THE NINTH CIRCUIT

NOV 18 2005

FILED ____
DOCKETED ____
DATE INITIAL

Appeal from the Ninth Circuit Bankruptcy Appellate Panel
Klein, Ryan and Brandt, Bankruptcy Judges, Presiding

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

Argued and Submitted October 18, 2005
San Francisco, California

Before: REINHARDT and THOMAS, Circuit Judges, and RESTANI**, Chief Judge, United States Court of International Trade.

Desert Land, LLC, Desert Oasis Apartments, LLC, and Desert Ranch, LLC, (collectively "Desert Land") appeal the Bankruptcy Appellate Panel ("BAP") memorandum decision modifying Desert Land's second amended plan of reorganization ("settlement agreement"). We affirm the BAP's decision.

As an initial matter, Gonzales's appeal to the BAP was not moot. Under the general mootness rule, courts are prohibited from hearing an appeal when events occur that "make it impossible for the appellate court to fashion effective relief." Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.), 378 F.3d 916, 922 (9th Cir. 2004). Desert Land has not satisfied its "heavy burden" of establishing that the court cannot provide any effective relief. See id. at 923 (citation omitted). Moreover, the doctrine of equitable mootness applies only when appellants "have failed and neglected diligently to pursue their available

** The Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for [the] court to consider the merits of the appeal." Trone v. Robert Farms, Inc. (In re Roberts Farm, Inc.), 652 F.2d 793, 798 (9th Cir. 1981). Here, it was equitable for the BAP to consider Gonzales's appeal because he pursued a stay of the bankruptcy court's order and the case does not present transactions that are "complex or difficult to unwind." See Lowenschuss v. Selnick (In re Fred Lowenschuss), 170 F.3d 923, 933 (9th Cir. 1999).

Further, we hold that the BAP's modification of the reorganization plan was an appropriate remedy for the bankruptcy court's abuse of discretion. Here, the bankruptcy court included a provision in the settlement agreement providing for the subordination of a transfer fee owed to Gonzales. Yet, the record does not show that the parties agreed to include the subordination provision in the settlement agreement. Under Nevada law, a court cannot force a settlement containing terms to which the parties have not agreed. See Fury v. Special Admin. (In re estate of Violet Mae Travis), 725 P.2d 570, 571 (Nev. 1986). Therefore, we agree with the BAP that the bankruptcy court abused its discretion by including the subordination provision in the settlement agreement. Moreover, we hold that the BAP did not err by removing the subordination requirement, while preserving

the settlement agreement. See Felder v. United States, 543 F.2d 657, 671 (9th Cir. 1976) (allowing for an appellate court to enter a modified judgment rather than remanding in "[t]he interests of justice and the best interest of the parties.").

Accordingly, the BAP's decision is AFFIRMED.

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

NOV 16 2005

by: Deputy Clerk

**Exhibit F**

# Cash Flow History and Projections

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Desert Oasis Apartments LLC**
**Ten Year Cash Flow Projection**
**Case # BK-S-11-17208-BAM**

| | 2007 | 2008 | 2009 | 2010 | 2011 | Projection 2012 | Projection 2013 | Projection 2014 | Projection 2015 | Projection 2016 | Projection 2017 | Projection 2018 | Projection 2019 | Projection 2020 | Projection 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Physical Occupancy %** | 93.4% | 84.9% | 80.3% | 91.9% | 95.6% | 96.0% | 95.0% | 95.0% | 96.0% | 96.0% | 95.0% | 96.0% | 95.0% | 94.0% | 95.0% |
| **Rental Income** | | | | | | | | | | | | | | | |
| Market Rent | 1,162,755 | 1,161,600 | 1,180,800 | 980,000 | 997,520 | 1,050,240 | 1,065,600 | 1,080,960 | 1,096,320 | 1,111,680 | 1,127,040 | 1,142,400 | 1,157,760 | 1,173,120 | 1,188,480 |
| Gain (Loss) To Lease | (279) | 1,556 | (46,215) | 60,156 | 31,117 | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,500) | (1,499) | (1,498) | (1,497) |
| Total Gross Potential Rent | 1,162,476 | 1,163,156 | 1,134,585 | 1,040,156 | 1,028,637 | 1,048,740 | 1,064,100 | 1,079,460 | 1,094,820 | 1,110,180 | 1,125,540 | 1,140,900 | 1,156,261 | 1,171,622 | 1,186,983 |
| Physical Vacancy Loss | (77,090) | (175,631) | (223,483) | (84,475) | (45,114) | (41,950) | (53,205) | (53,973) | (43,793) | (44,407) | (56,277) | (45,636) | (57,813) | (70,297) | (59,349) |
| Bad Debt - Skips and Evicts | (16,110) | (4,594) | (12,284) | (7,602) | (8,079) | (8,000) | (6,500) | (8,500) | (8,000) | (9,000) | (9,500) | (8,000) | (8,000) | (8,000) | (8,000) |
| Less Bad Debt Collected | 4,045 | 2,705 | 1,000 | 694 | 1,439 | 1,500 | 1,500 | 1,000 | 1,500 | 1,750 | 1,000 | 1,500 | 1,500 | 1,500 | 1,500 |
| Month To Month Fees | - | - | - | | 100 | - | - | - | - | - | - | - | - | - | - |
| Non Revenue Units - Models | - | - | (8,625) | (6,850) | (6,355) | (6,480) | (6,600) | (6,720) | (6,840) | (6,960) | (7,080) | (7,200) | (7,320) | (7,440) | (7,560) |
| Concessions - MIA | (23,219) | (12,065) | (27,728) | (29,101) | (23,780) | (20,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) |
| Rent Discounts | - | (1) | (1) | | (320) | - | - | - | - | - | - | - | - | - | - |
| Prepaid/(Delinquent) | 24,403 | (21,660) | - | (3,069) | 12,131 | (2,000) | (780) | (800) | (850) | (900) | (950) | (1,000) | (1,000) | (1,000) | (1,000) |
| Total Rental Income | 1,074,505 | 951,910 | 863,464 | 909,753 | 958,659 | 971,810 | 983,515 | 995,467 | 1,021,837 | 1,035,663 | 1,037,733 | 1,065,564 | 1,068,628 | 1,071,385 | 1,097,574 |
| Resident Related Income | 28,665 | 24,767 | 31,040 | 30,245 | 26,700 | 28,500 | 29,500 | 29,700 | 29,900 | 30,100 | 30,300 | 30,500 | 30,700 | 30,900 | 31,100 |
| Ancillary Income | 28,794 | 20,480 | 16,025 | 24,955 | 23,264 | 23,500 | 24,500 | 24,700 | 24,900 | 25,100 | 25,300 | 25,500 | 25,700 | 25,900 | 26,100 |
| Utility Reimbursements | 28,858 | 24,212 | 22,260 | 25,603 | 26,263 | 26,500 | 25,600 | 25,800 | 26,000 | 26,200 | 26,400 | 26,600 | 26,800 | 27,000 | 27,200 |
| Total Revenue | 1,160,822 | 1,021,369 | 932,789 | 990,556 | 1,034,886 | 1,050,310 | 1,063,115 | 1,075,667 | 1,102,637 | 1,117,063 | 1,119,733 | 1,148,164 | 1,151,828 | 1,155,185 | 1,181,974 |
| **Operating Expenses** | | | | | | | | | | | | | | | |
| Management Fee | 39,254 | 39,168 | 36,000 | 36,000 | 33,001 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| Administrative Expenses | 59,950 | 47,713 | 41,809 | 49,038 | 40,923 | 42,500 | 45,000 | 44,500 | 47,550 | 46,500 | 47,540 | 42,500 | 42,500 | 42,500 | 42,500 |
| Payroll and Benefits | 127,185 | 193,135 | 212,967 | 229,964 | 232,639 | 237,000 | 242,000 | 247,000 | 252,000 | 257,000 | 262,000 | 267,000 | 272,000 | 277,000 | 282,000 |
| Maintenance Expenses | 119,725 | 101,217 | 90,334 | 69,970 | 60,867 | 70,000 | 75,000 | 80,000 | 85,000 | 82,000 | 80,000 | 83,500 | 83,501 | 83,502 | 83,503 |
| Utilities | 77,702 | 67,142 | 75,782 | 70,240 | 72,136 | 72,500 | 73,500 | 74,500 | 75,500 | 76,500 | 77,500 | 78,500 | 79,500 | 80,500 | 81,500 |
| Total Operating Expenses | 423,816 | 448,375 | 456,892 | 455,212 | 439,566 | 458,000 | 471,500 | 482,000 | 496,050 | 498,000 | 503,040 | 507,500 | 513,501 | 519,502 | 525,503 |
| Taxes | 81,305 | 86,305 | 94,305 | 94,080 | 103,702 | 95,000 | 96,000 | 98,000 | 94,000 | 93,500 | 91,500 | 92,541 | 92,541 | 92,541 | 92,541 |
| Insurance | 15,860 | 18,653 | 19,519 | 19,987 | 21,817 | 19,900 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Total Expenses | 520,981 | 553,333 | 570,716 | 569,279 | 565,085 | 572,900 | 587,500 | 600,000 | 610,050 | 611,500 | 614,540 | 620,041 | 626,042 | 632,043 | 638,044 |
| Total Net Operating Income | 639,841 | 468,036 | 362,073 | 421,277 | 469,801 | 477,410 | 475,615 | 475,667 | 492,587 | 505,563 | 505,193 | 528,123 | 525,786 | 523,142 | 543,930 |
| Capital Improvements | 52,888 | 64,178 | 223,027 | 48,299 | 51,478 | 50,000 | 65,000 | 45,000 | 47,500 | 50,000 | 52,850 | 50,410 | 50,410 | 50,410 | 50,410 |
| Non-Recurring Costs | 153 | 17,930 | 37,069 | 18,128 | (18,185) | 16,000 | 16,000 | 15,000 | 14,000 | 14,000 | 14,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Total Cash Flow Before Debt Service | 586,800 | 385,928 | 101,977 | 354,850 | 436,508 | 411,410 | 394,615 | 415,667 | 431,087 | 441,563 | 438,343 | 462,713 | 460,376 | 457,732 | 478,520 |
| Debt Service | 343,438 | 254,593 | 172,931 | 184,190 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 | 219,000 |
| Unsecured Creditor Payment | - | - | - | - | - | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 |
| Total Net Cash Flow | 243,362 | 131,335 | (70,954) | 170,660 | 217,508 | 156,410 | 139,615 | 160,667 | 176,087 | 186,563 | 183,343 | 207,713 | 205,376 | 202,732 | 223,520 |
| Partnership Expenses | - | 5,900 | 539 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Net Income** | 243,362 | 125,435 | (71,493) | 170,660 | 217,508 | 156,410 | 139,615 | 160,667 | 176,087 | 186,563 | 183,343 | 207,713 | 205,376 | 202,732 | 223,520 |

Created on: 08/08/2011 01:51 PM